## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**NATIONAL REPUBLICAN
SENATORIAL COMMITTEE, *et al.*,**

        **Plaintiffs,**              **Case No. 1:22-cv-639**

        **v.**                  **JUDGE DOUGLAS R. COLE**

**FEDERAL ELECTION
COMMISSION, *et al.*,**

        **Defendants.**

### OPINION AND ORDER

The National Republican Senatorial Committee (NRSC), along with the National Republican Congressional Committee (NRCC), Senator J.D. Vance, and former Representative Steve Chabot, have moved to certify the following constitutional question to the en banc court of the United States Court of Appeals for the Sixth Circuit: "Whether the limits on coordinated party expenditures in 52 U.S.C. § 30116 violate the First Amendment, either on their face or as applied to party spending in connection with 'party coordinated communications' as defined in 11 C.F.R. § 109.37." (Doc. 20, #215). For the reasons stated more fully below, the Court **GRANTS** Plaintiffs' Motion to Certify Question to the En Banc Court of Appeals (Doc. 20).

### BACKGROUND

Plaintiffs sued the Federal Election Commission and each of its Commissioners in their official capacities (collectively, the FEC) seeking to enjoin the FEC from enforcing the provisions found in § 315 of the Federal Election Campaign Act of 1971

(FECA), as amended, 52 U.S.C. § 30116. These challenged provisions limit a party committees' campaign expenditures made in coordination with political candidates who are associated with the political party. According to Plaintiffs, this limitation on their coordinated expenditures unconstitutionally abridges their First Amendment rights. (Compl., Doc. 1). Review of Plaintiffs' cause of action is governed by § 310 of the FECA, 52 U.S.C. § 30110:

> The Commission, the national committee of any political party, or any individual eligible to vote in any election for the office of President may institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act. The district court immediately shall certify all questions of constitutionality of this Act to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc.

After this lawsuit was filed, the FEC moved to dismiss or to transfer the case on the basis of an improper venue, (Doc. 10), which motion the Court ultimately denied. (Doc. 18). Following the determination that the case was properly docketed in this Court, Plaintiffs moved to certify their First Amendment challenge to the en banc court of the United States Court of Appeals for the Sixth Circuit pursuant to § 310 of the FECA. (Doc. 20). In support of their motion, Plaintiffs argued that their proposed constitutional question was not an insubstantial or wholly frivolous legal question. (Doc. 21, #226–27). They acknowledged that the Supreme Court sustained the coordinated expenditure limits against a First Amendment challenge—the constitutional challenge Plaintiffs mount today—in *Federal Election Commission v. Colorado Republican Federal Campaign Committee* (*Colorado II*), 533 U.S. 431 (2001). (Doc. 21, #227). But they contend that *Colorado II* is distinguishable and that

2

even if it did govern this dispute, its reasoning is undermined by subsequent Supreme Court precedent. (*Id.* at #227–30). In support of their motion for certification, Plaintiffs attached a proposed set of undisputed facts for the Court to certify as part of the record the Sixth Circuit would review. (Doc. 21-1).

The FEC at first opposed this motion in full. Citing relevant examples from other courts, the FEC argued, in relevant part, that although § 310 of the FECA required "immediate[]" certification of all constitutional questions, the Court was required to permit the parties to engage in discovery to develop a complete record for the Sixth Circuit's review. (Doc. 26, #315–20). Responsive to the FEC's concerns, the Court held a telephone status conference with the parties on August 1, 2023, to discuss issues related to discovery. (8/1/23 Min. Entry). Based on this conference, the Court proposed an expedited discovery schedule, which would permit the parties to develop the record and to produce experts and expert reports before the Court ruled on the pending motion to certify. (8/1/23 Not. Order).

After the parties conducted discovery, they each filed dueling proposed findings of fact. The FEC's 339-paragraph proposed findings of fact (Doc. 43) relied on 178 exhibits filed with this Court, which span nearly 4,000 pages, (Docs. 36–40, 42). As explained further below in the Court's discussion of the factual record it is certifying to the Sixth Circuit, *see infra* Part D, the vast majority of these proposed findings of "fact" actually involve legal conclusions, quotations from historical sources that are editorialized, and citations to other public news or book sources. Plaintiffs, on the other hand, expanded the scope of their initial proposed findings of fact, adding some

81 paragraphs and additional citations to 12 exhibits of materials that were produced during the expedited discovery—materials spanning over 800 pages. (Doc. 44, #5245). Similar to the FEC's proposed findings, Plaintiffs' additional proposed findings of fact largely state legal conclusions and incorporate policy arguments that support their legal position here.

Concerned about the type of "facts" the parties requested the Court to certify, the Court held a telephone status conference on November 30, 2023. (11/30/23 Min. Entry). During this status conference, the Court shared its concerns about the legal conclusions and argumentation in the parties' filings, and the evidentiary issues, such as hearsay, occasioned by many of the sources the parties quoted as the basis for their "facts." (*Id.*). Due to such concerns, the Court requested supplemental briefing from the parties. The parties were asked to provide simultaneous supplemental briefing regarding the appropriate scope of the factual record the Court was to certify, and that responded directly to the opposing side's proposed findings of fact. (*Id.*) The parties filed their briefs in response to this request on December 15, 2023. (Docs. 46, 47).

At the November 30, 2023, conference, the Court also requested that the FEC provide an updated response to the motion to certify now that expedited discovery had been completed, with Plaintiffs to file any reply thereafter. (11/30/23 Min. Entry). The FEC responded in partial opposition to the motion to certify. (Doc. 45). Although the FEC no longer opposes certification, it argues that the Court should dismiss Chabot for want of Article III jurisdiction, strike the portion of Plaintiffs' proposed

certification question that purportedly challenges an FEC's regulation as outside the scope of § 310 of the FECA, and narrow the scope of the certified question by adding a qualifier—"as a matter of Sixth Circuit law"—to the proposed constitutional question. (*Id.* at #5293, 5297–98, 5303–04). Plaintiffs then replied. (Doc. 48).

The matter is now ripe for the Court's review.

## LEGAL STANDARD

As noted, Plaintiffs' motion is governed by § 310 of the FECA, 52 U.S.C. § 30110. Under the plain text of that provision, this Court "immediately shall certify all questions of constitutionality of th[e] [FECA] to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc." But there are limits on the immediacy of this mandate. As with any other case that comes before an Article III court, there must be a 'case' or 'controversy' for the Court to adjudicate. *Cal. Med. Ass'n v. Fed. Election Comm'n*, 453 U.S. 182, 192 n.14 (1981) ("A party seeking to invoke [§ 310 of the FECA] must have standing to raise the constitutional claim."). A district court presented with a question for certification also must evaluate whether the question raises a "frivolous" issue or poses a "purely hypothetical application[] of the statute." *Id.* In making its assessment of the proposed constitutional questions to certify, the Court is also "[em]power[ed], and apparently [has] the duty, to identify the constitutional issues and to reframe the question as necessary so that any proper non-frivolous question is certified to the en banc Court of Appeals." *Libertarian Nat'l Comm., Inc. v. Fed. Election Comm'n*, 930 F. Supp. 2d 154, 168–69 (D.D.C. 2013) (collecting appellate caselaw approving of district courts'

reframing constitutional questions). Finally, the Court must establish an adequate factual record on which the court of appeals may rely when evaluating the constitutional question certified. *Cal. Med. Ass'n*, 453 U.S. at 192 n.14.

## LAW AND ANALYSIS

The Court proceeds as follows. First, it turns to whether Plaintiffs have standing to bring this First Amendment challenge to the FECA's limits on coordinated party expenditures—a necessary prerequisite to reaching the other issues raised by their motion to certify as it implicates the Court's subject matter jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). Concluding that the Plaintiffs indeed do have standing, the Court next turns to the proposed question to be certified to evaluate whether it raises a frivolous issue. This is the logical next step, as the Court need not evaluate any other questions if there is no need to certify the question to the Sixth Circuit—a finding against Plaintiffs would dispose of their motion. Because the Court finds Plaintiffs raise a non-frivolous constitutional question, the Court next evaluates the FEC's arguments that the question should be modified or narrowed. And finally, after conducting that analysis, the Court then turns to the question of the factual record to be delivered with the certified constitutional question to the en banc court. This is the proper concluding step because, once the Court has the legal issues properly framed, it may make an informed decision about what adjudicatory facts are relevant and should form the

basis of the factual record to be delivered to the Sixth Circuit sitting en banc.[1]
*Libertarian Nat'l Comm.*, 930 F. Supp. 2d at 171.

## A.    Standing

As standing implicates the Court's subject matter jurisdiction over this case
under Article III § 2 of the Constitution, the Court starts there. *TransUnion LLC v.
Ramirez*, 594 U.S. 413, 423 (2021). To demonstrate standing, "a plaintiff must show
(i) that he suffered an injury in fact that is concrete, particularized, and actual or
imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the
injury would likely be redressed by judicial relief." *Id.* Both parties seemingly agree
that three Plaintiffs, Senator Vance and the two committee plaintiffs, have standing
to prosecute this suit. (Doc. 45, #5302; Doc. 48, #5446). They just dispute whether
Chabot has standing to sue. (*Compare* Doc. 45, #5293–97, *with* Doc. 48, #5447). But,
as standing is jurisdictional, the parties' agreement as to standing is irrelevant—the

---

[1] Contrary to the FEC's intimation that a factual record must be established prior to
evaluating frivolousness, (*see* Doc. 26, #314–15; Doc. 45, #5291), there is no such required
order of operations in the caselaw. *Buckley v. Valeo*, 519 F.2d 817, 818 (D.C. Cir. 1975) (en
banc) (per curiam) (directing the district court to "[i]dentify [the] constitutional issues" *prior
to* "[m]ak[ing] findings of fact with reference to those issues"); *Mariani v. United States*, 212
F.3d 761, 767 (3d Cir. 2000) (en banc) (noting that the district court evaluated frivolousness
before making findings of fact); *Libertarian Nat'l Comm.*, 930 F. Supp. 2d at 171 (certifying
the proposed constitutional question before making "findings of fact, limited to those facts
*potentially relevant to the question certified*" (emphasis added)). Certainly, findings of fact
might be relevant to assess whether a constitutional challenge is frivolous if the challenge
relates to "unanticipated variations [in the factual landscape that] may deserve the full
attention of the appellate court" even after "a core provision of [the] FECA has been reviewed
and approved by the courts." *Goland v. United States*, 903 F.2d 1247, 1257 (9th Cir. 1990).
But seeing as the Court finds the relevant change in the landscape permitting this
constitutional challenge to be certified is purely legal—shifts in the Supreme Court's analysis
of what is a proper justification for campaign finance laws and recent amendments to § 315
of the FECA—a factual record is not necessary here to assess frivolousness. *See infra* Part B.
Moreover, as noted, the Court can make informed findings of fact only once it has determined
what question is being certified to the Sixth Circuit.

Court has an independent obligation to assure itself it has subject matter jurisdiction over the dispute. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). Here, it is clear at least one individual plaintiff and one party committee has standing to sue. *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 278 n.4 (6th Cir. 1997) (explaining that while only one plaintiff with standing is necessary for justiciable claims to proceed, that applies solely to plaintiffs whose "position[s] [are] identical" with respect to their claimed injury in fact, and analyzing distinct sets of plaintiffs grouped based on their alleged injuries in fact (quoting *Sec'y of the Interior v. California*, 464 U.S. 312, 319 n.3 (1984)).

For the individual plaintiffs, consider Senator Vance's standing. He is a current sitting Senator who has expressed intent to run for re-election in 2028 and has started to raise campaign contributions in support of that run. (Doc. 41-6, #4715). Senator Vance declares that the legal threat imposed by FECA's coordinated expenditure limits has led to his campaign's limited interaction with the Republican Party as a whole and that without such limits he would "work[] in greater cooperation with the NRSC ... to make more efficient and effective use of party resources in support of Vance's campaign." (Doc. 41-6, #4717). For example, he would in the future "work with his party in furtherance of a greater number of coordinated public communication advertisements supporting his campaign." (*Id.* at #4717–18). Namely, the evidence shows that Senator Vance is preparing for a 2028 election run and that but for the coordinated expenditure limits he would organize his campaign to work in greater cooperation with the NRSC. (*Id.* at #4713–14). This constitutes a concrete

injury in fact: Senator Vance has materially changed his behavior because of the FECA's coordinated expenditure limits that, if his First Amendment analysis is correct, "ha[s] restricted … [his] political activities … and has limited [his] ability to associate" with political parties and their committees in the manner he wishes. *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 544 (6th Cir. 2014); *Magaw*, 132 F.3d at 279 (holding that an injury sufficient to maintain an action for declaratory relief exists "when a statute imposes costly, self-executing compliance burdens or … chills protected First Amendment activity" (cleaned up)).

In addition, because the FEC can enforce these provisions under § 306 of the FECA, 52 U.S.C. § 30106(b)(1), Senator Vance's injury is fairly traceable to the FEC's actions.[2] (Doc. 41-6, #4713 (noting "the risk of enforcement for a violation of th[e FECA's] limits" as the reason for Senator Vance's change in behavior)). And a judicial ruling sustaining Senator Vance's First Amendment challenge would certainly redress his injury as it would permit him to take the desired actions currently forbidden by existing law. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992) (When "the plaintiff is himself an objection of the action … at issue[,] … there is ordinarily little question that the action … has caused him injury, and that a judgment preventing … the action will redress it."). So Senator Vance has established standing to prosecute this First Amendment challenge to the FECA.

---

[2] *See, e.g.*, First General Counsel's Report, MUR 7826 – Iowa Democratic Party & Theresa Greenfield for Iowa, MUR 7862 – Iowa Democratic Party & Rita Hart for Iowa, Federal Election Commission 16–19, 22 (June 16, 2021), https://perma.cc/D4LW-9FQG (discussing the investigation and analysis leading the FEC's General Counsel's Office to recommend that the FEC find that two candidates' campaign committees knowingly accepted monies exceeding the FECA's coordinated party expenditure limits during the 2020 election cycle).

For the committee plaintiffs here, take the NRSC. Discovery demonstrates that the NRSC makes coordinated party expenditures up to the FECA's limit but has a desire to expend more monies in support and in conjunction with senatorial candidates in excess of those limits. (Doc. 41-1, #4040–44). The NRSC also declares that it has self-limited its coordinated expenditures below the FECA's express limit to avoid investigations and fines on account of unexpected costs arising at a later date. (*Id.* at #4041). And to ensure compliance with the FECA's limit, the NRSC has established a fire-walled independent expenditure unit that operates independent of the NRSC but diverts funding the NRSC declares it would have spent on other ventures—all but for the binding expenditure limits. (*Id.* at #4042–43). So the NRSC declares that the FECA's coordinated expenditure limits, which are enforced by the FEC under § 306 of the FECA, 52 U.S.C. § 30106(b)(1), (1) has caused it to suffer a pocket-book injury by expending financial resources in excess of what it would otherwise spend on setting up and funding an independent expenditure unit, and (2) has directly barred the NRSC from taking actions it otherwise would have taken (i.e., spending more money in coordination with specific senatorial candidates). The NRSC's pocket-book injury and that the FECA's limits prevent the NRSC from acting beyond its scope are clearly injuries that satisfy the injury-in-fact element of standing. *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021) (holding that an agency's action causing the petitioners to suffer a financial injury constitutes a "pocketbook injury [that] is a prototypical form of injury in fact"); *Lujan*, 504 U.S. at 561–62.

And as noted above, the FEC is the exclusive enforcer of the FECA, which means the NRSC's injury in fact is self-evidently fairly traceable to the FEC's real threat of investigation and enforcement of the coordinated party expenditure limits.[3] (Doc. 41-1, #4047, 4051–52). And again, a judicial determination that the limits unconstitutionally impinge on NRSC's First Amendment rights would remedy this injury, as it would permit NRSC to engage in its desired actions that are currently forbidden by § 315 of FECA. *Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 716 (6th Cir. 2015) ("It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of a suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress." (quoting *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC) Inc.*, 528 U.S. 167, 185–86 (2000))). Thus, NRSC has standing to bring this constitutional challenge to the FECA.

With that, the Court need not tread any further.[4] The other plaintiffs, Chabot and the NRCC, bring exactly the same legal challenge to § 315 of the FECA and are similarly situated with respect to the claimed injuries in fact. Both plaintiffs who

---

[3] *E.g.*, Final Audit Report of the Commission on the Republican Party of Minnesota – Federal, Attachment to First General Counsel's Report in Audit Referral 22-01, Federal Election Commission, at 7, 30–36 (June 30, 2022), https://perma.cc/PH7R-CQDA (discussing an investigation into coordinated party expenditures alleged to be in excessive of the limits established by the FECA by the Minnesota Republican party to Minnesotan candidates for the United States House of Representatives in the 2018 election).

[4] Although no party objected, the Court briefly notes that Plaintiffs all satisfy § 310's statutory standing requirement that the private parties bringing suit must either be "the national committee of any political party[] or an[] individual eligible to vote in any election for the office of President." (Doc. 1 ¶¶ 13–16, #5–7; Doc. 19-1, #174–75; Doc. 19-2, #184; Doc. 19-3, #194).

were candidates for office were prevented from accepting monies in support of the campaign in excess of the FECA's limits as they wanted. (Doc. 41-6, #4713; Doc. 41-7, #4746, 4750). And both political committees limited their coordination activities preventing them from expending more than the FECA's limits as they intended to do. (Doc. 41-1, #4050; Doc. 41-2, #4104). Under binding caselaw, "[w]hen one party has standing to bring a claim, the identical claims brought by other parties to the same lawsuit are justiciable." *Ne. Ohio Coal. For the Homeless v. Husted*, 837 F.3d 612, 623 (6th Cir. 2016); *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 827 n.1 (2002) (agreeing with the district court that because the respondent "ha[d] standing, [the court] need not address whether [another party] also ha[d] standing"). The same rule applies when a defendant objects that the cause is moot with respect to one of the plaintiffs. *T.M. ex rel. H.C. v. DeWine*, 49 F.4th 1082, 1087 n.3 (6th Cir. 2022) ("But where, as here, at least one plaintiff remains with a justiciable claim, we need not settle the mootness question before the merits."). So, considering the Court's statutory mandate to certify the constitutional issue to the Sixth Circuit "immediately" under § 310 of the FECA, 52 U.S.C. § 30110, the Court declines at this stage of the litigation to analyze whether the FEC is correct that Chabot lacks standing or, in the alternative, that his claim is moot.[5]

---

[5] Of course, the FEC is free to raise this jurisdictional issue in this Court once appellate review has been exhausted. The simple point is that a determination whether Chabot has standing to sue is not necessary at this time given that Senator Vance—a plaintiff in an "identical" position to Chabot with respect to the alleged injury in fact—has justiciable claims that can proceed to the merits. *Sec'y of Interior v. California*, 464 U.S. at 319 n.3.

## B. Frivolousness

Next, the Court must assess whether the proposed question to be certified to the court of appeals is frivolous. *Cal. Med. Ass'n*, 453 U.S. at 192 n.14. As a reminder, Plaintiffs request the Court certify the following question: "Whether the limits on coordinated party expenditures in 52 U.S.C. § 30116 violate the First Amendment, either on their face or as applied to party spending in connection with 'party coordinated communications' as defined in 11 C.F.R. § 109.37." (Doc. 20, #215). The Supreme Court did not fully articulate the standard to use to assess frivolousness under § 310 of the FECA. But it cited with approval two cases applying slightly distinct frameworks.

The first case the Supreme Court cited employed the frivolousness standard applicable to in forma pauperis cases under the Prison Litigation Reform Act (PLRA), 28 U.S.C. § 1915(e). *Cal. Med. Ass'n*, 453 U.S. at 192 n.14 (citing *Gifford v. Cong.*, 452 F. Supp. 802, 804 (E.D. Cal. 1978)); *Mariani v. United States*, 212 F.3d 761, 769 (3d Cir. 2000) (en banc) ("The [*California Medical* Supreme] Court cited with approval a district court decision from an *in forma pauperis* action that employed the standard from the *in forma pauperis* statute, 28 U.S.C. § 1915(e)(2)(B), to determine whether a challenge to FECA was frivolous."). Under the PLRA standard, a legal issue is deemed to be frivolous if it lacks "an arguable basis either in law or in fact." *Williams v. Parikh*, No. 1:23-cv-167, 2023 WL 8824845, at *13 (S.D. Ohio Dec. 21, 2023) (citation omitted).

The other case the Supreme Court cited used the "substantial federal question" standard. *Cal. Med. Ass'n*, 453 U.S. at 192 n.14 (citing *Cal. Water Serv. Co. v. City of*

13

*Redding*, <u>304 U.S. 252, 254</u>–55 (1938)). That standard previously governed whether a three-judge district court had subject-matter jurisdiction to adjudicate a constitutional challenge to a state law under previous iterations of the Judiciary Act. *Cal. Water Serv. Co.*, <u>304 U.S. at 254</u>. According to the Court, a case presents a substantial federal question unless the claim "is obviously without merit or because its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject." *Id.* at 255.

Although those standards are distinct, they both aim in the same direction: ascertaining whether the legal issues a case presents have arguable merit that warrants review by the court of appeals. And such arguable merit can exist even if the suit challenges existing Supreme Court precedent. *Holmes v. FEC*, <u>823 F.3d 69, 73</u>–74 (D.C. Cir. 2016). The key then is for this Court to determine whether the challenge is wholly baseless or whether it has some merit (even if the claim faces an uphill battle against existing precedent).

So what does that say about the proposed constitutional challenge at issue? Plaintiffs seek to challenge the FECA's coordinated expenditure limits, claiming they unconstitutionally infringe on their First Amendment rights. At first blush, this seems directly foreclosed by existing precedent—*Colorado II*. There, the respondents had "claim[ed] that *all limits* on expenditures by a political party in connection with congressional campaigns are facially unconstitutional and thus unenforceable even as to spending coordinated with a candidate"—a contention the Supreme Court "reject[ed]" because it found that "coordinated expenditures, unlike expenditures

14

truly independent, may be restricted to minimize circumvention of contribution limits." <u>533 U.S. at 437</u>, <u>465</u>. The Supreme Court's rejection of that facial challenge in *Colorado II* would seem to dispose of what is essentially the same legal challenge here: Plaintiffs claim "any coordinated party expenditure limits ... violate the First Amendment's guarantees of freedom of speech and freedom to associate with others," (<u>Doc. 1</u> ¶ 99, #25). Plaintiffs, though, contend that *Colorado II* should not govern because the legal backdrop has changed and because they present new arguments not previously raised before the *Colorado II* court. (<u>Doc. 21</u>, #250–53).

Plaintiffs' attempt to get around *Colorado II* faces a significant uphill battle. *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, <u>490 U.S. 477, 484</u> (1989) ("If a precedent of th[e Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). But regardless whether Plaintiffs ultimately succeed, the Court finds that Plaintiffs' constitutional challenge is non-frivolous even if *Colorado II* squarely applies. That is because Plaintiffs are correct to highlight the change in tide in First Amendment campaign finance caselaw since *Colorado II*.

The Supreme Court has narrowed its focus on the ends towards which Congress can act when enacting campaign finance laws: "the prevention of *quid pro quo* corruption or its appearance." *Fed. Election Comm'n v. Cruz*, <u>596 U.S. 289, 305</u> (2022); *id.* ("We have consistently rejected attempts to restrict campaign speech based on other legislative aims," such as "reduc[ing] the amount of money in politics,"

"equalizing candidate resources," and "limit[ing] the general influence a contributor may have over an elected official."). This narrowing creates, at the very least, tension with *Colorado II*'s reasoning, which presumed that Congress could enact campaign finance laws to respond to political corruption "understood not only as *quid pro quo* agreements, but also as undue influence on an officeholder's judgment, and the appearance of such influence." 533 U.S. at 441; *see McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 239–40 (2014) (Breyer, J., dissenting) (citing *Colorado II* and characterizing its definition of the type of corruption that can justify campaign finance regulations as "considerably broader" than just quid pro quo corruption). Because the *Colorado II* Court employed a broader definition, Plaintiffs are correct that their challenge raises a serious legal question with arguable merit: the Supreme Court may reasonably reach a different result if presented with the same challenge to the coordinated expenditure limits but with its analysis narrowly focused on analyzing whether such limits are justified by combatting only quid pro quo corruption or its appearance.

In addition, legislative amendments since *Colorado II* could alter the scrutiny calculus the Supreme Court might employ to determine whether the limits are "closely drawn"—the fit between the law and its objective or, put differently, whether the law employs "a means narrowly tailored to achieve" its objective. *McCutcheon*, 572 U.S. at 218 (per curiam) (cleaned up). In 2014, Congress amended § 315 of the FECA to exempt "segregated account[s] of a national committee of a political party" from the coordinated expenditure limits when such accounts are used to "defray

expenses incurred with respect to a presidential nominating convention, … the construction, purchase, renovation, operation, and furnishing of … headquarters buildings of the party, … [or] the preparation for and the conduct of election recounts and contests." 52 U.S.C. § 30116(a)(9), (d)(5). Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, 128 Stat. 2130, 2772–73, Div. N, § 101 (2014). This differential treatment between coordinated expenditures related to candidates for political office and coordinated expenditures spent on presidential nominations, election recounts, and a party's brick-and-mortar infrastructure implicates whether such a closely drawn fit exists. At the very least, the government will need to explain the legally significant difference between the risk of quid pro quo corruption or its appearance when coordinated expenditures are spent on individual campaigns rather than, for example, election recounts and related legal proceedings for § 315 of the FECA to withstand scrutiny. As this exemption was not extant at the time the Supreme Court decided *Colorado II*, the new exemption is another variable that will need to play into the "closely drawn" scrutiny of these expenditure provisions. (Doc. 21, #251 (arguing that this added exception "render[s] FECA's coordinated party expenditure limits fatally underinclusive")).

Simply, the change in the legal landscape ensures Plaintiffs' challenge is not frivolous, even assuming *Colorado II* governs. The Supreme Court has narrowed the justifications the government can use to defend its limits. And Congress has altered the rules permitting additional exceptions to the expenditure limits that affect the narrow tailoring of the specific regulations currently in force. Essentially, Plaintiffs

have highlighted legal changes that may affect the potential analysis of these provisions. As a result, their proposed constitutional issue is non-frivolous and based in an arguably meritorious challenge to the existing legal framework. *Holmes*, 823 F.3d at 74–76 (reversing the district court's denial of a motion to certify a First Amendment challenge to the FECA premised on the supposition that the issue was previously resolved by the Supreme Court in *Buckley v. Valeo*, 424 U.S. 1 (1976), because the court of appeals found that *Buckley* had not addressed the issue at any serious length, which suggests that the issue had not been truly settled).

And though no party argued or suggested that this dispute raised a "purely hypothetical application[] of the statute," *Cal. Med. Ass'n*, 453 U.S. at 192 n.14, the Court notes, as is its duty, that this is not such a challenge. As detailed in the standing analysis above, Plaintiffs have put forward evidence that the committees have materially altered their behavior to ensure compliance with the coordinated expenditure limits but would exceed those limits if permitted. (Doc. 41-1, #4050; Doc. 41-2, #4104). And, at the very least, Senator Vance had put forward evidence that he would alter his campaign strategy for 2028 if permitted to coordinate on expenditures above the FECA's limit. (Doc. 41-6, #4713–14, 4717–18). Moreover, the FEC has a demonstrated history of, at a minimum, investigating these alleged violations, which raises the specter of penalties if the FEC decides to prosecute any alleged offense. *See supra* notes 2, 3. Given these tangible risks of harm and the resulting material change in Plaintiffs' position, the challenge is not hypothetical—it is very much concrete.

For these reasons, the question should be certified to the United States Court of Appeals for the Sixth Circuit sitting en banc.

## C.    The Question to Be Certified

Now, turn to the precise contours of the actual question to be certified. Plaintiffs ask that the certified question be framed as follows: "Whether the limits on coordinated party expenditures in 52 U.S.C. § 30116 violate the First Amendment, either on their face or as applied to party spending in connection with 'party coordinated communications' as defined in 11 C.F.R. § 109.37." (Doc. 20, #215). The FEC raises two challenges to the proposed question and suggests two corresponding revisions. (Doc. 45, #5285). First, quoting the relevant language from § 310 of the FECA authorizing "certif[ication] [of] all questions of constitutionality of th[e] [FECA]," 52 U.S.C. § 30110, the FEC argues that the Court should strike the second half of Plaintiffs' proposed certified question that references the FEC's implementing regulation defining "party coordinated communications." (Doc. 45, #5297–303). Second, the FEC contends that the Court should insert the caveat "as a matter of Sixth Circuit law" into the question so that the en banc court "address[es] only Sixth Circuit law" when evaluating the certified question. (Doc. 45, #5303–07). Take each in turn.

### 1.    Regulatory Objection

The FEC first contends that Plaintiffs are trying to sneak a regulatory challenge into the certified question, which is beyond the scope of the FECA's judicial

review provision.[6] The FEC is correct on the law insofar as it argues that § 310 does not permit the district court to certify constitutional challenges to FEC *regulations* to the Sixth Circuit. The plain text of § 310 refers only to "questions of constitutionality of this Act"—the FECA—or "any provision" thereof. But that a question includes a reference to FEC regulations is not enough, in and of itself, to suggest that the challenge is not properly within the scope of the judicial review provision. *See In re Cao*, 619 F.3d 410, 418 (5th Cir. 2010) (analyzing a constitutional challenge to the coordinated expenditure limits by "read[ing the FECA] in light of the FEC regulations that implement the statute"). Rather, the dividing line between inappropriate and appropriate challenges is whether the challenge is "a consequence of the Commission's regulations" rather than the FECA itself. *Holmes*, 823 F.3d at 76.

---

[6] Both parties appear to treat this provision as jurisdictional. (Doc. 45, #5299; *see* Doc. 48, #5448–49). The Court agrees that § 310 vests jurisdiction in "the appropriate district court" over "such actions … to construe the constitutionality of any provision of this Act." However, it is less clear that the portion of § 310 governing certification is also jurisdictional in nature. The certification provision is mandatory and is directed at the scope of the review of the en banc court of appeals. But neither feature is a distinctive mark of a jurisdictional provision. *Santos-Zacaria v. Garland*, 598 U.S. 411, 420 (2023). And the provision commands that the Sixth Circuit will "hear *the matter* sitting en banc." 52 U.S.C. § 30110 (emphasis added). The term "matter" does not clearly take the antecedent "all questions of constitutionality," as it could also take the broader antecedent "actions … to construe the constitutionality" of the FECA, which is located in the prior sentence in § 310. *Id.*; *cf. Gonzalez v. Thaler*, 565 U.S. 134, 145–48 (2012) (holding that a provision governing certificates of appealability over habeas decisions requiring the certificate to indicate those legal issues for which the petitioner had made a "substantial showing of the denial of a constitutional right" was a non-jurisdictional rule governing the scope of review even though the command was mandatory and directed at the courts and even though, under another provision in the same subsection, the issuance of a certificate was a jurisdictional prerequisite to the court of appeals' jurisdiction over a habeas appeal). But the Court need not answer that question today. Regardless whether certification of constitutional questions under § 310 of the FECA is jurisdictional or simply a mandatory rule governing only the scope of the en banc court of appeals' review, the FEC's regulatory objection is properly raised and will be addressed by the Court in this Section. *Gonzalez*, 565 U.S. at 146. And as the Court explains, the Court finds that the objection lacks merit.

Reviewing just the portion of Plaintiffs' proposed certified question referencing the FEC's regulations—that is to say, Plaintiffs' as-applied challenge—reveals that Plaintiffs are directing this constitutional challenge at *the FECA's* coordinated party expenditure limits, not any particular regulation. Plaintiffs' as-applied challenge asks the Sixth Circuit to resolve "[w]hether *the limits on coordinated party expenditures in 52 U.S.C. § 30116* violate the First Amendment … as applied to party spending in connection with 'party coordinated communications.'" (Doc. 20, #215 (emphasis added)). In other words, Plaintiffs challenge the FECA's imposition of limits on specific forms of communications that they believe unconstitutionally abridge their First Amendment rights. This constitutional challenge is squarely aimed at the statute itself.

What of the reference to 11 C.F.R. § 109.37 in the proposed certified question (omitted above to illustrate the focus of the legal question)? That regulation—entitled "What is a 'party coordinated communication'?"—helpfully (and unsurprisingly, given its title) defines a specific category of communications covered by the coordinated party expenditure limits. Naturally, Plaintiffs included the citation to define what is meant by the term "party coordinated communications." In fact, Plaintiffs made this point express by including "as defined in 11 C.F.R. § 109.37" in their proposed question. (Doc. 20, #215). But the citation to the regulations is not an indirect way to challenge constitutionality of the regulation itself. A different result may obtain if, for example, Plaintiffs were contending that the regulation is a content-based restriction on speech that fails strict scrutiny because how 'party coordinated

communication' is defined regulates expressive activity based on its subject matter. But that is not the challenge here. Instead, Plaintiffs merely reference a category of covered conduct that they claim cannot be restricted by the FECA's coordinated party expenditure limits consonant with the First Amendment. That is a constitutional challenge to the statute: the complained of restriction on Plaintiffs' actions—the limits on expenditures—is "traceable to the operation of [the] [FECA] itself." *Cruz*, 596 U.S. at 301–02 (holding that the special judicial review provisions of the Bipartisan Campaign Reform Act of 2002 were properly invoked because the constitutional challenged "the FEC's threatened enforcement of the [statute's] loan-repayment limitation, through its implementing regulation").

Moreover, while the FEC maintains that this is a regulatory challenge, it does not really explain *why* it believes so other than making conclusory assertions to that effect. (*E.g.*, Doc. 45, #5299 (asserting that "[P]laintiffs have unambiguously challenged the Commission's 'party coordinated communication' regulation.")). The force of its argument seems to be that because the certified question cites 11 C.F.R. § 109.37, it must be a regulatory, not a statutory, challenge. But as noted above, the reference to a regulation is not dispositive. *In re Cao*, 619 F.3d at 418 (relying on FEC regulations to reject a constitutional overbreadth challenge to the FECA). The closest the FEC comes to providing an actual reason the Court should agree with its position is the assertion that "[P]laintiffs make multiple arguments that are consistent with a separate regulatory challenge independent of the FECA's text." (Doc. 45, #5300). But other than cherry-picking statements from Plaintiffs' Complaint and Motion to

Certify that merely summarize Plaintiffs' understanding of how the regulations operate in this area (as opposed to arguments about the legal or constitutional validity of the regulations themselves), the FEC does not provide meaningful explanations why it believes that Plaintiffs' challenge, as made manifest in the proposed certified question, is to the constitutional infirmity of an FEC regulation. In fact, the FEC cites language from Plaintiffs' papers that suggests the exact opposite. For example, the FEC notes that "[P]laintiffs charge that 'more appropriately tailored alternatives to coordinated party expenditure *limits* exist'" and that "*the limits* are unconstitutional as applied to party spending in connection with 'party coordinated communications.'" (*Id.* (quoting Doc. 1 ¶ 102, #26 and Doc. 21, #33) (emphases added)). Both quotations reveal that Plaintiffs' claims go to the constitutional validity of the FECA's *limits*, not the FEC regulation that defines the term "party coordinated communications."

And that renders Plaintiffs' as-applied challenge here unlike the cases the FEC cites in which courts found the plaintiff to be raising purely regulatory challenges. (*Id.* at #5298, 5300–01). For example, *Holmes* involved Fifth Amendment challenges to the "timing" and "transfer" of campaign funds, which had to be purely regulatory challenges because "the Act [wa]s silent on both subjects." 823 F.3d at 75–76; *cf. McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 223 (2003) (noting that some of plaintiffs' claims "alleg[ing] constitutional infirmities [] found in the implementing regulations" themselves "must be pursued in a separate proceeding" and were "not ripe"), *overruled on other grounds by Citizens United v. Fed. Election Comm'n*, 558

U.S. 310 (2010). And *Bluman* involved a purely regulatory challenge because the implementing regulation imposed its own "prohibit[ion on] specific types of election-related activities," which meant the plaintiff was challenging the validity of a legal restriction that did not stem from the operation of the statute. *Bluman v. Fed. Election Comm'n*, 766 F. Supp. 2d 1, 4 (D.D.C. 2011).

Here, the challenged limits—whether as applied to some or all forms of coordinated expenditures—are dictated by § 315 of the FECA. And as such, Plaintiffs' constitutional arguments (for both challenges) that those limits violate the First Amendment are properly understood as constitutional claims implicating the FECA. So the proposed question, even with its citation to a regulatory definition, is well within the bailiwick of the FECA's judicial review provision. That means there is no need to revise the proposed certified question in the first manner the FEC proposes.

### 2.      The FEC's Proposed Caveat

Next, the FEC requests that the Court add a caveat to the certified question so that the Sixth Circuit answers whether "as a matter of Sixth Circuit law" the coordinated party expenditure limits are constitutional. (Doc. 45, #5303). The Court agrees with Plaintiffs—"[t]hat is a rather head-scratching request." (Doc. 48, #5450).

For starters, one could reasonably read the FEC's proposed caveat as attempting to limit the law that the Sixth Circuit should apply when it reviews this constitutional challenge to just Sixth Circuit law. But that would be wholly impermissible as Plaintiffs' claims invoke the *First Amendment* and thereby call for an application of corresponding First Amendment jurisprudence. Accordingly, the

Sixth Circuit should not be limited in what law it considers pertinent to the legal question—whether or not that law is set forth in Sixth Circuit decisions. Moreover, the Court is rather confused about the FEC's justification for the addition—that failing to add the requested caveat will permit the Sixth Circuit to "intrud[e] on the Fifth Circuit's power within its jurisdiction." (Doc. 45, #5306). To put it gently, the Court has no reason to believe the Sixth Circuit has gained authority over any of the courts under the Fifth Circuit's jurisdiction—let alone, the Fifth Circuit itself—or that this Court's framing of the question could somehow magically create such authority. To the contrary, however the question is worded, the Court is confident that the Fifth Circuit, and district courts located there, will feel free to treat the Sixth Circuit's analysis the same way they do, day-in and day-out, when parties cite out-of-circuit precedent for a given proposition. In sum, the FEC's proposed caveat is mere surplusage, has no legal significance, and could itself sow confusion rather than aid the Sixth Circuit. That is not the hallmark of a useful or important addition. And it would not be a proper "exercise [of the Court's] discretion in fashioning a question for the [Sixth] Circuit," as the FEC's proposed addition does not "more precisely capture[] the Constitutional difficulty raised by the [P]laintiffs' arguments." *Anh Cao v. Fed. Election Comm'n*, 688 F. Supp. 2d 498, 542 (E.D. La. 2010).

Finally, to the extent that the FEC raises (very valid) concerns about the scope of a district court's authority to grant *relief* that extends to parties beyond the parties to the instant action, (Doc. 45, #5304–06 (collecting cases questioning the propriety of nationwide *injunctions* that were entered by district courts)), *those* concerns, and

the related legal arguments, are best raised at a later date. *E.g.*, *SpeechNow.org v. Fed. Election Comm'n*, 599 F.3d 686, 698 (D.C. Cir. 2010) (returning an answer to the certified question and leaving for the district court the determination of the proper remedies in light of the court's opinion); *cf. Bread Pol. Action Comm. v. Fed. Election Comm'n*, 678 F.2d 46 (7th Cir.) (mem) (remanding to the district court that had certified the initial constitutional question under § 310 of the FECA to implement the Supreme Court's opinion in the case), *on remand from* 455 U.S. 577 (1982). For present purposes, the concern is not with the relief available, but with the "immediate[] ... certif[ication of] all questions of constitutionality of th[e] [FECA]" to the Sixth Circuit sitting en banc pursuant to § 310 of the FECA, so that it may analyze the merits of Plaintiffs' constitutional challenge expeditiously.

So the Court declines to include the second modification that the FEC requests.

\*     \*     \*

Because neither proposed modification has merit, the Court **GRANTS** Plaintiffs' Motion to Certify (Doc. 20).[7] Accordingly, pursuant to § 310 of the Federal Election Campaign Act of 1971, the Court **CERTIFIES** to the United States Court of Appeals for the Sixth Circuit sitting en banc the following question:

> Do the limits on coordinated party expenditures in § 315 of the Federal Election Campaign Act of 1971, as amended, 52 U.S.C. § 30116, violate the First Amendment, either on their face or as applied to party

---

[7] The Court makes a couple of non-substantive changes to the proposed question. First, it restyles the question as an interrogatory, rather than a declaratory statement as Plaintiffs initially posed it. Second, the Court adds an FECA citation to the code compilation citation of the relevant provision, because Title 52 of the United States Code has not yet been enacted into positive law by Congress. *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993) (citing 1 U.S.C. §§ 204(a), 112).

spending in connection with "party coordinated communications" as defined in 11 C.F.R. § 109.37?

## D.     Factual Record

That leaves the Court with one remaining task—identifying the factual record that should be delivered with the above certified question. As noted above, the parties' submissions related to the proposed record have been voluminous. Combined, there are nearly 5,000 pages of proposed exhibits. The FEC filed a proposed findings of fact that is 127 pages long and includes 339 paragraphs (Doc. 43); Plaintiffs' is 35 pages and contains 136 paragraphs (Doc. 44). And although the Court stressed several times during the November 30, 2023, status conference that the parties *streamline* their supplemental briefing, the FEC filed a nearly line-by-line response to Plaintiffs' proposed findings of fact (despite the Court's express admonition not to provide such a response, (*see* Doc. 46, #5312 n.1)) that spanned 107 pages. (Doc. 47).

Despite the volume of these filings, the Court finds itself in the unenviable position of concluding, as explained further below, that the expedited discovery period the FEC requested was largely for naught. The central problem with the parties' proposed findings of fact based on those discovery materials remains the same as that which the Court (1) raised on the November 30, 2023, call, and (2) highlighted in its notation order issued the same day. The "facts" the parties ask the Court to find fall into several buckets that are not remotely close to adjudicative facts proper for certification: argumentation, statements of the law, quotations from historical documents, policy, descriptions of judicially noticeable materials, and evidentiary materials subject to exclusion under the Federal Rules of Evidence for, *inter alia*,

containing hearsay statements. Even the experts retained by both parties do not fully provide expert opinion on financial matters, which would be directly relevant to how plaintiff committees structure and organize their campaign funding under the current framework. Rather, these experts engage in an academic debate about the health of political parties abstractly and discuss the legal and policy implications of the FECA's coordinated party expenditure limits.[8] (*Compare* Doc. 36-1, #413–14, *with* Doc. 41-3, #4130–34, 4148).

All this raises a question for the Court—do all of these "facts" have to be delivered along with the certified question found above? The FEC fervently argues yes. (Doc. 47, #5338–41). Plaintiffs, meanwhile, argue that the FEC's proposed findings should be disregarded—and even concede that the Court could reasonably decide to "adopt[] only Plaintiffs' Proposed Findings ¶¶ 1–55" (i.e., a small subset of the "facts" they have tendered). (Doc. 46, #5311, 5315). As explained below, the Court agrees that Plaintiffs have the stronger of the arguments and will certify the factual record that largely tracks a pared-down version of their proposed findings of fact (with additional findings of fact detailing campaign finance data drawn from the FEC's sworn declaration, which has a foundation in the declarant FEC employee's personal knowledge of the FEC's records, (Doc. 36-13, #1283–84)). *Fed. Election Comm'n v. Colo. Republican Fed. Campaign Comm.*, 41 F. Supp. 2d 1197, 1200–01 (D. Colo. 1999) (explaining that the Court "ignore[d] the mass of irrelevant and/or inadmissible

---

[8] Admittedly, Plaintiffs' expert does go beyond providing more than just mere abstract policy assertions—adding charts and tables summarizing concrete financial data related to campaigns to illustrate his bottom-line conclusions. (*E.g.*, Doc. 41-3, #4136–39).

evidence in the record" because the parties had "lard[ed] the summary judgment record with voluminous documentation ... without any attention to elementary evidentiary requirements"), *aff'd*, 213 F.3d 1221 (10th Cir. 2000), *rev'd*, *Colorado II*, 533 U.S. 431. Because of the prolixity with which the parties' proposed findings of fact were briefed, the Court will not engage in a granular analysis explaining why every proposed paragraph was included or rejected as outside the proper scope of the Court's fact-finding responsibility. Rather, the Court will explain why it is rejecting categories of proposed findings with examples. And it will attach an appendix containing its factual findings to establish the record for this case.

The dividing line for the Court in what it chooses to certify as a "fact" or not is the crucial distinction between "adjudicative" and "legislative" facts. The former category relates to the "facts of the particular case." *Toth v. Grand Trunk R.R.*, 306 F.3d 335, 349 (6th Cir. 2002) (quoting Fed. R. Evid. 201, advis. comm. note (1972 proposed rules)); *Qualley v. Clo-Tex Int'l, Inc.*, 212 F.3d 1123, 1128 (8th Cir. 2000) (describing adjudicative facts as those that concern "the activities or characteristics of the litigants" (citation omitted)). The latter refers to that which "ha[s] relevance to *legal reasoning* ..., whether in the formulation of a legal principle or ruling by a judge ... or in the enactment of a legislative body." *Id.* (quoting Fed. R. Evid. 201, advis. comm. note (1972 proposed rules)) (emphasis added). Because the Court is tasked with finding facts and not engaging with the merits of Plaintiffs' challenge, it would be improper for the Court to make findings of any legislative facts. *Rufer v. Fed. Election Comm'n*, 64 F. Supp. 3d 195, 205 (D.D.C. 2014). Section 310 of the FECA

textually commits any determinations about the merits of the parties' legal positions to the en banc court of appeals, which means any legislative fact-finding necessitated by engaging with the merits are also textually committed to the en banc court of appeals. *See Athens Lumber Co. v. Fed. Election Comm'n*, 689 F.2d 1006, 1015 (11th Cir. 1982) (deciding to certify the constitutional question to the en banc court of appeals rather than to remand for additional factfinding because "the facts necessary to resolve the issues raised … are legislative as opposed to adjudicative" and "[a]s such they are [] easily presented to the court of appeals en banc"); *Buckley v. Valeo*, 519 F.2d 817, 820 (D.C. Cir. 1975) (Bazelon, J., dissenting) ("At issue in this case is whether statutory prohibitions actually infringe upon constitutional rights. The facts bearing upon these questions are—we should assume absent specific evidence of particular adjudicatory disputes—legislative facts. In no way is the trial court better qualified than we to isolate and to decide those many questions whose resolution will turn on such legislative facts."); *cf. Teter v. Lopez*, 76 F.4th 938, 946–47 (9th Cir. 2023) (denying a motion to remand to apply the newly minted history-and-tradition test set forth in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen* to the Second Amendment challenge at bar because the relevant historical evidence implicated legislative facts easily ascertainable on appeal).

Furthermore, any so-called findings of legislative facts that the Court could make here would be reviewed de novo by the en banc court of appeals because it is integral to the legal analysis of the constitutional issues raised. *United States v. Miller*, 982 F.3d 412, 430 (6th Cir. 2020). Making such findings and parsing through

the conflicting characterizations (and argumentation) regarding the relevance and importance of historical events or sources at this stage would be duplicative. And not only would it be largely wasted effort, but it would unnecessarily delay this proceeding. Such delay conflicts with the Court's statutory mandate to certify constitutional questions "immediately." For this reason, it is unsurprising that the D.C. Circuit's seminal discussion in *Buckley v. Valeo* of the procedure district courts should follow when certifying a question under § 310 of the FECA instructs that district courts should "[t]ake … evidence—[but only] over and above submissions that may suitably be handled through judicial notice," such as "legislative facts." 519 F.2d at 818 (providing a standard for determining what is outside the scope of the district court's evidentiary mandate, which standard is materially similar to the current judicial notice standard set forth Rule 201(b)). So the Court will decline to find any legislative, rather than adjudicative, facts—the Sixth Circuit can take judicial notice of such legislative facts as it deems necessary to dispose of the certified question.

So what does that exclude here? Quotations from (and argumentation about) founding sources (*e.g.*, Doc. 43 ¶¶ 9–10, #5118–19)) are out—those are inherently tied to legal arguments about the application of the First Amendment to this dispute. *Cf. Teter*, 76 F.4th at 946–47. Summaries and excerpts drawn from caselaw (*e.g.*, (Doc. 43 ¶¶ 73–74, #5140; Doc. 44 ¶¶ 85, 106, #5265, 5272)) are self-evidently beyond the scope of the Court's fact-finding responsibility. References to historical or current events and public reporting on those matters (*e.g.*, Doc. 43 ¶ 85, #5143; Doc. 44 ¶ 118, #5275) are handled through judicial notice and are rarely useful for establishing

adjudicative facts for a given case (especially considering the serious hearsay problems these sources raise, *Cary v. Cordish Co.*, 731 F. App'x 401, 405–07 (6th Cir. 2018)). *See Oneida Indian Nation of N.Y. v. New York*, 691 F.2d 1070, 1086 (2d Cir. 1982). So they will not form part of the record here. Equally inappropriate to form the basis of the factual record are citations to so-called factual findings in other cases and the related discovery materials that formed the record of *those* cases but were not tested through discovery *here* (*e.g.*, Doc. 43 ¶ 67, #5138; Doc. 44 ¶ 79, #5264). *Athridge v. Aetna Cas. & Sur. Co.*, 474 F. Supp. 2d 102, 110 (D.D.C. 2007) (citing *United States v. Jones*, 29 F.3d 1549, 1554 (11th Cir. 1994)) ("Findings of fact by a judge are hearsay not subject to any exception enumerated by the Federal Rules of Evidence.").

Even more far afield from the category of adjudicative facts are matters of policy. *Qualley*, 212 F.3d at 1128, 1131–32 (explaining that matters of policy are legislative in nature because they factor into a court's legal analysis and involve activities beyond those specific to the parties to the suit); Wright & Miller, 21B Fed. Prac. & Proc. Evid. § 5103.2 (2d ed. 2023) (explaining that consultation of legislative facts in resolving matters of policy are better suited to judicial notice than adjudication through admissible evidence and are often more effectively presented on appeal than to the district court). Policy statements found in law review articles, treatises, and even the reports of the policy experts the parties have retained, which contain broad-sweeping arguments about the propriety or impropriety of certain legal positions, (*e.g.*, Doc. 43 ¶¶ 10, 45, 110, 160–61, #5119, 5131, 5155–56, 5179; Doc. 44 ¶¶ 62–66, 82, 84–85, 99, #5256–57, 5264–65, 5268), do "not [involve] the kind of facts

that can be determined in a judicial forum on the basis of a cold paper record full of hearsay and opinion." *Speechnow.org v. Fed. Election Comm'n*, No. 08-0248, 2009 WL 3101036, at *1 (D.D.C. Sept. 28, 2009). And finally, summaries or quotations from statutes, regulations, and other legislative materials, such as legislative history, (*e.g.*, Doc. 43 ¶¶ 80–81, 86–87, 261–62, 309–14, #5141–44, 5213–14, 5231–32), are well within the scope of judicial notice and beyond the Court's purview of making findings of adjudicative facts. *Oneida Indian Nation*, 691 F.2d at 1086; *Rufer*, 64 F. Supp. 3d at 205.

The FEC disagrees with this position by highlighting expansive records certified by a handful of other district courts and noting that some courts of appeals have remanded for additional factfinding in FECA cases. (Doc. 47, #5338–41). First, to the extent that the FEC contends district courts predominately certify legislative facts, it ignores district courts that have expressly rejected the notion that a district court should certify or find legislative facts under § 310 of the FECA. *Rufer*, 64 F. Supp. 3d at 205 (collecting cases). Second, while courts of appeals have remanded for additional factfinding, the examples cited involved records entirely devoid of facts, *Khachaturian v. Fed. Election Comm'n*, 980 F.2d 330, 332 (5th Cir. 1992) (per curiam), or required additional adjudicative facts to be developed, *Anderson v. Fed. Election Comm'n*, 634 F.2d 3, 5 (1st Cir. 1980). And contrary to the FEC's position, at least one circuit court went out of its way to chastise the corresponding district court for making "findings [that] are disputed, are unsupported by proper evidence, or go beyond appropriate fact finding … metamorphos[izing] into conclusions regarding

the legal issues in this case." *Mariani*, 212 F.3d at 767. Finally, although findings of legislative facts are often considered in campaign finance and First Amendment cases, (Doc. 47, #5343–44, 5346–47), that is the nature of the legal analysis required under applicable precedent. But that courts, including appellate courts, engage with legislative materials and historical documents does not impose on the district court an obligation to make findings of legislative facts. That inquiry would naturally and necessarily bleed into legal analysis, which is statutorily reserved for the courts of appeals. *See Mariani*, 212 F.3d at 767 (choosing not to credit the district court's findings of legislative facts). So the FEC's arguments fail to persuade.

Simply, given the defined and segregated responsibilities of the two courts, the Court follows the text of the FECA and adheres to its obligation to make findings of adjudicative facts only. And to the extent that the FEC is fearful that such findings' being absent from the record will not permit it to rely on any of these materials in the Sixth Circuit,[9] the Court's declination to certify any legislative facts does not

---

[9] The Court sincerely doubts that any such fear is well-founded. The FEC filed all this material on the Court's docket and presented its argumentation to this Court thereby preserving its legal arguments for the certification proceedings and protecting them against any claim of waiver or forfeiture. But even had the FEC not done so, there is no reason to think such arguments and proposed findings of legislative facts would be waived or forfeited. After all, under the plain text of § 310 of the FECA, any legal issues are textually reserved for and committed to the care of the Sixth Circuit sitting en banc. As a result, both parties had no reason to brief any legal issue—beyond whether Plaintiffs' challenge merits certification in the first instance—in this Court. Therefore, they would be more than justified to develop their arguments on the merits of Plaintiffs' claims in full for the first time on appeal without risking a waiver or a forfeiture. *See Hill v. Xerox Bus. Servs., LLC*, 59 F.4th 457, 469 n.15 (9th Cir. 2023) ("A party cannot forfeit what is not available because it never would have had an opportunity to raise that right in the first instance—hence the forfeiture caselaw's focus on whether an issue was timely asserted." (cleaned up)); *Shy v. Navistar Int'l Corp.*, 781 F.3d 820, 830 (6th Cir. 2015) (holding that a party had not waived its arbitration defense by developing it in full for the first time in a motion to compel—the primary

prejudice the FEC's (or Plaintiffs') ability to cite such sources and make the same legal arguments it (they) has (have) in its (their) proposed findings of fact.[10] *Rufer*, <u>64 F. Supp. 3d at 205</u> (The Court's "determination does not prejudice the FEC inasmuch as it may still cite … [these materials]—*e.g.*, legislative history, legal treatises, or media reports—in its appellate briefing." (citation omitted)).

With the dividing line between adjudicative and legislative facts drawn, there are two substantial remaining factual issues to resolve.[11]

First, Plaintiffs highlight areas of noted disagreement between the parties' retained experts. (*See* <u>Doc. 44</u> ¶¶ 98–99, 103–07, 116–18, #5268–75). But these disagreements strike the Court as a dispute about *policy* rather than a disagreement

---

mechanism used to invoke the defense—because its prior response to a motion to intervene was not inconsistent with that defense).

[10] Because the sources the parties have cited may potentially (and validly) be reviewed on appeal by the Sixth Circuit to establish legislative facts necessary to resolve the certified question, the Court declines to grant Plaintiffs' request to strike a slew of exhibits the FEC has filed on the docket. (<u>Doc. 46</u>, #5323–29).

[11] Not surprisingly, given the FEC provided a near paragraph-by-paragraph response to Plaintiffs' proposed findings of fact (despite the Court's admonition not to file such a response), the FEC provided a slate of objections to Plaintiffs' proposals too numerous to address individually in this opinion. (*See* <u>Doc. 47</u>, #5364–442). Most of these objections are effectively handled by the Court's refusal to certify legislative facts. The rest largely fall into disagreements about framing (usually because the proposed findings are argumentative) or because the FEC contends that proposed facts lack a proper foundation (even though Plaintiffs cited to declarations and discovery responses supporting in part the proposed facts). If a proposed finding of fact needed to be reframed because it contains argument, the Court has done so. If the FEC's only objection is that the proposed fact is based on self-serving discovery responses or declarations, the Court has overruled that objection. *Camara v. Mastro's Rests. LLC*, <u>952 F.3d 372, 374</u>–75 (D.C. Cir. 2020) (explaining that uncontroverted self-serving evidence based in a party's personal knowledge is not objectionable just because it is self-serving—such evidence is "by [its] nature [] self-serving"). To the extent that the FEC's objection has not fallen into one of those camps or is not otherwise resolved by the Court's Opinion and Order, the Court has evaluated the FEC's objection, taken it into account in determining whether and what to certify, and has provided substantiation for its factual finding with a citation to the record—and the Court has erred on the side of caution by largely quoting from the original source to avoid inadvertently editorializing the fact at issue.

about adjudicative facts specific to the parties or this particular suit. (*E.g.*, *id.* ¶¶ 98–99, 103, #5268–69 (experts disagree whether coordinated expenditure limits constitute the best regulatory mechanism to limit quid pro quo corruption); *id.* ¶ 117, #5275 (experts disagree whether political parties "have prospered" or are "weak")). But as noted above, these types of legal and policy arguments are beyond the scope of this Court's responsibility. *Qualley*, 212 F.3d at 1128, 1131–32. And because these policy issues may be aired in connection with the parties' legal arguments about the merits of Plaintiffs' claims before the Sixth Circuit, *Rufer*, 64 F. Supp. 3d at 205, the Court need not (and does not) wade into evaluating the relative merit of the experts' proffered positions. That is for the en banc court.

Second, the FEC directly challenges Plaintiffs' discovery responses, in which they label certain monies expended by the NRSC and NRCC during the 2022 election cycle as the costs of operating their respective independent expenditure units. (Doc. 43 ¶¶ 330–33, #5238–39; Doc. 47, #5359–63). This dispute is the rare instance here where the parties raise a disagreement of *adjudicative* fact that is properly within the purview of this Court.[12] *Qualley*, 212 F.3d at 1128. Essentially, the FEC argues the NRCC's and NRSC's claimed operating expenses for running their "firewalled" independent expenditure unit—the organizational structure created by the

---

[12] For the same reason that the financials submitted by the NRSC and the NRCC describe the "activities [and] characteristics of the litigants," the financial information drawn from the FEC's own records detailing campaign finance data, as submitted in the FEC's employee's sworn declaration, (*see* Doc. 36-13, #1283–84), also speaks to adjudicative facts within this Court's fact-finding bailiwick. *Qualley*, 212 F.3d at 1128. So the Court will rely on that sworn declaration to make findings of adjudicative fact regarding campaign finance data as set forth in the Appendix attached to this Opinion and Order.

committees to avoid flouting the coordinated party expenditure limits—of $92.4 million and $38 million, respectively, are inflated.

The FEC claims that (1) documentary evidence tends to prove that the costs of running an independent expenditure unit are lower than Plaintiffs contend, (2) expenses related to advertising borne by the independent expenditure units do not constitute operating costs because such expenditures would have been made by the committees regardless "whether [it was] coordinated or independent," and (3) Plaintiffs have not proffered evidence that, in the counterfactual world where parties can spend as much as they want on coordinated expenditures, they would not have "incurred specific costs" (e.g., polling data) that are currently borne by the independent expenditure units. (Doc. 47, #5360–62). Plaintiffs disagree. They contend that "advertising [costs] are properly considered among the[] total operating expenses" because the NRSC and NRCC would have "allocated [such monies] toward other party activities"; "[i]t is not clear what evidence the FEC would expect NRSC or NRCC to maintain to establish th[e] counterfactual [it demand Plaintiffs prove]"; and that such proof is unnecessary because "the record shows that forcing NRSC and NRCC to dedicate scarce party resources toward establishing and maintaining separate [independent expenditure] units results in an inefficient split in the party operations." (Doc. 46, #5321–22).

Part of the disagreement is about the exact numbers reflected in the evidence. (*Compare* Doc. 40-7, #3889, 3900, *and* Doc. 40-11, #3930, *with* Doc. 44 ¶ 75e, #5261). When Plaintiffs overstate the numbers found in the record evidence, the Court will

cite just to the record evidence itself and not defer to Plaintiffs' characterization. But another dimension to this disagreement is about the use of the term "operate" and whether it takes the colloquial meaning as Plaintiffs suggest, (Doc. 46, #5321), or the statutory meaning as the FEC argues, (Doc. 47, #5360–61). That strikes the Court as a dispute that would require dipping one's toes ever so slightly into the merits of the case. As a result, rather than conclude that advertising expenditures made by plaintiff committees' independent expenditure units are properly labelled operational, the Court will take up the FEC's suggestion: it will "differentiate 'administrative' expenses from independent expenditures on political advertising, which is a more accurate representation of this data and will be more useful for the Court of Appeals." (*Id.* at #5361).

Finally, what is the Court to do about the parties' disagreement as to what extent the NRSC's and the NRCC's balance sheets would look different in a counterfactual world without any coordinated party expenditure limits? To begin, the Court notes that the NRSC and the NRCC submitted sworn declarations and interrogatory responses containing non-conclusory statements detailing the problems with an organizational structure that bars the flow of information about how to avoid duplicative advertising and to streamline spending on candidates. (Doc. 19-1 ¶¶ 19–23, #179–80; Doc. 19-2 ¶¶ 19–23, #189–90; Doc. 41-1, #4034, 4038–39, 4044, 4052; Doc. 41-2, #4089–90, 4093–94, 4102, 4106–07). As repeat players that engage with candidates and observe the effect of campaign expenditures on voters, these uncontroverted statements about duplication of resources and risks of harmful

campaign advertising without proper coordination are well within the personal knowledge of the NRSC and the NRCC. *See Camara v. Mastro's Rests. LLC*, 952 F.3d 372, 374–75 (D.C. Cir. 2020) (explaining that self-serving evidence that is within a party's personal knowledge is not objectionable just because it is self-serving). The Court acknowledges Plaintiffs' contention that the FEC's demand for proof of a counterfactual is a tall ask. But, even so, the Plaintiffs have identified at least one concrete area in which one can credit their narrative that they have incurred extra expenses because of the coordinated expenditure limits: the payment for separate facilities and employees to avoid cross over between independent expenditure units and those committee officials that might engage in coordinated expenditures. (Doc. 40-6, #3886; Doc. 40-7, #3888–89; Doc. 41-1, #4036–37; Doc. 41-2, #4092–93).

The FEC really does not contest this point—suggesting only that the regulations do not require creation of a separate independent expenditure unit. (*See* Doc. 47, #5373–75). But that the regulations do not *require* an independent expenditure unit does not mean the NRSC and the NRCC lack the personal knowledge or the foundation to establish that creating independent expenditure units is how they have sought to comply with the FECA while still engaging in campaign speech. As the NRSC and the NRCC have placed uncontroverted evidence on the record tying these units and their costs solely to the coordinated party expenditure limits, (Doc. 41-1, #4036–37; Doc. 41-2, #4092–93), it is well within the Court's discretion to find as a matter of fact that plaintiff committees have incurred costs (in the order of millions of the dollars, (Doc. 43 ¶¶ 331, 333, #5238–39 (the FEC's

acknowledgment that the NRCC expended over $5 million and that the NRSC expended over $2 million on separate facilities for their respective independent expenditure units)) that are attributable to the coordinated expenditure units. *Camara*, 952 F.3d at 375. Now, whether such costs (or the risk of duplicative or harmful advertising and the bar on complete coordination among political parties, their committees, and the candidates) constitute a "substantial burden" on Plaintiffs' free speech rights is a merits question beyond the scope of the Court's mandate. All the Court finds at this stage in the litigation is that Plaintiffs have proffered evidence identifying those costs and risks as the result of the FECA's coordinated party expenditure limits.

With that, the Court has resolved the parties' legal disputes over the scope of the factual record it is to certify. To recap: The Court will certify only adjudicative facts in line with its explanation above. In addition, the Court will not delve into the dueling policy experts' academic dispute because they raise issues properly addressed in connection with an analysis of the merits Plaintiffs' constitutional claims. And the Court will avoid characterizing advertising costs incurred by the plaintiff committees' independent expenditure units as "operational." But it will find that Plaintiffs have identified examples of costs and burdens the coordinated expenditure limits have imposed on the NRSC and the NRCC. Finally, as noted above, the Court has read and will resolve any line-item objections that the FEC provided in its paragraph-by-paragraph response (if the other pronouncements do not obviate the objections) in the reframed findings of fact provided in the Appendix.

## CONCLUSION

As stated more fully above, the Court determines that at least one individual and one committee plaintiff has standing to bring suit and that Plaintiffs raise a non-frivolous constitutional challenge to the coordinated party expenditure limits found in the FECA. And the Court finds that the FEC's objections to Plaintiffs' framing of the proposed certified question lack merit. Thus, the Court **GRANTS** Plaintiffs' Motion to Certify Question to the En Banc Court of Appeals (Doc. 20). Accordingly, the Court **CERTIFIES** to the United States Court of Appeals for the Sixth Circuit sitting en banc the following question:

> Do the limits on coordinated party expenditures in § 315 of the Federal Election Campaign Act of 1971, as amended, 52 U.S.C. § 30116, violate the First Amendment, either on their face or as applied to party spending in connection with "party coordinated communications" as defined in 11 C.F.R. § 109.37?

And the Court delivers the Appendix attached to this Opinion and Order to the United States Court of Appeals for the Sixth Circuit sitting en banc as the record in this case containing the Court's findings of adjudicative fact.

The Court **DIRECTS** the Clerk to **TRANSMIT** forthwith to the United States Court of Appeals for the Sixth Circuit a copy of this Opinion and Order and the attached Appendix.[13]

---

[13] Because the Court certifies the above constitutional question to the United States Court of Appeals for the Sixth Circuit sitting en banc under § 310 of the FECA, "the matter" is now before the court of appeals. 52 U.S.C. § 30110. Accordingly, the Court **STAYS** further proceedings in this Court pending a decision of the en banc court of the United States Court of Appeals for the Sixth Circuit on the Court's certified question and, if a petition for a writ of certiorari is timely filed with the Supreme Court of the United States, the disposition of such a petition. In the event such a timely filed petition for a writ certiorari is granted, the stay shall continue until further order of this Court, but it shall not terminate before the

**SO ORDERED.**


January 19, 2024
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

---

sending down of the judgment of the Supreme Court. The Court will resume control over the matter and the certified question upon receiving the decision and mandate from the Sixth Circuit and, as applicable, from the Supreme Court. The parties are ordered to file a joint status report every six months, or more frequently if circumstances warrant, to inform the Court of the status of the certification proceedings.

## APPENDIX

### FINDINGS OF ADJUDICATIVE FACT

I. **Parties**

    a. **Plaintiffs**

        i. **National Republican Senatorial Committee**

1. The National Republican Senatorial Committee (NRSC) is a "national committee" of the Republican Party, as the term is defined by § 301 of the Federal Election Campaign Act of 1971 (FECA), 52 U.S.C. § 30101(14), that is registered with the Federal Election Commission and acts as the Republican Party's senatorial campaign committee. (Doc. 1 ¶ 13, #5–6; Doc. 36-13, #1283–84; Doc. 40-4, #3873; Doc. 40-5, #3878).

2. The NRSC's principal place of business is located at 425 2nd Street N.E., Washington, D.C. 20002. (Doc. 19-1, #174; Doc. 40-5, #3878).

3. The NRSC's stated purpose is to "promote the election of Republican candidates for the United States Senate." (Doc. 40-4, #3873; Doc. 40-5, #3878).

4. The NRSC, which was first organized in 1916, "was established by Republican Members of the United States Senate." (Doc. 40-12, #3934).

5. The United States Senate Republican Conference "advises the [NRSC] Board of Directors" regarding NRSC matters and "elect[s] the Chairman" of the NRSC. (Doc. 40-5, #3879–80).

6. The Chairman "appoint[s] the Executive Director [of the NRSC]," who "supervise[s] and control[s] all of the affairs of the [NRSC] and oversee[s] the management of the [NRSC]." (Doc. 40-5, #3880; Doc. 40-12, #3936).

7.      Members of the NRSC "are appointed by the Senate Republican Conference Committee." (Doc. 40-12, #3934).

8.      The current Executive Director, who has served in that role since January 2023, is Jason Thielman, who previously worked "as the Chief of Staff to Senator Steve Daines of Montana, the NRSC's current Chairman," as well as on federal and state election campaigns. (Doc. 19-1, #174).

### ii.      National Republican Congressional Committee

9.      The National Republican Congressional Committee (NRCC) is a "national committee" of the Republican Party, as the term is defined by § 301 of the FECA, 52 U.S.C. § 30101(14), that is registered with the Federal Election Commission and acts as the Republican Party's congressional campaign committee for elections to the United States House of Representatives. (Doc. 1 ¶ 14, #6; Doc. 36-13, #1283–84; Doc. 40-3, #3857).

10.     The NRCC's principal place of business is located at 320 First Street S.E., Washington, D.C. 20003. (Doc. 19-2, #184; Doc. 40-3, #3857).

11.     "The NRCC exists for the purpose of electing Republicans to the United States House of Representatives." (Doc. 40-3, #3857).

12.     The NRCC "acts as counsel and advisor to the House Republican Conference." (Id. at #3857).

13.     The United States House Republican Conference, which is made up of "Republican members of the United States House of Representatives during

2

the [relevant] two-year Congressional cycle," selects the Chairman of the NRCC. (*Id.* at #3861, 3863).

14. The House Republican Conference can also remove the Chairman, ratify his appointments to the NRCC's Executive Committee, and dissolve the NRCC by a majority vote. (*Id.* at #3863).

15. The NRCC's Board of Directors "must be Members of the House Republican Conference." (*Id.* at #3858).

16. The NRCC's Executive Committee "must be members of the U.S. House of Representatives in the Republican Party." (*Id.* at #3864).

17. The Executive Committee, which has the "authority [to] govern[] and [to] manag[e] the political affairs" of the NRCC is "composed of at least 38 members, [which] includ[es] the Speaker (when Republicans constitute a majority in the House), the Republican Leader, the Republican Whip, the [House Republican] Conference Chairman, the NRCC Chairman, the Policy Chairman, the [House Republican] Conference Vice Chairman, and the [House Republican] Conference Secretary." (*Id.*).

18. The NRCC Executive Director is appointed by the NRCC Chairman, who is "act[s] as a professional advisor of the Board of Directors on all aspects of the organization's activities," "oversee[s] the day-to-day operations of the organization … [and] the planning, implementation and evaluation of the organization's activities." (*Id.* at #3861–62).

19. The current Executive Director, who has served in that role since January 2023, is Christopher Winkelman, who previously practiced election law and served as outside counsel to the NRCC as a partner at a law firm. (Doc. 19-2, #184).

### iii. James David Vance

20. James David ("J.D.") Vance is a United States Senator, who has represented the State of Ohio since January 3, 2023, after being elected in the 2022 General Election. (Doc. 19-3, #194).

21. Senator Vance is a member of the Republican Party. (*Id.*).

22. He was the 2022 Republican Party nominee for the United States Senate in Ohio. (*Id.*).

23. He is eligible to vote in any election for the office of the President of the United States. (*Id.*).

24. He intends to run for federal office again, which intention he has demonstrated by filing a statement of candidacy and making periodic disclosure reports reflecting his campaign's raising contributions for his anticipated 2028 campaign. (Doc. 41-6, #4711, 4715).

### iv. Steven Joseph Chabot

25. Steven Joseph Chabot is a former United States Congressman, who had represented Ohio's First Congressional District in the United States House of Representatives. (Doc. 1 ¶ 16, #6–7).

4

26. He is eligible to vote in any election for the office of the President of the United States. (*Id.*).

27. He lost re-election to the United States House of Representatives in the 2022 General Election. (Doc. 36-31, #1541).

28. He does not intend to run for federal office again in the future having filed "to terminate his campaign committee, which has raised no funds toward any future election" and having taken no further actions revealing an intention to run for federal office again. (*Id.* at #1541–42).

### b.     Defendants

29. The Federal Election Commission (FEC) was established by the FECA, *see* Federal Election Campaign Act Amendments of 1974, Pub. L. No. 93-443, § 208(a), 88 Stat. 1263, 1280 (1974), and is the independent federal agency of the United States with exclusive jurisdiction over the administration and civil enforcement of the FECA. (Doc. 1 ¶ 17, #7; Doc. 24 ¶ 17, #280).

30. Defendant Shana M. Broussard is a commissioner of the FEC. As a commissioner, she is responsible for administering and enforcing FECA. She is sued in her official capacity. (Doc. 1 ¶ 20, #7; Doc. 24 ¶ 20, #280).

31. Defendant Sean J. Cooksey is a commissioner and the Chair of the FEC. As a commissioner, he is responsible for administering and enforcing FECA. He is sued in his official capacity. (Doc. 1 ¶ 21, #7; Doc. 24 ¶ 21, #280).

32.     Defendant Allen J. Dickerson is a commissioner of the FEC. As a commissioner, he is responsible for administering and enforcing FECA. He is sued in his official capacity. (Doc. 1 ¶ 18, #7; Doc. 24 ¶ 18, #280).

33.     Defendant Dara Lindenbaum is a commissioner of the FEC. As a commissioner, she is responsible for administering and enforcing FECA. She is sued in her official capacity. (Doc. 1 ¶ 19, #7; Doc. 24 ¶ 19, #280).

34.     Defendant James E. Trainor, III is a commissioner of the FEC. As a commissioner, he is responsible for administering and enforcing FECA. He is sued in his official capacity. (Doc. 1 ¶ 22, #7; Doc. 24 ¶ 22, #280).

35.     Defendant Ellen L. Weintraub is a commissioner and the Vice Chair of the FEC. As a commissioner, she is responsible for administering and enforcing FECA. She is sued in her official capacity. (Doc. 1 ¶ 23, #7; Doc. 24 ¶ 23, #280).

## II.     Procedural Background

36.     Plaintiffs brought this lawsuit on November 4, 2022, in which suit they challenge the FECA's coordinated party expenditure limits as an unconstitutional abridgment of their First Amendment rights. (Doc. 1, #1–5).

37.     Plaintiffs' Complaint raises two claims for relief. The first challenges the coordinated party expenditure limits as facially unconstitutional. (*Id.* at #24–25). The second challenges those limits as unconstitutional as applied to "party coordinated communications," as the term is defined in 11 C.F.R. § 109.37. (*Id.* at #26).

6

38. For these alleged violations, Plaintiffs demand declaratory and injunctive relief barring the FEC's enforcement of the coordinated party expenditure limits either *in toto* or as applied to party coordinated communications. (*Id.* at #26–27). And they request costs and fees as appropriate. (*Id.* at #27).

39. On January 9, 2023, Defendants moved to dismiss the Complaint or, in the alternative, to change the venue of this suit. (Doc. 10, #81–82). The motion to dismiss became ripe on February 13, 2023. (*See* Doc. 15).

40. On May 9, 2023, the Court denied Defendants' Motion to Dismiss, including denying the request to transfer venue. (Doc. 18).

41. On May 17, 2023, Plaintiffs moved to certify their facial and as-applied constitutional challenges to the United States Court of Appeals for the Sixth Circuit sitting en banc pursuant to § 310 of the FECA. (Doc. 20, #215).

42. On May 23, 2023, Defendants answered the Complaint denying Plaintiffs' entitlement to relief and reserving as its only affirmative defense a challenge to the Court's subject matter jurisdiction over "a plaintiff[]" (who was not explicitly named but was suggested to be Chabot). (Doc. 24, #280, 283, 291).

43. On June 7, 2023, Defendants opposed Plaintiffs' motion to certify arguing that certification was premature because discovery had not been conducted. (Doc. 26, #307–08).

44. On August 1, 2023, the Court met with the parties to discuss the pending motion and the scope of the requested discovery. (8/1/23 Min. Entry).

45.     The same day, the Court issued a notation order setting an expedited briefing schedule permitting the parties to conduct limited discovery and to develop the factual record to be delivered to the Sixth Circuit if the Court ultimately granted Plaintiffs' motion. (8/1/23 Not. Order).

46.     Discovery closed on October 31, 2023. (*Id.*). On November 17, 2023, the parties tendered their respective proposed findings of fact for the Court's consideration. (Docs. 43–44). These proposed findings of fact relied on nearly 5,000 pages of exhibits filed on the Court's docket. (Docs. 19, 36–42).

47.     The Court met with the parties on November 30, 2023, to discuss the parties' proposed findings of fact. (11/30/23 Min. Entry). The parties were ordered to file a response to each other's proposed findings of fact. (*Id.*). And Defendants were ordered to file an updated response to the motion to certify with Plaintiffs' reply to be filed thereafter. (*Id.*). The supplemental briefing was completed on December 20, 2023. (*See* Doc. 48).

48.     As detailed in the Court's Opinion and Order, pursuant to § 310 of the FECA, the Court certifies to the United States Court of Appeals for the Sixth Circuit sitting en banc the following question:

> Do the limits on coordinated party expenditures in § 315 of the Federal Election Campaign Act of 1971, as amended, 52 U.S.C. § 30116, violate the First Amendment, either on their face or as applied to party spending in connection with "party coordinated communications" as defined in 11 C.F.R. § 109.37?

And in addition to this question, the Court delivers this Appendix with the Court's findings of adjudicative fact to the United States Court of Appeals for the Sixth Circuit sitting en banc to serve as the record in this case.

8

### III.  Coordinated Party Expenditure Limits and Their Effects on Plaintiffs

49.  Plaintiffs' prior and future campaign activities are governed by the contribution and expenditure limits and rules set by the FECA and its implementing regulations. (<u>Doc. 19-3</u>, #194–95; <u>Doc. 40-3</u>, #3857, <u>Doc. 40-4</u>, #3873; *see generally* <u>Doc. 41-7</u> (discovery requests and Chabot's answers reflecting the parties' unanimous belief that Chabot's former campaign activities were governed by the FECA and its implementing regulations)).

50.  Under its authority to implement and to enforce the FECA, the FEC regularly publishes the applicable limits on contributions and coordinated expenditures with which Plaintiffs are required to comply for any given election cycle. *See Contribution Limits*, Fed. Election Comm'n (Feb. 2023), https://perma.cc/QBZ7-SZEH; *Coordinated Party Expenditure Limits*, Fed. Election Comm'n (Feb. 2, 2023), https://perma.cc/FZQ2-AGBV.

51.  So long as the coordinated party expenditure limits remain in place, Plaintiffs will comply with those limits. (<u>Doc. 19-3</u>, #197; <u>Doc. 41-1</u>, #4043–44, 4048, 4053; <u>Doc. 41-2</u>, #4099, 4107; <u>Doc. 41-6</u>, #4714, 4721).

52.  Under its FECA investigation and enforcement authorities, the FEC has a demonstrated history of investigating and enforcing the coordinated expenditure limits: instances of violations of the coordinated party expenditure limits have been brought to the FEC's attention, investigated, and enforced via civil proceedings. *E.g.*, Final Audit Report of the Commission on the Republican Party of Minnesota – Federal, Attachment to First General Counsel's Report in Audit Referral 22-01, Federal Election Commission, at 7,

30–36 (June 30, 2022), https://perma.cc/PH7R-CQDA (discussing an investigation into coordinated party expenditures alleged to be in excessive of the limits established by the FECA by the Minnesota Republican party to Minnesotan candidates for the United States House of Representatives in the 2018 election); First General Counsel's Report, MUR 7826 – Iowa Democratic Party & Theresa Greenfield for Iowa, MUR 7862 – Iowa Democratic Party & Rita Hart for Iowa, Federal Election Commission 16–19, 22 (June 16, 2021), https://perma.cc/D4LW-9FQG (discussing the investigation and analysis leading the FEC's General Counsel's Office to recommend that the FEC find that two candidates' campaign committees knowingly accepted monies exceeding the FECA's coordinated party expenditure limits during the 2020 election cycle); *Colo. Republican Fed. Campaign Comm. v. Fed. Election Comm'n* (*Colorado I*), 518 U.S. 604, 612–13 (1996) (per curiam) (procedural history explaining that the FEC brought an enforcement action against the petitioner for alleged violations of the coordinated party expenditure limits).

### a. The NRSC's and the NRCC's Coordinated Expenditures

53. When the NRSC and the NRCC engage in coordinated expenditures with specific candidates under the FECA (i.e., when they pay for goods or services in coordination with candidates for the latter's benefit), the NRSC and the NRCC do not give money to candidates, do not relinquish ownership of the funds, and retain final approval over how such monies will be spent. (Doc. 19-1, #176–77; Doc. 19-2, #187–88; Doc. 41-1, #4039–41; Doc. 41-2, #4096).

54. When engaging in coordinated expenditures, the NRSC and the NRCC accept and account for the suggestions and recommendations of the relevant candidates regarding the end to which such coordinated expenditures should be put. (<u>Doc. 41-1</u>, #4039–41; <u>Doc. 41-2</u>, #4096).

### i.    Plaintiffs' Coordinated Expenditures for the 2022 Election

55. Senator Vance declares that in 2022, "NRSC's staff consulted [his] campaign staff about how the NRSC should spend its money on [coordinated] advertising to best support [his] candidacy." (<u>Doc. 19-3</u>, #196). He states that the coordinated expenditures paid for by the NRSC included an August 2022 television advertisement, "live and automated get-out-the-vote telephone" calls, and peer-to-peer "get-out-the-vote text messages." (<u>Doc. 41-6</u>, #4716).

56. The NRSC approved an August 2022 television advertisement as a coordinated expenditure on behalf of Senator Vance's 2022 campaign after being presented with a largely finished proposed advertisement. (<u>Doc. 40-9</u>). Senator Vance states that with respect to the television advertisement, his campaign "suggested the use of a draft television script," which led to "the NRSC['s] [use of] … a common vendor for the production and distribution of the advertisement." (<u>Doc. 41-6</u>, #4716). He declares he understood that the "approval of the advertisement and the decision to pay for it were all made at the sole discretion and authority of the NRSC and its staff." (*Id.*).

57. Vance similarly states that his campaign staff and the NRSC staff "discussed the messaging of the[] [coordinated telephone calls and coordinated peer-to-

peer text messages] ... but [that the] approval of these communications and [the] decision to pay for them also were all at the sole discretion and authority of the NRSC and its staff." (*Id.*).

58. In the 2022 election cycle, the NRSC "spent the full amount of the coordinated spending authority delegated to it" ($1,991,800) on Senator Vance's 2022 general election campaign. (Doc. 19-1, #178). The Ohio Republican Party had assigned all its coordinated expenditure authority ($1,008,400) to the NRSC for the 2022 senate election in Ohio. (Doc. 39-40, #3838). The Republican National Committee (RNC) assigned $983,400 in coordinated expenditure authority to the NRSC for the 2022 Senate election in Ohio. (Doc. 40-2, #3855).

59. Chabot states that the coordinated expenditure made by the NRCC during his 2022 campaign was spent on a television advertisement "targeting voters in Ohio's [First] Congressional District, in the Cincinnati market, supporting Chabot's election and opposing the election of his opponent, Greg Landsman," which advertisement aired in September 2022. (Doc. 41-7, #4748).

60. Chabot states that "agents of his campaign requested or suggested the use of a draft television script and media plan to NRCC staff for use in a coordinated party communication, and the NRCC utilized the services of common vendor for the production and distribution of the advertisement." (*Id.*). The completed television advertisement and media plan for Chabot's 2022 campaign was presented to the NRCC in August, which then led to the latter's approval of a

coordinated expenditure worth $103,000 for the advertisement's airing in September. (Doc. 40-8).

61. Chabot states he understood that the "approval of the advertisement script, copy, media plan, and decision to pay for the advertisement were all at the sole discretion and authority of the NRCC and its staff." (Doc. 41-7, #4748). His campaign "paid for a further distribution of the advertisement" that was not part of the NRCC's coordinated party expenditure. (*Id.*).

62. In the 2022 election cycle, the NRCC "spent $103,000 of its delegated coordinated spending authority on advertisements … supporting former Congressman Chabot's general election candidacy, [and] le[ft] $2,000 in reserve to ensure the NRCC's compliance with the coordinated party expenditure limits in the event of an unexpected cost becoming known after the election." (Doc. 19-2, #188). The Ohio Republican Party assigned $55,000 in coordinated expenditure authority to the NRCC for the 2022 general election for Ohio's First Congressional District. (Doc. 39-39, #3836). The RNC assigned $50,000 in coordinated expenditure authority to the NRCC for the 2022 general election for Ohio's First Congressional District. (Doc. 40-1, #3853).

###### ii. Data on Plaintiff Committees' Coordinated Expenditures

63. The NRSC receives assignments of expenditure authority that come from the RNC and Republican state party committees, which assignments increase the amount of money the NRSC may dedicate toward coordinated party expenditures. (Doc. 19-1, #177).

13

64. "Based on [] assignments of spending authority [eventually executed] during the 2021-2022 election cycle, the NRSC spent over $15.5 million on coordinated party expenditures with the campaigns of Republican Senate nominees" across 17 electoral races. (*Id.*; <u>Doc. 36-13</u>, #1287).

65. Based on reporting to the FEC, the NRSC spent over $9.7 million total on coordinated expenditures across 14 electoral races during the 2020 election. (<u>Doc. 36-13</u>, #1287).

66. The NRSC states that it "often spends the full amount of any coordinated party expenditure authority assigned to it in competitive Senate races." (<u>Doc. 19-1</u>, #178).

67. The NRCC receives assignments of expenditure authority that come from the RNC and Republican state party committees, which assignments increase the amount of money the NRCC may dedicate toward coordinated party expenditures. (<u>Doc. 19-2</u>, #187).

68. "Based on [] assignments of spending authority [eventually executed] during the 2021–2022 election cycle, the NRCC spent over $8.3 million on coordinated party expenditures with the campaigns of Republican House nominees" across 80 electoral races, which included "over $400,000 on four Ohio House races." (<u>Doc. 19-2</u>, #187; <u>Doc. 36-13</u>, #1287). The NRCC notes that requests for assignment authority from other party committees are "typically honor[ed] … within a matter of days." (<u>Doc. 41-2</u>, #4100–01).

69. Based on reporting to the FEC, the NRCC spent over $5.5 million total on coordinated expenditures across 58 electoral races during the 2020 election. (Doc. 36-13, #1287).

70. The NRSC and the NRCC declare that "[c]oordinated spending [from segregated accounts exempted from the coordinated party expenditure limits] on legal proceedings directly involving or requested by [congressional] candidates or campaigns have become particularly common since 2014." (Doc. 19-1, #178; Doc. 19-2, #188). They further declare that they "defrayed hundreds of thousands of dollars in legal costs at the request of 2022 [federal] campaigns" using these accounts. (Doc. 19-1, #178; Doc. 19-2, #188).

### b. The NRSC's and the NRCC's Independent Expenditure Units

71. Based on the NRSC's and the NRCC's stated desire to avoid entanglement with an FEC enforcement action by accidentally flouting the coordinated party expenditure limits, they have erected "firewalls" between the main operations of the committees and their self-styled "independent expenditure units" or "IE units." (Doc. 19-1, #178–79; Doc. 19-2, #188–89; Doc. 41-1, #4034, 4036; Doc. 41-2, #4090, 4092).

72. The NRSC's and the NRCC's IE units' operations are separated from the main operations of the NRSC and the NRCC, which results in the IE units' making messaging and spending decisions independent of the NRSC and NRCC leadership. (Doc. 19-1, #179; Doc. 19-2, #189).

73. Though independent, the NRSC and the NRCC allocate funds from their general operating accounts to fund their IE units. (<u>Doc. 41-1</u>, #4042; Doc 41-2, #4097–98; <u>Doc. 40-6</u>, #3886; <u>Doc. 40-7</u>, #3888–89). Both the NRSC and the NRCC declare that they would put such funding toward other uses, including expenditures made in coordination with candidates, if they did not feel compelled to create the IE units to ensure compliance with the FECA's coordinated party expenditure limits. (<u>Doc. 41-1</u>, #4042–43; Doc 41-2, #4097–99).

74. Creation of an independent operation unit translates into the NRSC's and the NRCC's payment for separate facilities and employees for their IE units to avoid cross over between the units and those committee officials that might engage in coordinated expenditures. (<u>Doc. 41-1</u>, #4036–37; <u>Doc. 41-2</u>, #4092–93).

75. The NRSC and the NRCC report that because their respective IE units are not "candidate-sponsored advertisements" and therefore do not qualify for the regulatorily mandated "lowest-unit advertising" when the IE units purchase advertising time, the NRSC and the NRCC have incurred increased advertising costs by running these IE units. (<u>Doc. 41-1</u>, #4037; <u>Doc. 41-2</u>, #4093; *see* <u>Doc. 47</u>, #5362 (FEC's acknowledgment that "broadcast stations [a]re not legally obligated to provide [the] NRSC and [the] NRCC['s] [IE units] the lowest unit rate[s]")). This is because they declare that they would have dedicated such money to additional coordinated expenditures for advertising

spots that qualify for the best rates were they permitted to engage in additional coordinated expenditures and thus did not feel compelled by the coordinated expenditure limits to set up and to operate fire-walled IE units. (Doc. 41-1, #4047–48; Doc. 41-2, #4106–07). But the record does not reveal specific expenses or dollar amounts the NRSC's and the NRCC's IE units have incurred as a result of not receiving the benefit of the legally mandated lowest-unit advertising rates to substantiate the magnitude of those added costs.

### i.    Data on the NRSC's Independent Expenditures

76.    For the 2022 election cycle, the NRSC's IE unit incurred actual expenses that totaled $37,379,382. (Doc. 40-11, #3930). The IE unit paid over $300,000 toward employee salaries, over $250,000 toward employee benefits and taxes, and nearly $450,000 on consultants. (*Id.*). Over $34 million of those expenses was spent on media and advertising. (*Id.*; *see also* Doc. 36-13, #1288). And the IE unit spent approximately $1.5 million on polling and research related expenses. (Doc. 40-11, #3930; Doc. 41-1, #4037). Over $164,000 of the monies expended by the IE unit went toward its offices—rent, furnishings, and related expenses. (Doc. 40-7, #3888; Doc. 41-1, #4037). For the 2022 election cycle, the IE unit made disbursements totaling over $36,401,000. (Doc. 40-7, #3888–89).

77.    The NRSC's draft organizational charts that were produced during discovery in October 2023 lists one individual in the NRSC's own corporate structure as being explicitly associated with its IE unit. (Doc. 40-10, #3920; Doc. 40-13).

78. Based on its self-reporting to the FEC for the last five election cycles (2014, 2016, 2018, 2020, and 2022 elections), the NRSC spent between 99.7% and 100% of all its independent expenditures on expenses that it categorized as "MEDIA" or "MEDIA BUY" expenditures. (Doc. 36-13, #1289; Doc. 41-1, #4034 (describing the 2022 election cycle IE unit expenditures as having been spent "mostly on television advertising")).

79. Based on reporting to the FEC, the NRSC's over $34 million in independent expenditures during the 2022 election were spent on 10 electoral races. (Doc. 36-13, #1288). Approximately $33.9 million of these expenditures was spent on electoral races in Arizona, Georgia, Nevada, New Hampshire, North Carolina, Pennsylvania, and Wisconsin. (*Id.* at #1308).

80. Based on reporting to the FEC, the NRSC spent over $120.6 million in independent expenditures on 12 electoral races during the 2020 election. (*Id.* at #1288).

### ii. Data on the NRCC's Independent Expenditures

81. For the 2022 election cycle, the NRCC's IE unit incurred actual expenses that totaled $92,364,793.51. (Doc. 40-6, #3886; Doc. 41-2, #4092). The IE unit paid over $830,000 related payroll for employees and over $1 million on consultants. (Doc. 40-6, #3886; Doc. 41-2, #4092–93). Over $87 million of those expenses was spent on media and advertising. (Doc. 41-2, #4093; *see also* Doc. 36-13, #1288). And the IE unit spent approximately $4.4 million on polling and research related expenses. (Doc. 40-6, #3886; Doc. 41-2, #4092). Over $265,000

of the monies expended by the IE unit went toward its offices—rent, furnishings, and related expenses. (Doc. 40-6, #3886; Doc. 41-2, #4093).

82. Based on its self-reporting to the FEC for the last five election cycles (2014, 2016, 2018, 2020, and 2022 elections), the NRCC spent between 96.5% and 100% of all its independent expenditures on expenses that it categorized as "MEDIA" or "MEDIA BUY" expenditures. (Doc. 36-13, #1289; Doc. 41-2, #4090 (describing the 2022 election cycle IE unit expenditures as having been spent "mostly on television advertising")).

83. Based on reporting to the FEC, the NRCC's over $87 million in independent expenditures during the 2022 election were spent on 36 electoral races. (Doc. 36-13, #1288).

84. Based on reporting to the FEC, the NRCC spent over $80.6 million in independent expenditures on 37 electoral races during the 2020 election. (*Id.*).

c. **The Effect of the Coordinated Expenditure Limits on Plaintiffs**

   i. **The NRSC and the NRCC**

85. The NRSC and the NRCC have found, in their respective experiences, that engaging in both coordinated and firewalled independent expenditures (1) results in redundancies in spending and advertising, (2) is an inefficient means to promote the success of specific candidates the committees wish to sponsor, and (3) has created a material risk that the IE units will "disseminat[e] advertisements that are unhelpful to, if not entirely disfavored by, the candidate the party supports," which stems from their campaign

experiences finding that "voters ... do not recognize [the] meaningful distinction[s] [among] a party's general operation, its IE unit, [and] the supported candidate." (Doc. 19-1, #179–80; Doc. 19-2, #189–90; Doc. 41-1, #4034, 4038–39, 4044, 4052; Doc. 41-2, #4089–90, 4093–94, 4102, 4106–07; *see also* Doc. 42-1, #4867–68 (deposition testimony from Krasno, the FEC's expert, that "from the standpoint of a voter ... [parties and candidates] are ... a big blur" so it is "probably fair" to say that "most constituents don't realize ... that there are differences between the party and the candidate")).

86.     The NRSC and the NRCC find coordinated expenditures to be more "efficient and effective" as compared to independent spending. (Doc. 41-1, #4039; Doc. 41-2, #4095). That is because, in their experiences, they have found that coordinated expenditures allow "the party and candidate [to] work together, [which makes] the party's speech becomes more focused, understandable, and effective, based on the known goals of the candidate on the ground." (Doc. 41-1, #4038; Doc. 41-2, #4094). And in their experiences, they have found that coordinated expenditures "allow[] the party to spend its resources on a unified message with its candidates," which thereby avoids any "counterproductive" spending. (Doc. 41-1, #4038–39; Doc. 41-2, #4093–95).

87.     Because of the coordinated expenditure limits, the NRSC and the NRCC will again institute IE units, as they have done before, to avoid violating the coordinated expenditure limits and will incur the attendant costs (tangible and intangible) detailed above. (Doc. 19-1, #179; Doc. 19-2, #189; Doc. 41-1, #4042;

Doc. 41-2, #4097–98). The NRSC and the NRCC would not establish IE units and incur the attendant costs but for the limits on coordinated party expenditures. (Doc. 41-1, #4036–37, 4043–44; Doc. 41-2, #4092–93, 4099). The NRSC and the NRCC declare that any money they would save for not erecting and operating IE units would be put to other party activities, such as more coordinated party communications. (Doc. 41-1, #4047–48, 4052; Doc. 41-2, #4102, 4106–07).

88. Because of the coordinated expenditure limits, the NRSC states that it "regularly makes the risk assessment that it is best to forego spending the full amount of any assigned coordinated spending authority on party speech and reserve a portion to ensure the NRSC's compliance with the coordinated party expenditure limits in the event of an unexpected cost becoming known after the election." (Doc. 41-1, #4041; *see* Doc. 19-1, #178).

89. Based on the NRSC's experiences, those entities that assign coordinated expenditure authority to the NRSC also make similar decisions to stop short of the expenditure limits—the NRSC notes that "assigning committee [will] often prophylactically withhold[] some portion of its coordinated party expenditure authority to … avoid entanglement in an enforcement action." (Doc. 41-1, #4041). For example, the RNC withheld from the NRSC $25,000 of the RNC's coordinated expenditure authority when it delegated its expenditure authority to the NRSC—$25,000 the NRSC asserts it would have expended in coordination with Senator Vance's 2022 campaign. (*Id.* at #4026). Although the

NRSC did not list any specific costs incurred to obtain assignments from these entities, it does declare that "NRSC staff had to devote time to attend meetings … [to] engage in follow-up discussions," which "divert[ed] [] party resources away from other activities." (*Id.* at #4044–45).

90. The NRSC also declares that it has felt compelled by the coordinated party expenditure limits to restrict itself by "limit[ing] interactions" with candidates, which "leads to less collaboration between the party and candidate." (*Id.* at #4039).

91. Based on the uncontroverted evidence in the record founded on its personal experiences with these limits, the NRSC has avoided "fully associating with and advocating for" candidates for federal office as it desires to do because of the coordinated party expenditure limits. (*Id.* at #4040).

92. And based on the uncontroverted evidence in the record founded on its personal experiences with these limits, the NRSC would, during the 2022 election cycle and in the future, engage in greater cooperation with electoral candidates and "make coordinated party expenditures, including for party coordinated communications, in excess of [the] FECA's coordinated party expenditure limits, and without any assignment authority from any other [entity]," but for those limits. (*Id.* at #4040, 4043, 4047, 4051–52; *see* Doc. 19-1, #181; *see also* Doc. 42-1, #4896–98 (deposition testimony from Krasno, the FEC's expert, that absent coordinated expenditure limits, party committees would engage in more coordinated expenditures); Doc. 43, #5190, 5196, 5207–08 (The FEC's

requested findings of fact acknowledging that without coordinated expenditure limits, the party committees would engage in further coordinated spending and cooperation with candidates.)).

93. The NRSC declares that based on its experience, the greater cooperation without the coordinated expenditure limits would result in added cost savings because it would enable the NRSC "to receive its candidates' input on how best to utilize the party's resources to win elections." (Doc. 41-1, #4034, 4048, 4052).

94. Because of the coordinated expenditure limits, the NRCC states that it "regularly foregoes spending the full amount of any assigned coordinated spending authority ... to ensure the NRCC's compliance with the coordinated party expenditure limits." (Doc. 41-2, #4097; *see* Doc. 19-2, #188).

95. Based on the NRCC's experiences, those entities that assign coordinated expenditure authority to the NRCC also make similar decisions to stop short of the expenditure limits—the NRCC notes that "assigning committee [will] often prophylactically withhold[] some portion of its coordinated party expenditure authority to ... avoid entanglement in an enforcement action." (Doc. 41-2, #4097). For example, the RNC withheld from the NRCC $5,000 of the RNC's coordinated expenditure authority when it delegated its expenditure authority to the NRCC—$5,000 the NRSC asserts it would have expended in coordination with Chabot's 2022 campaign (as well as in other House campaigns where similar amounts were withheld by the RNC). (*Id.* at #4105). Although the NRCC did not list any specific costs incurred to obtain

assignments from these entities, it does declare that "NRCC staff had to devote time to requesting assignments ... diverting [] party resources away from other activities." (Doc. 41-2, #4100).

96. The NRCC also declares that it has felt compelled by the coordinated party expenditure limits to restrict itself by "limit[ing] interactions" with candidates, which "leads to less collaboration between the party and candidate." (*Id.* at #4095).

97. Based on the uncontroverted evidence in the record founded on its personal experiences with these limits, the NRCC has avoided "fully associating with and advocating for" candidates for federal office as it desires to do because of the coordinated party expenditure limits. (*Id.* at #4096).

98. And based on the uncontroverted evidence in the record founded on its personal experiences with these limits, the NRCC would, during the 2022 election cycle and in the future, engage in greater cooperation with electoral candidates and "make coordinated party expenditures, including for party coordinated communications, in excess of [the] FECA's coordinated party expenditure limits, and without any assignment authority from any other [entity]," but for those limits. (*Id.* at #4096, 4098, 4101–02, 4104–07; *see* Doc. 19-2, #191; *see also* Doc. 42-1, #4896–98 (deposition testimony from Krasno, the FEC's expert, that absent coordinated expenditure limits, party committees would engage in more coordinated expenditures); Doc. 43, #5190, 5196, 5207–08 (The FEC's requested findings of fact acknowledging that without coordinated expenditure

limits, the party committees would engage in further coordinated spending and cooperation with candidates.)).

99. The NRCC declares that based on its experience, the greater cooperation without the coordinated expenditure limits would result in added cost savings because it would enable the NRCC "to receive its candidates' input on how best to utilize the party's resources to win elections." (Doc. 41-2, #4090, 4102, 4107).

### ii. Senator Vance and Chabot

100. Senator Vance declares that his campaign limited its interactions with the NRSC and the Republican Party during the 2022 election cycle, "particularly on matters relating to the party's public advertising in support of his campaign, to ensure his campaign committee and the party did not violate the limits on coordinated party expenditures." (Doc. 19-3, #196; Doc. 41-6, #4713–14, 4720–21).

101. Based on the uncontroverted evidence in the record founded on his personal campaign experience, Senator Vance declares that but for the FECA's coordinated party expenditure limits, he would, during the 2022 election cycle and in the future, accept coordinated expenditures on behalf of his candidacy in excess of the statutory limits. (Doc. 19-3, #196; Doc. 41-6, #4713–14, 4721).

102. Senator Vance also states that he would work in greater cooperation with the NRSC "to make more efficient and effective use of party resources in support of Vance's campaign" in the absence of the coordinated party expenditure limits. (Doc. 41-6, #4717). He states that he would direct such cooperation to

"work [on] … a greater number of coordinated public communication advertisements supporting his campaign, similar to those that were made in coordination with the NRSC in 2022." (*Id.* at #4717–18).

103. Chabot states that he would have desired to work in greater cooperation with the NRCC during his 2022 campaign on additional coordinated public communication advertisements supporting his campaign in the absence of the FECA's coordinated party expenditure limits. (Doc. 41-7, #4746, 4750, 4752). Chabot notes that this would have included "cooperation with the NRCC staff on the [over $1.8 million] in media advertising the NRCC disseminated as independent expenditures in connection with the 2022 general election for Ohio's First Congressional District." (*Id.*).

## IV. Campaign Expenditures Reported to the FEC

### a. Coordinated Expenditures

104. The FEC reports that in 2022 election cycle, the Democratic Senatorial Campaign Committee (DSCC) (the Democratic counterpart to the NRSC) spent over $8.8 million total on coordinated expenditures across 8 electoral races during the 2022 election. (Doc. 36-13, #1287). Based on reporting to the FEC, the DSCC spent over $15.3 million total on coordinated expenditures across 15 electoral races during the 2020 election. (*Id.*).

105. The FEC reports that in 2022 election cycle, the Democratic Congressional Campaign Committee (DCCC) (the Democratic counterpart to the NRCC) spent over $6.2 million total on coordinated expenditures across 87 electoral

races during the 2022 election. (*Id.*). Based on reporting to the FEC, the DCCC spent over $7.3 million total on coordinated expenditures across 121 electoral races during the 2020 election. (*Id.*).

106. In the 2022 election cycle, the Republican committees (national, state, and local) made coordinated expenditures in 126 congressional races. (*Id.* at #1292). In the 2020 election cycle, the Republican committees (national, state, and local) made coordinated expenditures in 103 congressional races. (*Id.*).

107. In the 2022 election cycle, the Democratic committees (national, state, and local) made coordinated expenditures in 128 congressional races. (*Id.*). In the 2020 election cycle, the Democratic committees (national, state, and local) made coordinated expenditures in 164 congressional races. (*Id.*).

108. In the 2022 election cycle, Republican committees (national, state, and local) combined spent above 95% of the authorized coordinated expenditure limits in 9 Senate races—6 races of which received over $1 million. (*Id.* at #1293). In the 2020 election cycle, Republican committees (national, state, and local) combined spent above 95% of the authorized coordinated expenditure limits in 5 Senate races—3 races of which received over $1 million. (*Id.* at #1296).

109. Based on reporting to the FEC, in the 2022 election cycle, Democratic committees (national, state, and local) combined spent above 95% of the authorized coordinated expenditure limits in 4 Senate races—3 races of which received over $1 million. (*Id.* at #1295). In the 2020 election cycle, Democratic committees (national, state, and local) combined spent above 95% of the

coordinated expenditure limit in 7 Senate races—2 races of which received over $1 million. (*Id.* at #1297).

110. In the 2022 election cycle, Republican committees (national, state, and local) combined spent above 95% of the authorized coordinated expenditure limits in 73 House races. (*Id.* at #1293–95). In the 2020 election cycle, Republican committees (national, state, and local) combined spent above 95% of the coordinated expenditure limit in 37 House races. (*Id.* at #1296–97).

111. Based on reporting to the FEC, Democratic committees (national, state, and local) combined spent above 95% of the authorized coordinated expenditure limits in 7 House races in the 2022 election cycle. (*Id.* at #1295). In the 2020 election cycle, Democratic committees (national, state, and local) combined spent above 95% of the authorized coordinated expenditure limits in 9 House races. (*Id.* at #1297).

112. In the 2022 election cycle, the Republican committees (national, state, and local) made coordinated expenditures equal to the applicable limit for 8 congressional candidates. (*Id.* at #1292). In the 2020 election cycle, the Republican committees (national, state, and local) made coordinated expenditures equal to the applicable limit for 5 congressional candidates. (*Id.*).

113. In the 2022 election cycle, the Democratic committees (national, state, and local) made coordinated expenditures equal to the applicable limit for 6 congressional candidates. (*Id.*). In the 2020 election cycle, the Democratic

committees (national, state, and local) made coordinated expenditures equal to the applicable limit for 6 congressional candidates. (*Id.*).

114. Based on reporting to the FEC, the RNC spent approximately $5,000 on coordinated expenditures in two electoral races during the 2022 election. (*Id.* at #1287).

115. Based on reporting to the FEC, Democratic National Committee (DNC) (the Democratic counterpart to the RNC) spent approximately $713,000 on coordinated expenditures in one electoral race during the 2022 election. (*Id.*).

116. Based on reporting to the FEC, the RNC spent approximately $25.4 million on coordinated expenditures in four electoral races during the 2020 election. (*Id.*).

117. Based on reporting to the FEC, the DNC spent over $17.1 million on coordinated expenditures in one electoral race during the 2020 election. (*Id.*).

118. Based on reporting to the FEC, coordinated expenditures during the 2022 election made by all Republican committees (national, state, and local) amounted to over $25.8 million. (*Id.* at #1305).

119. Based on reporting to the FEC, coordinated expenditures during the 2020 election made by all Republican committees (national, state, and local) amounted to over $46.2 million. (*Id.*).

120. Based on reporting to the FEC, coordinated expenditures during the 2022 election made by all Democratic committees (national, state, and local) amounted to over $17.9 million. (*Id.*).

121. Based on reporting to the FEC, coordinated expenditures during the 2020 election made by all Democratic committees (national, state, and local) amounted to over $40.6 million. (*Id.*).

122. Based on reporting to the FEC during the last five election cycles (2014, 2016, 2018, 2020, and 2022), coordinated expenditures from the Republican national party committees have ranged from approximately $11.5 million during the 2014 election cycle to approximately $40.7 million during the 2020 election cycle. (*Id.* at #1287). When factoring in coordinated expenditures from state and local Republican party committees, Republican coordinated expenditures have ranged from approximately $14.6 million during the 2014 election cycle to approximately $46.3 million during the 2020 election cycle. (*Id.* at #1305).

123. Based on reporting to the FEC during the last five election cycles (2014, 2016, 2018, 2020, and 2022), coordinated expenditures from the Democratic national party committees have ranged from approximately $7.7 million during the 2014 election cycle to approximately $39.8 million during the 2020 election cycle. (*Id.* at #1287). When factoring in coordinated expenditures from state and local Democratic party committees, Democratic coordinated expenditures have ranged from approximately $13.2 million during the 2014 election cycle to approximately $40.6 million during the 2020 election cycle. (*Id.* at #1305).

### b. Independent Expenditures

124. Based on reporting to the FEC, the DSCC spent over $49.4 million in independent expenditures on 6 electoral races during the 2022 election. (*Id.* at

#1288). Approximately $33.38 million of these expenditures was spent on electoral races in Arizona, Georgia, Nevada, New Hampshire, Pennsylvania, and Wisconsin. (*Id.* at #1308).

125.  Based on reporting to the FEC, the DSCC's spent over $91.2 million in independent expenditures were spent on 8 electoral races during the 2020 election. (*Id.* at #1288).

126.  Based on reporting to the FEC for the last five election cycles (2014, 2016, 2018, 2020, and 2022 elections), the DSCC spent 66.3% of all its independent expenditures in the 2022 election and 100% of all its independent expenditures in the other four election cycles on expenses that it categorized as "MEDIA" or "MEDIA BUY" expenditures. (*Id.* at #1289).

127.  Based on reporting to the FEC, the DCCC's spent over $96.4 million in independent expenditures on 45 electoral races during the 2022 election. (*Id.* at #1288).

128.  Based on reporting to the FEC, the DCCC's over $90.8 million in independent expenditures were spent on 53 electoral races during the 2020 election. (*Id.*).

129.  Based on reporting to the FEC for the last five election cycles (2014, 2016, 2018, 2020, and 2022 elections), the DCCC spent between 96.6% and 100% of all its independent expenditures on expenses that it categorized as "MEDIA" or "MEDIA BUY" expenditures. (*Id.* at #1289).

130. Based on reporting to the FEC, the RNC spent approximately $1.2 million on independent expenditures in one electoral race during the 2022 election. (*Id.* at #1288).

131. Based on reporting to the FEC, the RNC spent approximately $7.1 million on independent expenditures in one electoral race during the 2020 election. (*Id.*).

132. Based on reporting to the FEC, the DNC spent no money on independent expenditures in either the 2020 or the 2022 election. (*Id.*).

133. Based on reporting to the FEC, independent expenditures during the 2022 election made by all Republican committees (national, state, and local) amounted to over $124.2 million. (*Id.* at #1305).

134. Based on reporting to the FEC, independent expenditures during the 2020 election made by all Republican committees (national, state, and local) amounted to over $209.2 million. (*Id.*).

135. Based on reporting to the FEC, independent expenditures during the 2022 election made by all Democratic committees (national, state, and local) amounted to over $146.5 million. (*Id.*).

136. Based on reporting to the FEC, independent expenditures during the 2020 election made by all Democratic committees (national, state, and local) amounted to over $183.4 million. (*Id.*).

137. Based on publicly disclosed campaign finance data, independent expenditures made by non-party entities has increased from $14.7 million in 2004 to $1.678 billion in 2020. (Doc. 41-3, #4150).

### c.     Other Campaign Finance Data

138. Based on reporting to the FEC, the Republican national party committees'
total contributions to federal candidates amounted to $1,495,800 for the 2022
election cycle and $1,251,057 for the 2020 election cycle. (Doc. 36-13, #1290).
When factoring in contributions from state and local Republican party
committees, total Republican contributions to federal candidates amounted to
$1,783,668 for the 2022 election cycle and $1,461,839 for the 2020 election
cycle. (*Id.* at #1305).

139. Based on reporting to the FEC, the Democratic national party committees'
total contributions to federal candidates amounted to $1,252,842 for the 2022
election cycle and $1,420,939 for the 2020 election cycle. (*Id.* at #1290). When
factoring in contributions from state and local Democratic party committees,
total Democratic contributions to federal candidates amounted to $1,755,663
for the 2022 election cycle and $1,809,209 for the 2020 election cycle. (*Id.* at
#1305).

140. Based on a subset of the data reported to the agency for the 2020 election cycle,
the FEC reports 8 examples of 2020 senatorial races in which an individual
candidate received more than $50,000 in contributions from his or her party
(combining all national, state, and local contributions). (*Id.* at 1299).

141. Based on a subset of the data reported to the agency for the 2022 election cycle,
the FEC reports 11 examples of 2022 senatorial races in which an individual
candidate received more than $50,000 in contributions from his or her party
(combining all national, state, and local contributions). (*Id.* at #1298).

142. Based on a subset of the data reported to the agency for the 2020 election cycle, the FEC reports 2 examples of 2020 races in which a House candidate received more than $25,000 in contributions from his or her party (combining all national, state, and local contributions). (*Id.* at #1300).

143. Based on a subset of the data reported to the agency for the 2022 election cycle, the FEC reports 4 examples of 2022 races in which a House candidate received more than $25,000 in contributions from his or her party (combining all national, state, and local contributions). (*Id.*).

144. Based on reporting to the FEC, the NRSC spent a total of $256,279,028 during the 2022 election cycle. (*Id.*). And the NRSC's expenditures that the FEC does not code as independent expenditures, coordinated expenditures, or contributions amounted to $154,257,232 during the 2022 election cycle. (*Id.* at #1301).

145. Based on reporting to the FEC, the NRCC spent a total of $285,469,165 during the 2022 election cycle. (*Id.* at #1300). And the NRCC's expenditures that the FEC does not code as independent expenditures, coordinated expenditures, or contributions amounted to $130,377,109 during the 2022 election cycle. (*Id.* at #1301).

146. Based on reporting to the FEC, the DSCC spent a total of $289,027,976 during the 2022 election cycle. (*Id.*). And the DSCC's expenditures that the FEC does not code as independent expenditures, coordinated expenditures, or contributions amounted to $151,381,249 during the 2022 election cycle. (*Id.*).

147. Based on reporting to the FEC, the DCCC spent a total of $367,701,788 during the 2022 election cycle. (*Id.*). And the DCCC's expenditures that the FEC does not code as independent expenditures, coordinated expenditures, or contributions amounted to $198,353,141 during the 2022 election cycle. (*Id.*).

148. Based on financial disclosures to the FEC, approximately half of the total direct contributions, coordinated expenditures, and independent expenditures made by the national Republican party and its committees in the 2022 election for seats in the United States House of Representatives were spent in 11 congressional districts. (*Id.* at #1302).

149. Based on financial disclosures to the FEC, approximately half of the total direct contributions, coordinated expenditures, and independent expenditures made by the national Republican party and its committees in the 2020 election for seats in the United States House of Representatives were spent in 12 congressional districts. (*Id.*).

150. Based on financial disclosures to the FEC, approximately half of the total direct contributions, coordinated expenditures, and independent expenditures made by the national Democratic party and its committees in the 2022 election for seats in the United States House of Representatives were spent in 17 congressional districts. (*Id.*).

151. Based on financial disclosures to the FEC, approximately half of the total direct contributions, coordinated expenditures, and independent expenditures made by the national Democratic party and its committees in the 2020 election

for seats in the United States House of Representatives were spent in 18 congressional districts. (*Id.*).

152. Based on financial disclosures to the FEC, the non-inflation adjusted total amount of funding the Republican national party committees raised during the 1992 election cycle was $245,608,214 ($194,530,781 constituted "hard money" or monies raised that were subject to limits under the then-applicable FECA statutory regime; the remainder raised constituted "soft money" not subject to limits under the then-applicable FECA statutory regime).[*] (Doc. 36-13, #1306).

153. Based on financial disclosures to the FEC, the total amount of funding the Republican national party committees raised during the 2000 election cycle was $619,744,718 ($361,558,430 constituted "hard money"; the remainder raised constituted "soft money"). (*Id.* at #1285).

154. Based on financial disclosures to the FEC, the total amount of funding the Republican national party committees raised during the 2002 election cycle was $602,908,687 ($352,876,067 constituted "hard money"; the remainder raised constituted "soft money"). (*Id.*).

155. Based on financial disclosures to the FEC, the total amount of funding the Republican national party committees raised during the 2014 election cycle

---

[*] Since the passage of the Bipartisan Campaign Reform Act of 2002 (BCRA), national party committees and federal candidates have been prohibited from raising "soft money." Pub. L. No. 107-155, Title I § 101, 116 Stat. 82 (amending the FECA to add § 323. 52 U.S.C. § 30125). The Supreme Court has found that this ban withstands constitutional challenge. *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 188–89 (2003), *overruled on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010).

was $476,627,510: the RNC raised $194,861,133; the NRSC raised $128,278,255; and the NRCC raised $153,488,122. (*Id.*).

156. Based on financial disclosures to the FEC, the total amount of funding the Republican national party committees raised during the 2016 election cycle was $652,349,694: the RNC raised $343,371,200; the NRSC raised $138,376,518; and the NRCC raised $170,601,976. (*Id.*).

157. Based on financial disclosures to the FEC, the total amount of funding the Republican national party committees raised during the 2018 election cycle was $682,183,239: the RNC raised $324,836,805; the NRSC raised $151,570,520; and the NRCC raised $205,775,914. (*Id.*).

158. Based on financial disclosures to the FEC, the total amount of funding the Republican national party committees raised during the 2020 election cycle was $1,509,714,293: the RNC raised $890,538,963; the NRSC raised $338,263,383; and the NRCC raised $280,911,947. (*Id.*).

159. Based on financial disclosures to the FEC, the total amount of funding the Republican national party committees raised during the 2022 election cycle was $874,555,820: the RNC raised $335,196,209; the NRSC raised $250,044,900; and the NRCC raised $289,314,711. (*Id.*).

160. Based on financial disclosures to the FEC, the non-inflation adjusted total amount of funding the Democratic national party committees raised during the 1992 election cycle was $140,348,570 ($104,057,403 constituted "hard money"; the remainder raised constituted "soft money"). (*Id.* at #1307).

161. Based on financial disclosures to the FEC, the total amount of funding the Democratic national party committees raised during the 2000 election cycle was $469,864,075 ($212,880,651 constituted "hard money"; the remainder raised constituted "soft money"). (*Id.* at #1286).

162. Based on financial disclosures to the FEC, the total amount of funding the Democratic national party committees raised during the 2002 election cycle was $408,386,152 ($162,325,003 constituted "hard money"; the remainder raised constituted "soft money"). (*Id.*).

163. Based on financial disclosures to the FEC, the total amount of funding the Democratic national party committees raised during the 2014 election cycle was $538,435,215: the DNC raised $163,319,917; the DSCC raised $168,323,305; and the DCCC raised $206,791,993. (*Id.*).

164. Based on financial disclosures to the FEC, the total amount of funding the Democratic national party committees raised during the 2016 election cycle was $755,302,343: the DNC raised $354,610,726; the DSCC raised $179,800,229; and the DCCC raised $220,891,388. (*Id.*).

165. Based on financial disclosures to the FEC, the total amount of funding the Democratic national party committees raised during the 2018 election cycle was $620,891,026: the DNC raised $175,769,640; the DSCC raised $148,698,958; and the DCCC raised $296,422,428. (*Id.*).

166. Based on financial disclosures to the FEC, the total amount of funding the Democratic national party committees raised during the 2020 election cycle

was $1,141,395,183: the DNC raised $491,727,344; the DSCC raised $303,883,335; and the DCCC raised $345,784,504. (*Id.*).

167. Based on financial disclosures to the FEC, the total amount of funding the Democratic national party committees raised during the 2022 election cycle was $966,596,028: the DNC raised $306,790,180; the DSCC raised $296,838,737; and the DCCC raised $362,967,111. (*Id.*).

168. Based on financial disclosures to the FEC, state and local Republican party committees have raised the following "hard money" amounts for the last five election cycles: $189,752,802 during the 2014 election; $317,045,586 during the 2016 election; $205,114,861 during the 2018 election; $560,859,122 during the 2020 election; and $244,430,946 during the 2022 election. (*Id.* at #1304).

169. Based on financial disclosures to the FEC, state and local Democratic party committees have raised the following "hard money" amounts for the last five election cycles: $272,480,105 during the 2014 election; $547,451,981 during the 2016 election; $327,992,371 during the 2018 election; $662,831,271 during the 2020 election; and $440,556,460 during the 2022 election. (*Id.*).

170. Based on financial disclosures to the FEC, Republican and Democratic state and local party committees have raised a total of $42,636,070 in "Levin funds" and have made a total of $43,380,090 "Levin-funds" disbursements from January 1, 2009, through December 31, 2022.[†] (*Id.* at #1306).

---

[†] State and local party committees, which can raise soft money for non-federal elections without facing FECA limits, must comply with the limits found in § 323(b) of FECA, <u>52 U.S.C. § 30125(b)</u> (added by BCRA), when using such soft money in connection with federal

171. Based on publicly disclosed campaign finance data for elections from 1980 until 2020, contributions from political action committees to federal campaigns has consistently exceeded the contributions and expenditures made by party-affiliated committees to federal campaigns. (Doc. 41-3, #4150).

## V. Additional Findings of Adjudicative Fact

172. During discovery, the parties retained policy experts. The experts' reports detailing their respective policy views on the FECA's coordinated party expenditure limits and the propriety of ruling for or against Plaintiffs based on their policy expertise were filed on the Court's docket. (Docs. 41-3, 41-8). The parties also filed transcripts of the depositions taken of each of their policy experts on the Court's docket. (Docs. 41-4, 41-5).

173. Defendants' expert, Jonathan Krasno, is a professor of political science at Binghamton University in Binghamton, New York, who was designated as an expert witness in other campaign finance cases. (Doc. 36-1, #397, 399). In each case, he had been retained by the governmental entity to provide his opinion in defense of the campaign finance regulations. (*Id.* at #400). Krasno was the FEC's designated expert in *FEC v. Colorado Republican Federal Campaign Committee* (*Colorado II*), 533 U.S. 431 (2001), in which case he co-authored a report in support of upholding the FECA's coordinated party expenditure

---

elections. *McConnell*, 540 U.S. at 122, 161–62. But Levin funds are an exception to the hard limits as they permit state and local party committees to pay for specified federal election activities using "an allocated ratio of hard money and 'Levin funds.'" *Id.* at 162–63 (citing § 323(b)(2) of the FECA and noting that Levin funds may be spent on "voter registration activity, voter identification drives, GOTV drives, and generic campaign activities").

limits. (Doc. 36-1, #399–400). Krasno has published several articles and books, which academic works cover topics including campaign finance laws and American political parties. (*Id.* at #416–19).

174. Plaintiffs' expert, Raymond La Raja, is a professor of political science and Associate Dean at the University of Massachusetts, Amherst, who previously served as the designated expert for the plaintiffs in *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003), *overruled in part by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010). (Doc. 41-3, #4123–24, 4172). La Raja has published several articles and books, which academic works cover topics including campaign finance laws and American political parties. (*Id.* at #4162–65, 4166–69). La Raja also has served on a couple of task forces related to election matters, in which he has focused on campaign finance reform. (*Id.* at #4171–72; Doc. 41-5, #4672–73).

175. Neither the NRSC nor the NRCC have personal knowledge of what they understand to be instances of donors' seeking to use contributions to the committees to facilitate a quid pro quo arrangement with an elected official or candidate for office. (Doc. 19-1, #176; Doc. 19-2, #186).

176. Both Senator Vance and Chabot have declared that they have "no knowledge" of the party's "sources of funding used to engage in coordinated expenditures in support of" their respective 2022 campaigns. (Doc. 41-6, #4720; Doc. 41-7, #4752).

177. Neither Senator Vance nor Chabot or their agents identified any documents responsive to the FEC's requests for production relating to their knowledge of the sources of funding for coordinated party expenditures or communications with party donors concerning expectations of "legislative action or inaction." (Doc. 41-6, #4726–28; Doc. 41-7, #4757–59).

178. Neither the NRSC nor the NRCC identified any documents responsive to the FEC's requests for the production of documents relevant to establishing a connection between (1) contributions to the party committees and donor expectation about legislation action, (2) the amount of money the party committee expended on a candidate and the amount the latter raised for the party committee, and (3) the amount of money a candidate raised and his committee assignment once in office. (Doc. 41-1, #4057–58, 4061–62; Doc. 41-2, #4112–13, 4116–17).