No. 24-3051

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

_____

NATIONAL REPUBLICAN SENATORIAL COMMITTEE, *et al.*,
*Plaintiff-Appellants*,

v.

FEDERAL ELECTION COMMISSION, *et al.*,
*Defendant-Appellees.*

_____

On Certification from the United States District Court
for the Southern District of Ohio (Cole, J.)
District Court Case No. 1:22-cv-639

_____

## FIRST BRIEF OF PLAINTIFF-APPELLANTS NATIONAL REPUBLICAN SENATORIAL COMMITTEE, NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE, J.D. VANCE, AND STEVEN CHABOT

_____

Jessica Furst Johnson
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street, N.W.
Suite 643A
Washington, DC 20037
Phone: (202) 737-8808
jessica@holtzmanvogel.com

*Counsel for Plaintiff-Appellants National
Republican Senatorial Committee & National
Republican Congressional Committee*

Noel J. Francisco
Donald F. McGahn II
John M. Gore
E. Stewart Crosland
Brinton Lucas
Charles E.T. Roberts
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Phone: (202) 879-3939
njfrancisco@jonesday.com

Sarah Welch
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio 44114
Phone: (216) 586-3939
swelch@jonesday.com

*Counsel for Plaintiff-Appellants*

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 24-3051          Case Name: NRSC et al. v. FEC et al.

Name of counsel:  Noel J. Francisco

Pursuant to 6th Cir. R. 26.1,  National Republican Senatorial Committee, National Republican
Congressional Committee, James David Vance, and Steven Joseph Chabot

*Name of Party*

makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
     identity of the parent corporation or affiliate and the relationship between it and the named
     party:

No.

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
     in the outcome?  If yes, list the identity of such corporation and the nature of the financial
     interest:

No.

## CERTIFICATE OF SERVICE

I certify that on _____ March 4, 2024 _____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Noel J. Francisco
51 Louisiana Ave., NW
Washington, D.C., 20001

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT...........................................................i

TABLE OF AUTHORITIES ...............................................................................iii

STATEMENT REGARDING ORAL ARGUMENT ...............................................ix

INTRODUCTION...............................................................................................1

JURISDICTIONAL STATEMENT.......................................................................7

STATEMENT OF THE ISSUE ............................................................................7

STATEMENT OF THE CASE .............................................................................7

    A.  Legal Framework.................................................................................7

    B.  District Court Proceedings.................................................................17

SUMMARY OF THE ARGUMENT....................................................................21

STANDARD OF REVIEW.................................................................................23

ARGUMENT....................................................................................................24

  I. THE COORDINATED PARTY EXPENDITURE LIMITS VIOLATE THE FIRST AMENDMENT .....................................................................................24

    A.  The Coordinated Party Expenditure Limits Burden Core Political Speech And Association ........................................................................24

    B.  The Coordinated Party Expenditure Limits Fail Even "Closely Drawn" Scrutiny .........................................................................................28

  II.*COLORADO II* CANNOT SAVE THE ACT'S CURRENT COORDINATED PARTY EXPENDITURE LIMITS..................................41

    A.  *Colorado II* Does Not Directly Control This Case ...................41

    B.  *Colorado II* Should Be Overruled................................................49

CONCLUSION .................................................................................................54

CERTIFICATE OF COMPLIANCE ...................................................................55

CERTIFICATE OF SERVICE ............................................................................56

DESIGNATION OF RELEVANT LOWER COURT DOCUMENTS..................57

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ams. For Prosperity Found. v. Bonta*,
141 S. Ct. 2373 (2021) ................................................................. 38, 40

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*,
564 U.S. 721 (2011) ........................................................................ 24

*Arkansas Writers' Project, Inc. v. Ragland*,
481 U.S. 221 (1987) ........................................................................ 44

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
140 S. Ct. 2335 (2020) .................................................................... 44

*Bread Pol. Action Comm. v. FEC*,
455 U.S. 577 (1982) ........................................................................ 18

*Buckley v. Valeo*,
424 U.S. 1 (1976) ..................................................................... *passim*

*California Democratic Party v. Jones*,
530 U.S. 567 (2000) ............................................................... 1, 26, 32

*Citizens United v. FEC*,
558 U.S. 310 (2010) ................................................................. *passim*

*Colorado Republican Fed. Campaign Comm. v. FEC (Colorado I)*,
518 U.S. 604 (1996) ................................................................. *passim*

*Davis v. FEC*,
554 U.S. 724 (2008) ........................................................................ 36

*Eu v. S.F. Cnty. Democratic Cent. Comm.*,
489 U.S. 214 (1989) ............................................................... 1, 26, 53

*FEC v. Colorado Republican Fed. Campaign Comm.*,
213 F.3d 1221 (10th Cir. 2000) ...................................................... 39

*FEC v. Colorado Republican Federal Campaign Committee (Colorado II)*,
533 U.S. 431 (2001) ................................................................. *passim*

iii

*FEC v. Cruz,*
    596 U.S. 289 (2022) ...................................................*passim*

*FEC v. Democratic Senatorial Campaign Comm.,*
    454 U.S. 27 (1981) ...........................................4, 14, 15, 27

*FEC v. NRSC,*
    966 F.2d 1471 (D.C. Cir. 1992) ............................... 10

*Holmes v. FEC,*
    875 F.3d 1153 (D.C. Cir. 2017) (en banc)................ 38

*Janus v. AFSCME,*
    138 S. Ct. 2448 (2018) ...................................... 49, 50

*Jones v. Jegley,*
    947 F.3d 1100 (8th Cir. 2020) .......................... 39, 40

*Kennedy v. Bremerton Sch. Dist.,*
    597 U.S. 507 (2022) ............................................ 31

*Libertarian National Committee v. FEC,*
    924 F.3d 533 (D.C. Cir. 2019) (en banc)............. 44, 49

*McConnell v. FEC,*
    540 U.S. 93 (2003) ......................................44, 46, 47

*McCutcheon v. FEC,*
    572 U.S. 185 (2014) ...............................................*passim*

*Monitor Patriot Co. v. Roy,*
    401 U.S. 265 (1971) ........................................24, 26, 37

*Republican Party of Minn. v. White,*
    536 U.S. 765 (2002) ........................................... 2, 35

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.,*
    490 U.S. 477 (1989) ............................................ 41

*Shelby County v. Holder,*
    570 U.S. 529 (2013) ............................................ 47

*Smith v. Jefferson Cnty. Bd. of School Comm'rs,*
    788 F.3d 580 (6th Cir. 2015) .............................. 43

*SpeechNow.org v. FEC,*
   599 F.3d 686 (D.C. Cir. 2010) (en banc) ....................................... 49

*United States v. Davis,*
   84 F.4th 672 (6th Cir. 2023) ...................................... 23

*Williams-Yulee v. Florida Bar,*
   575 U.S. 433 (2015) ...................................... 3, 35

*Wisconsin Right to Life, Inc. v. FEC,*
   546 U.S. 410 (2006) ...................................... 48

*Zimmerman v. City of Austin,*
   881 F.3d 378 (5th Cir. 2018) ...................................... 39, 40

## STATUTES

28 U.S.C. § 1331 ...................................... 7

28 U.S.C. § 2201 ...................................... 7

28 U.S.C. § 2202 ...................................... 7

52 U.S.C. § 30101 ......................................*passim*

52 U.S.C. § 30102 ...................................... 8

52 U.S.C. § 30104 ...................................... 3, 10

52 U.S.C. § 30110 ......................................*passim*

52 U.S.C. § 30116 ......................................*passim*

52 U.S.C. § 30125 ...................................... 8

Ala. Code § 17-5-15 ...................................... 35

Ariz. Rev. Stat. § 16-911 ...................................... 35

Ariz. Rev. Stat. § 16-912 ...................................... 35

Ariz. Rev. Stat. § 16-915 ...................................... 35

Bipartisan Campaign Reform Act, Pub. L. No. 107-155, 116 Stat. 81 ....................*passim*

Cal. Gov't Code § 85301 ................................................... 35

Cal. Gov't Code § 85400 ................................................... 35

Consolidated and Further Continuing Appropriations Act 2015,
Pub. L. No. 113-235, 128 Stat. 2130 (2014) ................. 14

Ill. Comp. Stat. 5/9-8.5 ................................................... 35

Ind. Code § 3-9-2-1 *et seq.*. ............................................ 35

Iowa Code § 68A.101 *et seq.* ......................................... 35

Kan. Stat. § 25-4153 ....................................................... 35

Ky. Rev. Stat. § 121.150 ................................................. 35

La. Stat. § 18:1505.2 ....................................................... 35

Mass. Code Regs. 1.04 ................................................... 35

Miss. Code § 23-15-1021 ............................................... 35

N.C. Gen. Stat. § 163-278.13 ......................................... 35

N.D. Cent. Code § 16.1-08.1-01 *et seq.*. ...................... 35

N.J. Stat. § 19:44A-29 ................................................... 35

N.M. Stat. § 1-19-34.7 ................................................... 35

N.Y. Elec. Law § 14-114 ............................................... 35

Neb. Rev. Stat. ch. 32, art. 16 ........................................ 35

Ohio Rev. Code § 3517.102 ........................................... 35

Or. Rev. Stat. § 260.005 *et seq.* ................................... 35

25 Pa. Cons. Stat. § 3241 *et seq.* ................................. 35

S.D. Codified Laws § 12-27-7 ........................................ 35

S.D. Codified Laws § 12-28-8 ........................................ 35

Tex. Elec. Code § 253.001 *et seq.*. ............................... 35

Utah Code § 20A-11-101 *et seq.*..................................................... 35

Va. Code § 24.2-945 ....................................................................... 35

Vt. Stat. tit. 17, § 2941 ................................................................. 35

W. Va. Code § 3-8-5c ..................................................................... 35

Wis. Stat. § 11.1101 ....................................................................... 35

Wis. Stat. § 11.1104 ....................................................................... 35

Wyo. Stat. § 22-25-102 ................................................................. 35

**OTHER AUTHORITIES**

11 C.F.R. § 100.26 ......................................................................... 11

11 C.F.R. § 109.20 ..................................................................... 1, 11

11 C.F.R. § 109.32 ................................................................... 12, 13

11 C.F.R. § 109.33 ......................................................................... 13

11 C.F.R. § 109.37 ................................................................*passim*

11 C.F.R. § 110.6 ............................................................... 9, 10, 33

R. Bauer, *The Parties' Struggles in the Political "Market": Can Regulation Solve This Problem—Should It, and If So, How?*, 54 HOUS. L. REV. 881 (2017) ......................................... 4, 45

FEC, Contribution Limits ......................................................... 9, 33

FEC, Coordinated Party Expenditure Limits ................................... 12

R. Hasen, Buckley *Is Dead, Long Live* Buckley*: The New Campaign Finance Incoherence of* McConnell v. Federal Election Commission, 153 U. PA. L. REV. 31 (2004)........... 50

S. Issacharoff, *Democracy's Deficits*, 85 U. CHI. L. REV. 485 (2018) ................................. 47

S. Issacharoff, *Outsourcing Politics: The Hostile Takeover of Our Hollowed-Out Political Parties*, 54 HOUS. L. REV. 845 (2017) ....................................... 45, 46

N.J. Admin. Code § 19:25-11.2.................................................... 35

R. Pildes, *Romanticizing Democracy, Political Fragmentation, and the Decline of American Government*, 124 Yale L.J. 804 (2014) .................................................................... 46, 47

Gerald F. Seib, *For Saner Politics, Try Stronger Parties*, Wall St. J. (Apr. 20, 2023) .......... 6

I. Vandewalker & D. Weiner, *Stronger Parties, Stronger Democracy: Rethinking Reform*, Brennan Ctr. for Just. (2015) ............................................................................. 47

**STATEMENT REGARDING ORAL ARGUMENT**

The en banc Court has scheduled oral argument for 2:00 p.m. on June 12, 2024.

**INTRODUCTION**

This case concerns the most "basic" freedom "in our democracy"—"the right to participate in electing our political leaders." *McCutcheon v. FEC*, 572 U.S. 185, 191 (2014) (plurality) (*McCutcheon*). Political parties' expression of support for their candidates, particularly in elections, lies "at the core of our … First Amendment freedoms" and is entitled to the most robust constitutional protection. *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 222-23 (1989). Indeed, "[r]epresentative democracy in any populous unit of governance is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views." *California Democratic Party v. Jones*, 530 U.S. 567, 574 (2000).

The Federal Election Campaign Act (FECA) nevertheless restricts political party committees from doing what the First Amendment entitles them to do: fully associate with and advocate for their own candidates for federal office. Specifically, FECA's so-called "coordinated party expenditure limits" restrict the amount of their money party committees can spend in cooperation, or "coordination," with their general election candidates to influence federal elections. § 30116(d); *see* 11 C.F.R. § 109.20 (defining "coordinated").[1] These strict limits apply selectively to an array of coordinated spending between parties and their candidates, including, most egregiously, *political advertising*, dubbed "party coordinated communications" by the government, 11 C.F.R. § 109.37.

---

[1] Unless otherwise noted, all statutory citations refer to Title 52 of the U.S. Code.

The Federal Election Commission (FEC) has come nowhere close to carrying its demanding burden to prove that this severe speech rationing complies with the First Amendment. Indeed, the FEC is the agency charged with enforcing the limits—and even insisted on slowing down this case to take discovery—but it offered no evidence that the limits actually advance the "only … permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance." *FEC v. Cruz*, 596 U.S. 289, 305 (2022); *see* Findings, R.49-1 ¶¶ 175-78, PageID##5536-37. This lack of evidence is unsurprising, since Congress did not even enact the limits for that purpose, which were instead part of an improper effort to "reduc[e] what it saw as wasteful and excessive campaign spending." *Colorado Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 618 (1996) (plurality) (*Colorado I*).

Proving the point, Congress's arbitrary mathematical formula for setting the limits—which turns on the office sought, state, voting-age population, and inflation, § 30116(d)—makes sense only as a ration on political spending, not as a rule for preventing *quid pro quo* corruption. Indeed, the limits are "so woefully underinclusive" that Congress could not have enacted them for "th[e] purpose" of preventing *quid pro quo* corruption or its appearance. *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002). For example, FECA *exempts* from the limits coordinated spending on several forms of political advocacy indistinguishable from the political advertising it *subjects* to the limits, such as certain get-out-the-vote activities on behalf of presidential campaigns

and campaign mailers sent with assistance from party volunteers. § 30101(8)(B)(ix), (xi), (9)(B)(viii), (ix). And in 2014, Congress made this problem worse, adding coordinated spending on presidential nominating conventions, party infrastructure, and candidate legal fees to its preferred speech exempt from the limits. § 30116(a)(9). There is no principled explanation for Congress's disparate treatment of these various categories of coordinated spending, further underscoring that Congress was not "in fact pursuing," and the limits "do[] not actually advance," the interest in preventing actual or apparent *quid pro quo* corruption. *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 448-49 (2015).

Even if the FEC could overcome its dearth of evidence and the limits' underinclusiveness, it still could not carry its burden to prove that the limits are "'narrowly tailored" to the permissible anti-corruption interest. *McCutcheon*, 572 U.S. at 218. The limits are, at best, redundant of other FECA provisions that actually *do* promote that interest. In particular, FECA *already* limits how much any donor may contribute to any candidate or party committee via so-called "base limits." § 30116(a)(1). It *already* prevents a donor from using parties to circumvent the base limits through an earmarking rule that counts contributions made through intermediaries but directed to specific candidates against the donor's limit on contributions to those candidates. § 30116(a)(8). And it *already* requires detailed disclosures of nontrivial contributions and expenditures, § 30104—data readily available to all the world at fec.gov.

The coordinated party expenditure limits thus are "yet another in a long line of prophylaxis-upon-prophylaxis approaches to regulating campaign finance," a "significant indicator" that they flout the First Amendment. *Cruz*, 596 U.S. at 306 (cleaned up). And their harm to parties, candidates, voters, and the American public is undeniable. The limits inhibit the core political speech and associational activity of parties and candidates collaborating to communicate their message to voters and to win federal elections. And they inflict tangible pocketbook harm by compelling party committees to create costly and inefficient "independent expenditure units," firewalled from the party's main operations, to engage in public advocacy campaigns independent of the committee and candidates. Findings, R.49-1 ¶¶ 71-72, PageID#5510; *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 28 n.1 (1981) (*DSCC*). This forced separation of parties and candidates has predictably weakened parties' force in American democracy, especially over the last two decades, as donors have flocked to Super PACs, which face practically no fundraising restrictions. That, in turn, has only increased political polarization and fragmentation, such that even those sympathetic to campaign-finance restrictions in general have criticized the limits as "exceptionally harmful" to the Nation. La Raja Rept., R.41-3 at 13, PageID#4133; *see also* R. Bauer, *The Parties' Struggles in the Political "Market": Can Regulation Solve This Problem—Should It, and If So, How?*, 54 Hous. L. Rev. 881, 906 (2017) ("[S]eparation of party and candidate is unhealthy … and introduces inefficiencies and disruptions into the political market.").

The limits therefore flunk *any* level of First Amendment scrutiny, especially as applied to the political advertising addressed in 11 C.F.R. § 109.37. The FEC's only conceivable defense is that *FEC v. Colorado Republican Federal Campaign Committee*, 533 U.S. 431 (2001) (*Colorado II*), upheld the limits against a facial challenge. But *Colorado II* "does not control here" for four reasons. *McCutcheon*, 572 U.S. at 200.

*First*, since *Colorado II*, the Supreme Court has strengthened the "legal backdrop" governing First Amendment challenges to campaign-finance restrictions. *Id.* It has made clear that preventing *quid pro quo* corruption or its appearance is the "only" interest Congress may pursue through campaign-finance restrictions, *Cruz*, 596 U.S. at 305, and that any such restrictions must be "narrowly tailored," *McCutcheon*, 572 U.S. at 218. The *Colorado II* majority, however, did not address whether the limits can be justified as serving that interest or are narrowly tailored. *See* 533 U.S. at 456 n.18. Rather, it upheld them based upon a constitutionally inadequate interest in preventing "undue influence on an officeholder's judgment" and in the absence of narrow tailoring. *Id.* at 441.

*Second*, Congress enacted a "distinct legal backdrop" governing coordinated party expenditures through the 2014 amendments, *McCutcheon*, 572 U.S. at 200, which authorized *unlimited* coordinated spending on presidential nominating conventions, party infrastructure, and candidate legal fees, § 30116(a)(9). This post-*Colorado II* change confirms that FECA's limits on *other* forms of political speech neither advance a constitutionally acceptable interest nor are narrowly tailored. *See McCutcheon*, 572 U.S.

at 202-03. As such, this Court is "confronted with a different statute … at a different point in the development of campaign finance regulation," which alone merits "plenary consideration" of Plaintiffs' "substantial First Amendment challenge." *Id.*

*Third*, the limits also now operate against a different factual backdrop compared to 2001. *Colorado II* rested on the majority's view that "political parties are dominant players … in federal elections." 533 U.S. at 450. After *Colorado II*, however, Congress significantly eroded the parties' power by enacting the Bipartisan Campaign Reform Act (BCRA), Pub. L. No. 107-155, 116 Stat. 81, which banned them from raising or spending so-called "soft money." As a result, since *Colorado II*, Super PACs have come to dominate the parties in campaign fundraising and spending—as this case's record amply shows. *See* La Raja Rept., R.41-3 at 5-25, 28-31, PageID##4125-45, 4148-51; *see also* Gerald F. Seib, *For Saner Politics, Try Stronger Parties*, WALL ST. J. (Apr. 20, 2023), https://perma.cc/TU76-TWMK ("Donna Brazile, a former Democratic national chairwoman, says that 'over the years, the parties have been weakened by the new landscape where super PACs … have a stranglehold.'").

*Finally*, in all events, *Colorado II* expressly left open any "as-applied challenge," 533 U.S. at 456 n.17, such as this lawsuit's challenge to the application of the limits to "party coordinated communications," 11 C.F.R. § 109.37.

The Court should hold that FECA's coordinated party expenditure limits violate the First Amendment.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction to certify the constitutional question to this Court under § 30110 and 28 U.S.C. §§ 1331, 2201, 2202. This Court has jurisdiction to "hear the matter sitting en banc," § 30110, because the district court properly certified a question of FECA's constitutionality, Cert. Order, R.49 at 41, PageID#5494.

## STATEMENT OF THE ISSUE

The district court certified this question: "Do the limits on coordinated party expenditures in § 315 of the Federal Election Campaign Act of 1971, as amended, 52 U.S.C. § 30116, violate the First Amendment, either on their face or as applied to party spending in connection with 'party coordinated communications' as defined in 11 C.F.R. § 109.37?" Cert. Order, R.49 at 4, PageID#5494.

## STATEMENT OF THE CASE

**A.    Legal Framework**

**1.    FECA's restrictions on political parties' speech**

Every dollar a political party committee receives for the purpose of influencing an election for federal office is a "contribution" and must be collected in compliance with FECA's contribution limits and prohibitions—including the earmarking rule—and publicly reported to the FEC. §§ 30101(8)(A)(i); 30116(a)(8). Prior to 2002, party committees could raise unlimited funds for use in general party-building activities, without regard for FECA's contribution limits or source prohibitions. But in 2002, Congress significantly amended FECA through BCRA, which banned this so-called

"soft money" by prohibiting national party committees from raising (or spending) any funds not subject to FECA's "limitations, prohibitions, and reporting requirements." § 30125(a). BCRA also generally bars state and local parties from using such funds in connection with any "federal election activity." § 30125(b).

FECA's regulation of political parties' political speech does not end there. FECA also restricts how party committees can spend the limited contributions they raise to support their own candidates in federal elections. Party committees have three principal options for spending their money to provide financial support to federal candidates: (i) contributions, (ii) coordinated party expenditures, and (iii) "independent expenditures." FECA strictly limits the first two categories.

### a.    Contribution limits and reporting requirements

Under FECA, party committees must maintain a general operating bank account from which they must make any contributions or expenditures "for the purpose of influencing any election for Federal office," including coordinated party expenditures. § 30102(h); *see* § 30101(8)(A)(i) (defining "contribution"), (9)(A)(i) (defining "expenditure"). FECA imposes dollar limits on contributions to or spending from these general operating accounts. § 30116(a).

On the front end, FECA restricts how much money party committees can *receive* by imposing base limits on the amounts individuals and other political committees can contribute to their operating accounts. Presently, the base limit on individual

contributions is $41,300 per year to the national party committees and $10,000 per year to any state, district, and local party committees. § 30116(a)(1)(B), (a)(2)(B); FEC, *Contribution Limits*, https://perma.cc/X65Z-L27E (*Limits*).

On the back end, FECA caps how much the party committees can *give* to any federal candidate, through a $5,000 base limit per election. § 30116(a)(2)(A).[2] FECA similarly imposes base limits on contributions from individuals and other political committees to federal candidates. § 30116(c). The base limit on individual contributions to candidates is currently $3,300 per election. § 30116(a)(1)(A); *Limits*, *supra*.

FECA imposes additional restrictions to prevent donors from circumventing the base limits. Namely, FECA's earmarking rule applies the base limits to funds that are "in any way earmarked or otherwise directed through an intermediary or conduit" to a federal candidate. § 30116(a)(8). Earmarking broadly encompasses any "designation, instruction, or encumbrance, whether direct or indirect, express or implied, oral or written, which results in all or any part of a contribution or expenditure being made to, or expended on behalf of, a clearly identified candidate or a candidate's authorized committee." 11 C.F.R. § 110.6(b)(1). So, if "a donor gives money to a party committee but directs the party committee to pass the contribution along to a particular candidate, then the transaction is treated as a contribution from the original donor to the specified candidate," and governed by the $3,300 base limit for donor contributions. *McCutcheon*,

---

[2] A national party committee and its senatorial committee, however, may together contribute up to $57,800 to a senatorial candidate's campaign. § 30116(h); *Limits*, *supra*.

572 U.S. at 194. The FEC has a demonstrated history of enforcing the earmarking rule. *See, e.g.*, Exh. Q–Conciliation Agreement, R.41-11, PageID##4812-16; *FEC v. NRSC*, 966 F.2d 1471, 1477 n.7 (D.C. Cir. 1992).

FECA and its implementing regulations also impose substantial public-disclosure requirements on parties and candidates. These rules demand periodic reporting of all receipts and disbursements, including detailed itemization of certain transactions, § 30104(b), such as contributions aggregating more than $200 from any one individual by a party committee in a calendar year or by a candidate campaign in an election cycle, § 30104(b)(3). They also require special disclosures for earmarked contributions made through any intermediary, including a party committee. "The intermediary … shall report the original source and the recipient candidate … to the [FEC] and to the recipient candidate." 11 C.F.R. § 110.6(c)(1)(i). And the recipient candidate also must disclose the earmarked contribution and, in some cases, the intermediary's identity. *Id.* § 110.6(c)(2). All mandated disclosures are publicly available on the FEC's website.

### b.    Coordinated party expenditure limits

On top of the base contribution limits, earmarking rule, and disclosure requirements, FECA imposes strictly enforced limits on what political parties can spend in coordination with their candidates. § 30116(d); Findings, R.49-1 ¶ 52, PageID#5504. In particular, FECA restricts the ability of political party committees to make any "expenditure[s]"—defined as "any purchase, payment, distribution, loan, advance,

deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office," § 30101(9)(A)(i)—"coordinated" with their chosen candidates in connection with the general election, § 30116(d). The FEC construes "coordinated" to mean "made in cooperation, consultation or concert with, or at the request or suggestion of, a candidate, a candidate's authorized committee, or a political party committee." 11 C.F.R. § 109.20(a). Thus, coordinated party expenditures broadly include party payments of any expenses made in coordination with a candidate or campaign, such as for advertisements, a campaign's rental of a rally venue, data and information technology costs, or fundraising consultants. This lawsuit's *facial* challenge targets FECA's restriction of all coordinated party expenditures.

This lawsuit's *as-applied* challenge targets a subset of coordinated party expenditures—payments in connection with so-called "party coordinated communications," as defined by the FEC at 11 C.F.R. § 109.37. In general, a party coordinated communication is any form of general public political advertising— including ads disseminated "by means of any broadcast, cable, or satellite communication, newspaper, magazine, outdoor advertising facility, mass mailing, or telephone bank to the general public," or "placed for a fee on another person's website"—paid for by a party committee and coordinated with a candidate or campaign that expressly advocates the election or defeat of a clearly identified federal candidate. 11 C.F.R. § 109.37(a)(2)(ii); *id.* § 100.26 (defining "[p]ublic communication"). Yet the

term also captures party communications lacking express advocacy, including coordinated party advertising that (1) simply republishes campaign materials prepared by a candidate or campaign or (2) merely references a candidate within certain timeframes before the general election. *Id.* § 109.37(a)(2)(i), (iii).

Congress's restriction of coordinated party expenditures turns on nothing more than office sought, state, voting-age population, and inflation. For presidential, Senate, and House races in states with only one representative, Congress has set the coordinated party expenditure limits according to a formula that multiplies by two cents the voting-age population of the United States or the State, depending on the federal office involved. § 30116(d)(2)-(3). The FEC updates the exact limits annually based on this formula. In states with more than one representative, Congress set a coordinated party expenditure limit of $10,000, which is also increased annually based on the Cost-of-Living Adjustment. § 30116(d)(3)(B). For 2024, the limits range from $123,600 to $3,772,100 for Senate candidates, and from $61,800 to $123,600 for House candidates. 11 C.F.R. § 109.32; Findings, R.49-1 ¶ 50, PageID#5504; FEC, *Coordinated Party Expenditure Limits*, https://perma.cc/T9N9-9VJP.

Yet FECA entirely strips some party committees—such as Plaintiffs National Republican Senatorial Committee (NRSC) and National Republican Congressional Committee (NRCC) (together, the Committees) and their Democratic counterparts— of the right to make their own "coordinated party expenditures." The only national

Republican Party committee with authority to make any coordinated party expenditures (subject to FECA's limits) is the Republican National Committee (RNC). § 30116(d)(1)-(3); *see* 11 C.F.R. § 109.32. If the NRSC or NRCC wish to make coordinated expenditures with their candidates, the FEC requires they first obtain permission—an express written assignment of spending authority—from the RNC or the state party committee in the candidate's home state. 11 C.F.R. § 109.33; Findings, R.49-1 ¶¶ 63, 67, PageID#5504. Absent a written assignment, the Committees cannot engage in any coordinated party expenditures with their candidates. And even with an assignment, the Committees must comply with FECA's coordinated party expenditure limits and the scope of the assignment. § 30116(d). Findings, R.49-1 ¶ 50, PageID#5504.

### c. Congress's selective exclusion of certain coordinated spending from the coordinated party expenditure limits

While FECA imposes limits on coordinated political advocacy at the core of the First Amendment, such as "party coordinated communications," 11 C.F.R. § 109.37, Congress has allowed unlimited coordinated spending for certain purposes. For example, state and local party committees may coordinate freely with candidates on payment for production and dissemination of "campaign materials," "such as pins, bumper stickers, … and yard signs" if they are distributed using volunteers. § 30101(8)(B)(ix), (9)(B)(viii). For presidential and vice-presidential candidates, these committees may also freely coordinate and spend on voter-registration and get-out-the-vote phone banks run by volunteers. § 30101(8)(B)(xi), (9)(B)(ix).

Furthermore, in 2014, Congress amended FECA to add three new exceptions to the coordinated party expenditure limits applicable to the national party committees. Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, div. N, § 101, 128 Stat. 2130, 2272-73 (2014); § 30116(a)(1)(B), (a)(9). FECA now permits donors to contribute up to three times the general base limit—currently $123,900 (as opposed to $41,300) for individuals—into special segregated bank accounts for expenses incurred with respect to (1) presidential nominating conventions; (2) national party headquarters buildings; and (3) "election recounts and contests and other legal proceedings." § 30116(a)(1)(B), (a)(9). Congress expressly exempted "expenditures made from any of the[se] accounts" from FECA's coordinated party expenditure limits. § 30116(d)(5).[3] In recent years, it has become common for national committees to use their legal-proceedings accounts to pay for a wide array of candidate and campaign legal costs. Findings, R.49-1, ¶ 70, PageID#5510.

> ### d. How political parties comply with FECA's coordinated party expenditure limits today

From its enactment in 1974 until 1996, § 30116(d) limited *all* party committee expenditures in support of candidates. *DSCC*, 454 U.S. at 28 n.1. This included parties' independent expenditures—spending "expressly advocating the election or defeat of a clearly identified [federal] candidate" that is "not made in concert or cooperation with

---

[3] Instead, the only cap is that, regardless of coordination, a party cannot spend over $20 million in total on a single presidential convention. § 30116(a)(9)(A). For the two major parties, only the RNC and Democratic National Committee have convention accounts.

or at the request or suggestion of [any] candidate" (or his committee or agents). § 30101(17). Given their close identity of interests, party committees and their candidates had been presumed incapable of acting independently of each other. *Colorado I*, 518 U.S. at 620; *DSCC*, 454 U.S. at 28 n.1. But in *Colorado I*, the Supreme Court held that political parties have the same First Amendment right as any other entity to make unlimited independent expenditures in support of their preferred candidates. It thus struck down FECA's limits on independent party expenditures. 518 U.S. at 613-19.

As a result, when party committees wish to make expenditures on behalf of party nominees—particularly for public advertising campaigns—that may exceed the limits in § 30116(d), they must operate fully independent of their candidates, or else risk FEC enforcement. Findings, R.49-1 ¶ 52, PageID#5504. Because party committee operations are traditionally presumed to be coordinated—and because the FEC's regulations on coordination are broad and vague—party committees, including Plaintiffs, generally have sought to comply with § 30116(d) by creating separate "independent expenditure units," firewalled from the party's main operations, to engage in public advocacy campaigns independent of the party committee and candidates. *Id.* ¶¶ 71-72, PageID#5510; *DSCC*, 454 U.S. at 28 n.1.

Independent expenditure units are expensive to operate. Findings, R.49-1 ¶¶ 73-74, PageID#5511. The units' political activities are also inefficient (and often ineffective) because they must be conducted independently of the party committee and

campaign, and because the units' advertisements do not qualify for the lower-cost rates available to candidate-sponsored advertisements. *Id.* ¶ 75, PageID##5511-12. Thus, but for FECA, party committees would make more coordinated expenditures with their own candidates, *id.* ¶¶ 52, 92, 98, PageID##5504-05, 5517-19, would be able to speak more with the same amount of funds by qualifying for lower-cost ads, *id.* ¶ 75, PageID##5511-12, and would engage in more effective speech informed by their own candidates' input, *id.* ¶¶ 85-86, 91, 97, PageID##5514-15, 5517, 5519.

## 2. *Colorado II*

In 2001, the Supreme Court rejected a facial challenge to § 30116(d)'s limits on coordinated party expenditures in *Colorado II*. 533 U.S. at 447. The majority viewed coordinated party expenditures as "the functional equivalent of contributions," *id.*, and thus applied "closely drawn" scrutiny, which asks "whether the restriction is 'closely drawn' to match what [the Court has] recognized as the 'sufficiently important' government interest in combating political corruption," *id.* at 456; *see Buckley v. Valeo*, 424 U.S. 1, 19-21 (1976) (different tests for contribution limits and expenditure limits).

The majority reasoned that the government has a sufficiently important interest in preventing "corruption (and its appearance)," including preventing circumvention of the base limits by channeling donations above the limits to candidates through parties. *Colorado II*, 533 U.S. at 447. The majority, however, employed a broad notion of "corruption" that encompassed not only "*quid pro quo* agreements, but also … undue

16

influence on an officeholder's judgment." *Id.* at 441, 456 n.18. Importantly, the majority did not address whether the coordinated party expenditure limits can be justified as preventing *quid pro quo* corruption; nor did it identify any instances of *quid pro quo* corruption or circumvention of base limits through coordinated expenditures. *Id.*

Justice Thomas—joined by Chief Justice Rehnquist in part and Justices Scalia and Kennedy in full—dissented. *Id.* at 465-82 (Thomas, J., dissenting). The dissenters argued that the coordinated party expenditure limits trigger, and fail, strict scrutiny as unconstitutional restrictions on expenditures. *Id.* at 466-74. In the alternative, they explained that the limits fail "closely drawn" scrutiny because there is no evidence "that coordinated expenditures by parties give rise to corruption," and "better tailored alternatives" are available to prevent any potential corruption. *Id.* at 474, 481.

### B.    District Court Proceedings

*Litigation.* In 2022, Plaintiffs brought facial and as-applied challenges to the current iteration of FECA's coordinated party expenditure limits under § 30110, which charges the district court to "immediately" certify "all questions of the constitutionality of" FECA to the en banc Court. § 30110. Compl., R.1, PageID##1-28. After the FEC unsuccessfully moved to transfer, Transfer Op., R.18, PageID##151-69, Plaintiffs sought certification of the constitutional question, Cert. Mot., R.20, PageID##215-17.

The FEC opposed certification, claiming a need to engage in discovery before responding on the legal question whether certification was warranted. *See* Cert. Opp., R.26 at 15-16, PageID##320-21. Among other topics, the FEC sought to take

discovery regarding whether coordinated expenditures "have furthered *quid pro quo* arrangements." *Id.* Even though it is the agency charged with enforcing FECA, the Commission did not claim to possess any evidence of *quid pro quo* corruption linked to coordinated party expenditures—and it offered no explanation for this dearth of such evidence in its possession. *See id.*

The district court granted the FEC's request for discovery and deferred ruling on certification. *See* Aug. 1, 2023 Minute Entry. After the close of discovery, the district court observed "that the expedited discovery period the FEC requested was largely for naught," as it yielded no evidence of relevant "adjudicative facts." Cert. Order, R.49 at 27-35, PageID##5480-88.

*Findings.* The district court then made 178 paragraphs of factual findings "to serve as the record in this case." Findings, R.49-1 ¶ 48, PageID#5503; *see Bread Pol. Action Comm. v. FEC*, 455 U.S. 577, 580 (1982) (district court must find facts in certifying question under § 30110). Those findings reduce to two key points.

*First*, FECA's coordinated party expenditure limits burden political speech by party committees and candidates, including Plaintiffs. Party committees regularly spend up to the limits (minus in some cases a trivial safety margin to avoid FEC enforcement actions). *See* Findings, R.49-1 ¶¶ 58, 62, 66, 88-89, 94-95, PageID##5507-09, 5516-19. But for FECA's limits, and the FEC's demonstrated history of enforcing them, party committees would make more coordinated expenditures with their own candidates, *id.*

¶¶ 52, 92, 98, PageID##5504-05, 5517-19, and would avoid the costs and inefficiencies of having to engage in political speech in support of their own candidates independently of those candidates, including the costs of using independent expenditure units, *see, e.g.,* *id.* ¶¶ 73, 75, 85-86, 91, 97, PageID##5511-12, 5514-15, 5517, 5519.

*Second*, there is no record evidence—none—of *quid pro quo* corruption involving coordinated party expenditures as a whole or involving party coordinated political advertising in particular. *See, e.g., id.* ¶¶ 175-78, PageID##5536-37. If such evidence existed, it presumably would be in the possession of the FEC, the agency charged with enforcing FECA. The Commission, however, identified no such evidence in its possession. Moreover, it specifically sought discovery to ferret out such evidence*, see* Cert. Opp., R.26 at 15-16, PageID##320-21, but found none. Thus, the FEC adduced no evidence—and the district court made no findings of any instance—of *quid pro quo* corruption linked to coordinated party expenditures. Instead, the only findings the district court made regarding *quid pro quo* corruption were:

175. Neither the NRSC nor the NRCC have personal knowledge of what they understand to be instances of donors[] seeking to use contributions to the committees to facilitate a quid pro quo arrangement with an elected official or candidate for office.

176. Both Senator Vance and Chabot have declared that they have "no knowledge" of the party's "sources of funding used to engage in coordinated expenditures in support of" their respective 2022 campaigns.

Findings, R.49-1 ¶¶ 175-76, PageID#5536.

*Certification.* The district court also certified the constitutional question under § 30110. Cert. Order, R.49 at 4, PageID#5494. In doing so, it concluded that Plaintiffs have standing and that the certified question is not frivolous. *Id.* at 7-19, PageID##5460-72. On the latter point, the district court explained that "even if *Colorado II* squarely applies," Plaintiffs' facial challenge would be "non-frivolous" due to "the change in tide in First Amendment campaign finance case law since" that decision. *Id.* at 15, PageID#5468. Specifically, the Supreme Court has "narrowed" the "ends towards which Congress can act when enacting campaign finance laws" to "'the prevention of *quid pro quo* corruption [and] its appearance'" alone. *Id.* (quoting *Cruz*, 596 U.S. at 305). And that development, the district court explained, "creates, at the very least, tension with *Colorado II*'s reasoning," which "employed a broader definition" of corruption capturing both "'*quid pro quo* agreements'" and "'undue influence.'" *Id.* at 16, PageID#5469 (quoting *Colorado II*, 533 U.S. at 411). Accordingly, Plaintiffs' "challenge raises a serious legal question" as to whether the coordinated party expenditure limits "are justified by combatting only quid pro quo corruption." *Id.*

In addition, the district court emphasized that since *Colorado II*, "Congress has altered the rules permitting additional exceptions to the expenditure limits that affect the narrow tailoring of the specific regulations currently in force." *Id.* at 17, PageID#5470. Specifically, the 2014 amendments resulted in "differential treatment between coordinated expenditures related to candidates for political office and

20

coordinated expenditures spent on presidential nominations, election recounts, and a party's brick-and-mortar infrastructure" that "implicates whether a closely drawn fit exists." *Id.* "At the very least," the FEC "will need to explain the legally significant difference between the risk of quid pro quo corruption or its appearance when coordinated expenditures are spent on individual campaigns rather than, for example, election recounts and related legal proceedings." *Id.*

## SUMMARY OF THE ARGUMENT

**I.** The coordinated party expenditure limits violate the First Amendment even under "closely drawn" scrutiny. The burdens they impose on core political speech and association are both intuitively obvious and backed by extensive factual findings. Yet despite their significant intrusion on bedrock First Amendment freedoms, these limits do not pursue the "only … permissible ground for restricting political speech"— preventing "'*quid pro quo*' corruption or its appearance." *Cruz*, 596 U.S. at 305. There is no evidence that coordinated party expenditures create any genuine—as opposed to merely conjectural—risks of actual or apparent *quid pro quo* corruption. Nor is there evidence that Congress even meant to target such (nonexistent) risks with its limits on coordinated party expenditures, either in their entirety or as applied to party coordinated communications.

In all events, the coordinated party expenditure limits would not be a narrowly tailored response to *quid pro quo* corruption. The limits are just one of several prophylactic layers of campaign-finance restrictions—on top of the base limits, the

21

earmarking rule, and the disclosure requirements. There is no evidence that these limits, over and above these other measures, independently serve to prevent *quid pro quo* corruption or its appearance. Indeed, there is no evidence of donors or party committees even *attempting* to engage in *quid pro quo* corruption via coordinated party expenditures. And at a minimum, Congress could have used obvious alternatives before rationing the core political speech embodied in party coordinated communications.

**II.** *Colorado II* cannot ward off the facial and as-applied challenges here. Several material differences of law, fact, and the scope of Plaintiffs' challenges mean *Colorado II* does not control in this case.

*First*, since *Colorado II*, the Supreme Court has clarified and strengthened the legal standard for adjudicating First Amendment challenges to campaign-finance restrictions. In particular, it has made clear that preventing *quid pro quo* corruption or its appearance is the *only* interest that the First Amendment permits Congress to pursue through campaign-finance restrictions, and that such restrictions must be narrowly tailored to that interest. But *Colorado II* did not address whether the limits can be justified as serving that interest or are narrowly tailored—and neither in *Colorado II* nor in this case has the FEC adduced any evidence that the limits do anything to advance that interest.

*Second*, Congress substantially altered the legal backdrop of federal campaign-finance law in 2014, when it approved unlimited coordinated party spending in some of the areas it favors. This change underscores that the challenged limits on forms of

22

political speech that Congress disfavors—such as political advertising—neither advance a constitutionally acceptable interest nor are narrowly tailored.

*Third*, the limits also operate against different factual circumstances compared to the time of *Colorado II*, due to both BCRA's erosion of the party committees' political power and the intervening rise of Super PACs and other outside groups in federal elections.

*Finally*, at a minimum, *Colorado II*'s rejection of a *facial* challenge does not bar this challenge to the coordinated party expenditure limits *as applied* to coordinated political advertising—particularly since *Colorado II* expressly left the door open to as-applied challenges. This Court should go through it, especially given the significant harms this subset of restrictions inflicts on candidate and committee speech alike.

The Court should declare that the coordinated party expenditure limits violate the First Amendment. In the alternative, Plaintiffs preserve for Supreme Court review the argument that *Colorado II* should be overruled.

## STANDARD OF REVIEW

There is no district court judgment on review. The en banc Court decides the merits in the first instance under § 30110. This Court generally reviews factual findings for clear error. *See United States v. Davis*, 84 F.4th 672, 678 (6th Cir. 2023).

## ARGUMENT

## I. THE COORDINATED PARTY EXPENDITURE LIMITS VIOLATE THE FIRST AMENDMENT

### A. The Coordinated Party Expenditure Limits Burden Core Political Speech And Association

FECA's coordinated party expenditure limits strike "precisely" where the First Amendment has its "fullest and most urgent application": "the conduct of campaigns for political office." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971). There can be "no doubt" that the limits "burden First Amendment electoral speech" and association. *Cruz*, 596 U.S. at 305; *see Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 746 (2011) ("[W]e do not need empirical evidence to determine that the law at issue is burdensome."). Even the *Colorado II* majority acknowledged that the limits "burden" speech and "associational efficiency." 533 U.S. at 450 n.11 & 453. The dissent explained just how severely they do so. *Id.* at 470 (Thomas, J., dissenting). Maintaining independence from candidates tends "to undermine the candidate that the party sought to support." *Id.* Coordinated expenditure limits target "the party's most natural form of communication" and prevent parties from effectively discharging their basic function of "amplifying the voice of their adherents." *Id.* at 471.

FECA continues to inflict those harms today. As the district court found, coordinated expenditures are more efficient and effective than independent expenditures because the candidate and party can collaborate on the message. Findings, R.49-1 ¶ 86, PageID#5515. When making coordinated expenditures, the Committees

accept and consider candidate suggestions but retain ownership of the funds and final approval of how they are spent. *Id.* ¶¶ 53-54, PageID##5505-06. For example, in 2022, NRSC (subject to the limits and other applicable rules) coordinated with Senator Vance on messaging for get-out-the-vote calls and texts, but NRSC had sole authority to approve the communications. *Id.* ¶¶ 55, 57, PageID##5506-07. The same year, NRCC worked with then-Representative Chabot on an ad in which he offered a draft script and NRCC approved the script and paid for the ad. *Id.* ¶¶ 60-61, PageID##5507-08.

The district court found that independent expenditures, by contrast, are inefficient on three dimensions. For one thing, because they are not coordinated with campaigns and candidates, independent expenditures result in redundant spending and advertising, risk disseminating ads that "are unhelpful to, if not entirely disfavored by, the candidate," and are overall an inefficient way of promoting candidate success. *Id.* ¶ 85, PageID#5514.

For another, independent expenditure units are firewalled from committees' primary operations—separate offices, separate employees, and separate decisions with no communication on strategy. *Id.* ¶¶ 71-72, 74, PageID##5510-11. For their units' office space in the 2022 election cycle alone, the Committees spent a combined total of over $400,000—money that they would have spent on other party activities, including political speech, but for the challenged limits. *Id.* ¶¶ 73, 76, 81, 87, PageID##5512-16.

For a third, political advertising on television and radio is more expensive when it is done independently of the candidate. Independent expenditure units do not qualify to purchase television ads at the cheaper rates mandated for candidate-sponsored ads. *Id.* ¶ 74, PageID#5511. Independent expenditures thus require party committees to pay more to speak the same amount—which ultimately means they cannot speak as much as they otherwise would. That is a significant disadvantage, since the Committees' independent expenditure units have spent virtually all of their funds on media expenditures for each of the last five election cycles. *Id.* ¶¶ 78, 84, PageID##5513-14.

All of this is particularly true when it comes to party coordinated communications. As political advertisements intended to influence federal elections, *see* 11 C.F.R. § 109.37, party coordinated communications are pure political speech and associational activities occupying the very core of the First Amendment's protections, *see, e.g.*, *Monitor Patriot Co.*, 401 U.S. at 272; *Eu*, 489 U.S. at 222; *California Democratic Party*, 530 U.S. at 574. FECA's restriction of such communications is therefore the principal First Amendment evil Plaintiffs seek to remedy in this case—and the principal driver of the harm that the coordinated expenditure limits inflict on Plaintiffs.

In particular, to comply with the limits, Senator Vance's campaign staff had to "limit their interactions with [his] political party, particularly on matters relating to the party's public advertising in support of [his] campaign"—precisely the kind of advertising the FEC considers party coordinated communications. Vance Decl. ¶ 11,

R.19-3, PageID#196; 11 C.F.R. § 109.37. Senator Vance also desires to engage in "party coordinated communications" in future campaigns, but cannot do so as long as FECA's coordinated party expenditure limits apply to such ads. Vance Decl. ¶¶ 12-13, R.19-3, PageID#196; *see also* Vance Discovery Resp., R.41-6 at 17-18, PageID##4717-18.

The restriction on party coordinated communications is also what compels the Committees to establish costly and inefficient independent expenditure units and to engage in more limited, more expensive, and less effective speech than they otherwise would. *See* Findings, R.49-1 ¶¶ 71-72, PageID#5510; *DSCC*, 454 U.S. at 28 n.1. Indeed, the Committees' independent expenditure units have spent virtually all of their funds on media expenditures and advertisements for each of the last five election cycles. *See* Findings, R.49-1 ¶¶ 78, 84, PageID##5513-14. Those funds would be deployed to more efficient and effective campaign speech and activities if the party coordinated communications restrictions were lifted. *See id.* ¶¶ 52, 75, 85-86, 91, 92, 97-98, PageID##5504-05, 5511-19.

Whether on their face or as applied, the coordinated party expenditure limits have "a 'stifling effect on the ability of the party to do what it exists to do.'" *Colorado II*, 533 U.S. at 471 (Thomas, J., dissenting); *see, e.g.*, La Raja Rept., R.41-3 at 15-24, PageID##4135-45 (limits' harms to political parties). The FEC therefore "cannot … claim" the limits "impose[] no burden on" core First Amendment activity. *Cruz*, 596 U.S. at 304.

## B. The Coordinated Party Expenditure Limits Fail Even "Closely Drawn" Scrutiny

The government "bears the burden of proving the constitutionality of" these selective, redundant, burdensome limits on political speech and association, *McCutcheon*, 572 U.S. at 210, and it cannot do so under any applicable level of scrutiny, especially on the record here. *Colorado II* held that the limits should be treated as "contribution limits" subject to "closely drawn" scrutiny under *Buckley*, 533 U.S. at 456, but they fail even this less demanding test as they stand today. Under "closely drawn" scrutiny, the government must still prove that the challenged law both furthers "a sufficiently important interest and employs means closely drawn" to do so. *McCutcheon*, 572 U.S. at 197. The FEC cannot satisfy either requirement.

### 1. The coordinated party expenditure limits do not prevent *quid pro quo* corruption

To sustain a restriction on free speech in the area of campaign finance—even under "'closely drawn' scrutiny"—the government "must prove at the outset that it is in fact pursuing a legitimate objective." *Cruz*, 596 U.S. at 305. It cannot do so here.

a. The Supreme Court "has recognized only one permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance." *Id.*; *accord McCutcheon*, 572 U.S. at 206. *Quid pro quo* corruption is "a direct exchange of an official act for money"—*i.e.*, "dollars for political favors." *McCutcheon*, 572 U.S. at 192. Anything else is not *quid pro quo* corruption, and goals other than preventing *quid pro quo* corruption or its appearance are not enough to sustain restrictions on political

28

speech. Rather, "[c]ampaign finance restrictions that pursue other objectives … impermissibly inject the Government 'into the debate over who should govern.'" *Id.* So "[i]ngratiation and access … are not corruption," and preventing donor ingratiation with, access to, or influence over elected officials is not a sufficiently weighty interest to support campaign-finance restrictions. *Citizens United v. FEC*, 558 U.S. 310, 360 (2010); *see McCutcheon*, 572 U.S. at 192, 208. Similarly, Congress may not limit political speech "to reduce the amount of money in politics," "to level electoral opportunities by equalizing candidate resources," or "to limit the general influence a contributor may have over an elected official." *Cruz*, 596 U.S. at 305.

To show that a speech restriction prevents *quid pro quo* corruption or its appearance, the FEC "must do more than 'simply posit the existence of the disease sought to be cured'"; instead, it must supply facts showing that the challenged restriction itself is necessary to prevent *quid pro quo* corruption. *Id.* at 307. "[M]ere conjecture" is not "adequate." *McCutcheon*, 572 U.S. at 210. This rule has special significance in analyzing the constitutionality of FECA's provisions because "the *base limits* themselves," the earmarking rule, and disclosure requirements are all "prophylactic measure[s]" that already prevent corruption and its appearance. *Id.* at 221.

Thus, when the government goes beyond those measures and layers overlapping campaign-finance restrictions "on top," it takes a "prophylaxis-upon-prophylaxis approach." *Id.*; *accord Cruz*, 596 U.S. at 306. In that scenario, courts must "greet the

assertion of an anticorruption interest … with a measure of skepticism," and insist that the FEC produce "'record evidence or legislative findings' demonstrating the need to address a special problem" that the base limits themselves do not already handle—such as actual instances of "*quid pro quo* corruption in [the relevant] context." *Cruz*, 596 U.S. at 306-07; *see McCutcheon*, 572 U.S. at 221. And if there is any doubt whether the FEC has carried its demanding burden, "the First Amendment requires [courts] to err on the side of protecting political speech rather than suppressing it." *Cruz*, 596 U.S. at 308.

**b.** The FEC has not come close to satisfying that demanding burden here. Even after the discovery the FEC demanded, it has adduced no evidence that coordinated party expenditures in excess of FECA's limits would give rise to "'*quid pro quo*' corruption"—the "direct exchange of an official act for money"—or its appearance. *McCutcheon*, 572 U.S. at 192. In fact, Congress did not even enact the limits to address that problem. To the contrary, all indications "suggest that Congress wrote [§ 30116(d)] not so much because of a special concern about the potentially 'corrupting' effect of party expenditures, but rather for the constitutionally insufficient purpose of reducing what it saw as wasteful and excessive campaign spending." *Colorado I*, 518 U.S. at 618. Indeed, given that "parties are the most likely to give to challengers," these limits furnished Congress with a self-serving "incumbent protection rule." La Raja Rept., R.41-3 at 33, PageID#4153 (emphasis omitted), even though "those who govern should be the *last* people to help decide who *should* govern," *McCutcheon*, 572 U.S. at 192.

And because "[g]overnment justifications for interfering with First Amendment rights must be genuine, not hypothesized or invented *post hoc* in response to litigation," the FEC cannot backfill this deficiency now. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) (cleaned up).

It is hardly surprising that Congress was not motivated by a special fear that political parties were corrupting candidates. The notion that a political party committee can corrupt its *own* candidates makes no sense because "[t]he very aim of a political party is to influence its candidate's stance on issues and, if the candidate takes office or is reelected, his votes." *Colorado II*, 533 U.S. at 476 (Thomas, J., dissenting). "If coordinated expenditures help achieve this aim, the achievement does not constitute a subversion of the political process," let alone *quid pro quo* corruption, but instead the *functioning* of the political process. *Id.* at 477 (cleaned up); *see* La Raja Rept., R.41-3 at 7, PageID#4127 ("My colleagues who study politics in other established democracies are perplexed when I explain to them that American political parties must declare their independence from their own candidates if they wish to support them vigorously in elections."). Perhaps recognizing that "[p]olitical parties and their candidates are 'inextricably intertwined' in the conduct of an election," the *Colorado II* majority expressly declined "to reach" whether the coordinated party expenditure limits could be "justified by a concern with *quid pro quo* arrangements and similar corrupting relationships between candidates and parties themselves." 533 U.S. at 456 n.18, 469.

Nor is there evidence that coordinated *party* expenditures somehow invite *quid pro quo* corruption by *individual* donors. The government produced no such evidence in this case or in *Colorado II*, *see id.* at 475 (Thomas, J., dissenting), and there is no plausible argument that the limits prevent *quid pro quo* corruption or "circumvention of the base limits" on individual contributions, *McCutcheon*, 572 U.S. at 193.

"As an initial matter, there is not the same risk of *quid pro quo* corruption or its appearance when money flows through independent actors to a candidate, as when a donor contributes to a candidate directly," *id.* at 210, because "[w]hen an individual contributes to a candidate, a party committee, or a PAC, the individual must by law cede control over the funds," *id.* at 210-11. Even the government has "admit[ted]" that when "the funds are subsequently re-routed to a particular candidate, such action occurs at the initial recipient's discretion—not the donor's." *Id.* at 211. "As a consequence, the chain of attribution grows longer, and any credit must be shared among the various actors along the way." *Id.* "For th[e]se reasons, the risk of *quid pro quo* corruption is generally applicable only to 'the narrow category of money gifts that are directed, in some manner, to a candidate or officeholder,'" not to a party committee. *Id.*; *see* La Raja Rept., R.41-3 at 33-34, PageID##4153-54 (discussing party control over funds).

Political parties also are particularly poor circumvention vehicles, as they "have numerous members with a wide variety of interests," making "the influence of any one person … significantly diffused." *Colorado I*, 518 U.S. at 647 (Thomas, J., concurring in

the judgment). Thus, so long as donors face "uniform" "limits on the amount they can give to parties," "there is little risk that an individual donor could use a party as a conduit for bribing candidates." *Id.* The parties are not "simply empty vessels for candidates to raise money through for themselves." La Raja Rept., R.41-3 at 33, PageID#4153.

Add to this all of the numerous *other* prophylactic rules FECA imposes, which make it inconceivable that a donor could effectively bribe a candidate through donations to a party committee. Suppose, for example, that a candidate and donor agree that the candidate will take an action if the donor makes a certain contribution. To route that contribution through a party committee, the donor would have to make the contribution without "direct or indirect, express or implied, oral or written" suggestion that it should go to the candidate—or convince the party to violate the earmarking rule. 11 C.F.R. § 110.6(b)(1). Even then, the base limit restricts the donor to giving only $41,300 to the party committee—an amount Congress views as restrictive enough to prevent *quid pro quo* corruption. *Limits*, *supra.* And even *then*, the party cannot give the money directly to the candidate, but can only spend it in coordination with the candidate—yet another layer of party discretion. § 30116(h). Finally, the donation will be publicly disclosed at fec.gov, tipping off third-party watchdogs that routinely monitor FEC disclosures in the event that the candidate ultimately takes an action that benefits the donor. Charitably stated, the suggestion that a donor could effect *quid pro quo* bribery through coordinated party expenditures is wildly improbable.

The record bears out this sensible conclusion. It contains no evidence that *any* of the various categories of coordinated party spending that FECA permits have resulted in "'*quid pro quo*' corruption or its appearance." *Cruz*, 596 U.S. at 305; *see* Findings, R.49-1 ¶ 175, PageID#5536. That is true of coordinated party spending, including on political advertising, below FECA's limits. It is true of coordinated spending on other forms of political advocacy *not* subject to any limits, such as spending by state and local parties on certain get-out-the-vote activities and campaign mailers and materials disseminated using volunteers. § 30101(8)(B)(ix), (9)(B)(viii). And it is true of the coordinated spending that Congress exempted from *any* limits in 2014: coordinated spending on presidential nominating conventions, party infrastructure, and candidate legal fees. § 30116(a)(1)(B), (a)(9), (d)(5).

Presumably, if evidence existed that any of these permitted forms of coordinated spending had resulted in *quid pro quo* corruption or its appearance, the FEC would have found it already through its decades of broad-ranging enforcement of FECA or through discovery in this case. More importantly, Congress would have prohibited, rather than permitted, such spending. Congress's allowance of these categories of coordinated payments thus underscores that the coordinated party expenditure limits do not prevent "'*quid pro quo*' corruption or its appearance." *Cruz*, 596 U.S. at 305.

Moreover, at least 28 states largely give parties free rein to make coordinated expenditures on behalf of their state-level nominees, even though 17 of these states

34

impose generally applicable base limits on individuals' contributions to the same candidates. The record is again devoid of any evidence of *quid pro quo* corruption associated with coordinated expenditures in those states—a "significant" sign of a First Amendment problem with the Act's coordinated party expenditure limits. *Id.* at 306; *see McCutcheon*, 572 U.S. at 209 n.7 (relying on evidence that most states have found a restriction unnecessary); La Raja Rept., R.41-3 at 36, PageID#4156 ("I am not aware of any evidence of greater occurrences of *quid pro quo* corruption through the party system" in the "states that allow parties to support their candidates without limit.").[4]

Finally, in all events, the arbitrary line-drawing between permitted and prohibited coordinated spending renders the limits "so woefully underinclusive" that Congress could not have passed them for "th[e] purpose" of preventing *quid pro quo* corruption. *White*, 536 U.S. at 780. "[U]nderinclusiveness can raise 'doubts about whether the government is in fact pursuing the interest it invokes'" and "can also reveal that a law does not actually advance a compelling interest." *Williams-Yulee*, 575 U.S. at 448-49.

---

[4] *See* Ala. Code § 17-5-15; Ariz. Rev. Stat. §§ 16-911(B)(4)(b), 16-912, 16-915; Cal. Gov't Code §§ 85301, 85400; 10 Ill. Comp. Stat. 5/9-8.5(b); Ind. Code § 3-9-2-1 *et seq.*; Iowa Code § 68A.101 *et seq.*; Kan. Stat. § 25-4153(a); Ky. Rev. Stat. § 121.150; La. Stat. § 18:1505.2(H)(1); 970 Mass. Code Regs. 1.04(12); Miss. Code § 23-15-1021; Neb. Rev. Stat. ch. 32, art. 16 (repealed); N.J. Stat. § 19:44A-29; N.J. Admin. Code § 19:25-11.2; N.M. Stat. § 1-19-34.7; N.Y. Elec. Law § 14-114(1), (3); N.C. Gen. Stat. § 163-278.13; N.D. Cent. Code § 16.1-08.1-01 *et seq.*; Ohio Rev. Code § 3517.102(B); Or. Rev. Stat. § 260.005 *et seq.*; 25 Pa. Cons. Stat. § 3241 *et seq.*; S.D. Codified Laws §§ 12-27-7, 12-28-8; Tex. Elec. Code § 253.001 *et seq.*; Utah Code § 20A-11-101 *et seq.*; Vt. Stat. tit. 17, § 2941(a); Va. Code § 24.2-945; W. Va. Code § 3-8-5c; Wis. Stat. §§ 11.1101(1), 11.1104(5); Wyo. Stat. § 22-25-102.

That is the case here. There is no principled basis under the First Amendment for FECA's limits to apply to pure speech like campaign advertisements, but *not* to apply to other forms of pure speech, such as certain get-out-the-vote efforts and campaign mailers disseminated using volunteers. Yet FECA draws precisely that line. *Compare* § 30101(8)(B)(ix), (9)(B)(viii), *with* § 30116(d).

Nor is there any good explanation for limiting coordinated spending on campaign advertisements but permitting unlimited coordinated spending—from accounts with base-contribution limits three times as high as those governing general operating accounts—for "election recounts and contests and other legal proceedings." § 30116(a)(9). Defraying a candidate's or campaign's legal expenses is common, Findings, R.49-1 ¶ 70, PageID#5510, and may be just "as useful to the candidate as cash," *Colorado II*, 533 U.S. at 446, by freeing up the candidate's funds for other purposes. "[G]iven Congress' judgment that liberalized limits for" coordinated party spending in select areas "do not unduly imperil anticorruption interests, it is hard to imagine how the denial of liberalized limits to" other coordinated party expenditures "can be regarded as serving anticorruption goals sufficiently to justify the resulting constitutional burden." *Davis v. FEC*, 554 U.S. 724, 741 (2008).

**c.** This reasoning is particularly compelling as applied to "party coordinated communication" defined in 11 C.F.R. § 109.37—*i.e.*, political advertising. Even if there were evidence to support the existence of a connection between *some* forms of

coordinated spending and *quid pro quo* corruption, there is certainly nothing to support the idea that coordinated spending on political advertisements is a hotbed of *quid pro quo* arrangements. Nor is there evidence that the limits on political advertisements in particular were motivated by a genuine goal of eliminating *quid pro quo* corruption. *See supra* at 30-31. Instead, the supposed harms from coordinated spending on political advertisements are "mere conjecture." *McCutcheon*, 572 U.S. at 186.

Likewise, the coordinated party expenditure limits' underinclusiveness is most stark with respect to the category of party coordinated communications. These communications lie at the core of the First Amendment's protections, *see Monitor Patriot Co.*, 401 U.S. at 272, but Congress has given them *disfavored* treatment compared to other categories of coordinated political advocacy. Yet there is no basis to believe that contributions used on *political advertising* pose a greater risk of *quid pro quo* corruption than either contributions used on other forms of *political advocacy* like get-out-the-vote activities and campaign mailers enveloped by volunteers or donations three times as large used on *candidate legal fees*. That, however, is the underinclusive scheme Congress has created, which underscores that the limits on party coordinated communications, like the limits on coordinated spending in general, are not genuinely motivated by the only "legitimate objective" that Congress may pursue in this area. *Cruz*, 596 U.S. at 305.

### 2. Even if the coordinated party expenditure limits sought to stop *quid pro quo* corruption, they are not narrowly tailored

**a.** Even if the coordinated party expenditure limits somehow pursued a legitimate end, they still represent a "prophylaxis-upon-prophylaxis" approach and would not be "closely drawn" to preventing *quid pro quo* corruption or its appearance. *McCutcheon*, 572 U.S. at 218, 221. "[C]losely drawn" scrutiny is "rigorous"—specifically, the government must show the challenged law is "narrowly tailored" to "achieve" the interest of preventing *quid pro quo* corruption. *Id.* at 197, 218; *see Ams. For Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) (*AFP*) (explaining that "exacting scrutiny" for "compelled disclosure requirements," including in the "campaign finance" realm, requires that the requirements "be narrowly tailored"). As part of that inquiry, courts must ask whether there are "alternatives available" that would serve the government's interest in preventing *quid pro quo* corruption while "avoiding 'unnecessary abridgment' of First Amendment rights." *McCutcheon*, 572 U.S. at 221. The government thus must "demonstrate its need" for the coordinated party expenditure limits "in light of any less intrusive alternatives." *AFP*, 141 S. Ct. at 2386.

Courts must "be particularly diligent in scrutinizing the law's fit" where, as here, it takes a "prophylaxis-upon-prophylaxis approach." *McCutcheon*, 572 U.S. at 221. Any "additional constraint" on campaign finance "layered on top of the base limits and thus separately need[s] to serve the interest in preventing the appearance or actuality of corruption." *Holmes v. FEC*, 875 F.3d 1153, 1161 (D.C. Cir. 2017) (en banc) (cleaned

up). Thus, for example, an Arkansas law barring contributions during certain "blackout" periods was unconstitutional where the state failed "to provide any evidence that [it] accomplishe[d] anything more than" the contribution limits alone. *Jones v. Jegley*, 947 F.3d 1100, 1106 (8th Cir. 2020). Similarly, an Austin ordinance restricting the timing of campaign contributions flunked the First Amendment where it lacked supporting evidence "distinct from what [was] needed to justify" the same law's "dollar limit on contributions." *Zimmerman v. City of Austin*, 881 F.3d 378, 392 (5th Cir. 2018).

**b.**      Here, the FEC has failed to show that the coordinated party expenditure limits are narrowly tailored to preventing *quid pro quo* corruption or its appearance. The base limits, earmarking rule, and disclosure requirements already provide the appropriate alternative means by which Congress can "minimize[] the potential for abuse of the campaign finance system" without imposing a "ceiling" on party committees' "speech." *McCutcheon*, 572 U.S. at 223.

"[G]iven that 'few if any contributions to candidates will involve *quid pro quo* arrangements,'" the base limits, earmarking rule, and disclosure requirements "are themselves prophylactic measures" designed to prevent *quid pro quo* corruption and circumvention of base limits. *Cruz*, 596 U.S. at 306. Indeed, through the earmarking rule, Congress foresaw the risk of "'an individual us[ing] the party as a conduit to channel money to specified candidates … and foreclosed it.'" *FEC v. Colorado Republican Fed. Campaign Comm.*, 213 F.3d 1221, 1232 (10th Cir. 2000), *rev'd by Colorado II*, 533 U.S.

431; *see McCutcheon*, 572 U.S. at 222-23 ("the earmarking rules" "already prohibit[]" both explicit and "implicit agreements to circumvent the base limits"). Moreover, public "disclosure often represents a less restrictive alternative to flat bans on certain types or quantities of speech," and "[w]ith modern technology, disclosure now offers a particularly effective means of arming the voting public with information." *McCutcheon*, 572 U.S. at 223-24. If Congress is concerned about the efficacy of those measures, it should tighten them before turning to the speech rationing of the coordinated party expenditure limits. *See id.* at 222-24.

And "even if" coordinated party expenditures could raise a legitimate *quid pro quo* "concern in some cases," Congress's "indiscriminate" imposition of these speech limits "in all cases would not be justified." *AFP*, 141 S. Ct. at 2387. Congress's willingness to carve out certain campaign activities for unlimited coordinated spending, *see supra* at 35-36, leaves no evident reason why it could not exempt political advertising as well. These limits thus do not "fit" the goal of preventing *quid pro quo* corruption, but rather flout the First Amendment. *McCutcheon*, 572 U.S. at 218; *see Cruz*, 596 U.S. at 305; *Jones*, 947 F.3d at 1107; *Zimmerman*, 881 F.3d at 395.

**c.**    As before, these arguments have their greatest force as applied to "party coordinated communications." *See* 11 C.F.R. § 109.37. Even if some categories of coordinated party expenditure limits were somehow narrowly tailored to preventing *quid pro quo* corruption, there is no reason to think that would be true of restrictions on

40

party coordinated communications. And even if there were evidence that these communications facilitate corruption (there is not), Congress must use alternatives that restrict less speech before targeting the core political expression of political advertising. *See McCutcheon*, 572 U.S. at 223-24.

## II. *COLORADO II* CANNOT SAVE THE ACT'S CURRENT COORDINATED PARTY EXPENDITURE LIMITS

While *Colorado II* upheld the Act's coordinated party expenditure limits as they stood in 2001, it cannot salvage those speech restrictions today. Instead, this Court must apply *current law* to *current facts* to resolve this dispute—something that the *Colorado II* Court neither did nor could do. And if this Court concludes its hands are tied, it should speed this case on its way so that the Supreme Court can overrule *Colorado II*.

### A. *Colorado II* Does Not Directly Control This Case

No one denies that if *Colorado II* "directly controls," this Court "should follow" it. *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). But this case involves a distinct legal backdrop, changed factual circumstances, and an as-applied challenge, none of which were before the Supreme Court 23 years ago. As a result, *Colorado II* "does not control here" for four main reasons. *McCutcheon*, 572 U.S. at 200.

*First*, in the intervening 23 years, the Supreme Court has strengthened the "legal backdrop" for adjudicating First Amendment challenges to campaign-finance restrictions. *Id.* Specifically, the Supreme Court has clarified that there is "only one permissible ground for restricting political speech: the prevention of '*quid pro quo*'

corruption or its appearance." *Cruz*, 596 U.S. at 305; *see McCutcheon*, 572 U.S. at 192. *Colorado II*, however, did not address whether the limits do anything to prevent *quid pro quo* corruption or its appearance, much less whether they do enough to be constitutionally justified as advancing that interest. *See* 533 U.S. at 456 n.18. Indeed, it was undisputed in *Colorado II* that the government "presented no evidence at all of corruption or the perception of corruption." *Id.* at 475 (Thomas, J., dissenting).

Instead, the *Colorado II* majority believed that preventing "undue influence on an officeholder's judgment" sufficed to justify the limits. *Id.* at 441, 465 (majority); *see McCutcheon*, 572 U.S. at 239-40 (Breyer, J., dissenting) (noting that *Colorado II* applied "a considerably broader definition" of "corruption" than current doctrine allows); *Citizens United*, 558 U.S. at 447 (Stevens, J., concurring in part and dissenting in part) (similar). The Supreme Court has now clarified that such an interest is constitutionally inadequate, so *Colorado II* does not even speak to, let alone foreclose plenary review of, Plaintiffs' challenges here. *McCutcheon*, 572 U.S. at 200; *see Cruz*, 596 U.S. at 305.

Moreover, the Supreme Court has also since strengthened the "closely drawn" test, emphasizing it is "rigorous" and demands a "narrow[] tailor[ing]" analysis. *McCutcheon*, 572 U.S. at 197, 199. The *Colorado II* majority never mentioned, much less applied, "narrow tailoring," even in the face of the dissent's charge that there were "better tailored alternatives for addressing" any corruption addressed by the coordinated party expenditure limits. 533 U.S. at 481 (Thomas, J., dissenting). This

Court cannot rely on that incomplete analysis, and must apply the present version of "closely drawn" scrutiny. *Cf. Smith v. Jefferson Cnty. Bd. of School Comm'rs*, 788 F.3d 580, 586-88 (6th Cir. 2015) (applying *Lemon* test as refined and clarified by later cases).

*Second*, Congress enacted a "distinct legal backdrop" against which the coordinated party expenditure limits "now operate" in 2014, *McCutcheon*, 572 U.S. at 200, when it amended FECA to let parties make *unlimited* coordinated expenditures for certain purposes, § 30116(a)(9). As explained, this post-*Colorado II* change underscores that FECA's coordinated party expenditure limits are fatally underinclusive. *See supra* at 35-36; Cert. Order, R.49 at 17, PageID#5470 ("As this exemption was not extant at the time the Supreme Court decided *Colorado II*, the new exemption is another variable that will need to play into the 'closely drawn' scrutiny of these expenditure provisions.").

This statutory change "in the campaign finance arena" alone means that Plaintiffs' "substantial First Amendment challenge to the system of [coordinated party expenditure] limits currently in place" deserves "plenary consideration." *McCutcheon*, 572 U.S. at 202-03. In *McCutcheon*, for instance, the Supreme Court did not overrule *Buckley*'s upholding of "the aggregate limit in place" in 1976; instead, it concluded that *Buckley* did "not control" the Court's resolution of a new constitutional challenge to "the aggregate limits in place" in 2014 because "statutory safeguards against circumvention have been considerably strengthened since *Buckley* was decided." *Id.* at

200. Given that "different statutory regime," the Court considered the issue without any need to apply the traditional *stare decisis* factors. *Id.*

Similarly, in *Libertarian National Committee v. FEC*, 924 F.3d 533 (D.C. Cir. 2019) (en banc)—a case certified under § 30110—the en banc D.C. Circuit gave plenary consideration to a First Amendment challenge to the "sort of contribution limits that the Supreme Court upheld" in *McConnell v. FEC*, 540 U.S. 93 (2003), because the 2014 amendment "radically altered [the Act's] nature and structure" by "introduc[ing] gradations into the political party contribution limit where none had been before." 924 F.3d at 546-47; *see id.* at 546-52. This Court therefore must consider the "new scheme" now in place, as *Colorado II* "did not address the propriety of a regime with these exceptions, the presence of which 'can raise doubts about whether the government is in fact pursuing the interest it invokes' or 'reveal that a law does not actually advance' that interest." *Id.* at 553-54 (Griffith, J., concurring in part and dissenting in part); *see also, e.g.*, *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2348 (2020) (plurality) (noting that an amendment to a previously constitutional statute *can* render the "underlying … restriction" on speech "no longer justified … and therefore now unconstitutional," but concluding that the particular amendment at issue did not do so); *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 224 & nn.1-2, 234 (1987) (exemptions for newspapers and certain magazines later added to general tax statute triggered First Amendment violation).

*Third*, the revised limits also now operate against a different factual backdrop, as circumstances have dramatically changed since 2001. *Colorado II* was premised on the majority's view that "in reality, political parties are dominant players … in federal elections." 533 U.S. at 450. That claim was dubious at the time, *see id.* at 472 n.4 (Thomas, J., dissenting), and cannot stand in light of the substantial erosion in parties' political power over the past 23 years, *see, e.g.*, La Raja Rept., R.41-3 at 5-25, 28-31, PageID##4125-51 (documenting decline of parties' political power since 2001).

Today, for instance, it is "widely accepted" that the rise of "Super PACs," which "can freely receive and spend money to support specific candidates" while "operating independently of candidates and parties," "has been damaging to the political parties." Bauer, *supra*, at 899; *see, e.g.*, La Raja Rept., R.41-3 at 13-12, PageID##4133-34. The party expenditure limits have exacerbated that harm by "mak[ing] Super PACs a better vehicle for channeling campaign finances." S. Issacharoff, *Outsourcing Politics: The Hostile Takeover of Our Hollowed-Out Political Parties*, 54 HOUS. L. REV. 845, 861 (2017). "[O]nce the interaction between party and candidate was limited by a principle of non-coordination, … there was no longer a manifest advantage" to using the party for campaigns "as opposed to buying from outside vendors." *Id.* at 864-65.

Shifting power away from the parties in turn increases political polarization and fragmentation. Indeed, it is well established that the "states that give more freedom to political parties in the campaign-finance system end up with less polarized legislatures."

R. Pildes, *Romanticizing Democracy, Political Fragmentation, and the Decline of American Government*, 124 YALE L.J. 804, 837 (2014); *see* La Raja Rept., R.41-3 at 12, PageID#4132 ("[S]tates with laws constraining the political parties—including limits on party-candidate coordination—[are] more likely to result in polarized legislatures compared to states with laws allowing parties to robustly support their candidates."). "The only way collective responsibility has ever existed, and can exist given our institutions, is through the agency of the political party; in American politics, responsibility requires cohesive parties." La Raja Rept., R.41-3 at 7-8, PageID##4128-29 (quoting M. Fiorina, *The Decline of Collective Responsibility in American Politics*, 109 DAEDALUS 25, 26 (1980)). "Instead, we have a system that abets polarization between the parties because political factions—often amorphous and transient—have strong incentives to mobilize adherents on hot-button issues and force candidates to focus on narrowly-based moral agendas." *Id.* at 10, PageID#4131.

Moreover, when *Colorado II* was decided in 2001, FECA did not ban "soft money"—money raised by parties without the Act's limits on source and amount for party-building activities. *See McConnell*, 540 U.S. at 123-24. The following year, however, BCRA imposed such a ban, which further diminished parties' power by creating an "impetus for the emergence of political funding outside the parties." Issacharoff, *supra*, at 866. Indeed, "[b]etween 2000 and 2008, [non-party] independent expenditures in the federal domain increased by at least 425%." *Id.* Thus, by "removing soft money,

[BCRA] made it more difficult of political parties to perform vital … functions." La Raja Rept., R.41-3 at 10, PageID#4130; *see, e.g.*, Pildes, *supra*, at 835-36 (similar); I. Vandewalker & D. Weiner, *Stronger Parties, Stronger Democracy: Rethinking Reform*, BRENNAN CTR. FOR JUST. 5-6 (2015) (similar).

Rapid "changes in technology" have further altered FECA's factual backdrop. *Citizens United*, 588 U.S. at 364; *cf. Shelby County v. Holder*, 570 U.S. 529, 554 (2013) (rejecting "formula based on 40-year-old facts having no logical relation to the present"). For example, the "rise of low-cost social media" has continued to erode the power of the parties as an institutional force. S. Issacharoff, *Democracy's Deficits*, 85 U. CHI. L. REV. 485, 490 (2018). Conversely, technological advances have made disclosure requirements a far more effective (but less restrictive) alternative. *See McCutcheon*, 572 U.S. at 224-25. "Today, given the Internet, disclosure offers much more robust protections against corruption," and it "is effective to a degree not possible at the time *Buckley*, or even *McConnell*, was decided." *Id.* at 224.

Individually and collectively, these various changes have stripped parties of any former "dominan[ce]" in the electoral sphere. *Colorado II*, 533 U.S. at 450. More importantly, they free this Court to give plenary consideration to Plaintiffs' challenges. *See, e.g.*, *McCutcheon*, 572 U.S. at 200. After all, where, as here, the Supreme Court has invigorated the legal standard, Congress has altered the statutory regime, and the operative facts have changed in the intervening years, *Colorado II* cannot dictate the

outcome of this new case. Instead, the Court should apply the Supreme Court's current legal standards to the current statute in light of the current facts. And under those standards, it is quite clear that the current limits on coordinated spending cannot stand.

*Finally*, *Colorado II* did not in any event purport to resolve any "as-applied challenge," such as the one here. 533 U.S. at 456 n.17. Instead, *Colorado II* resolved only a "facial challenge" to the coordinated party expenditure limits as they stood in 2001, and expressly left open the possibility of "an as-applied challenge focused on application of the limit[s] to specific expenditures." *Id.* at 437, 456 n.17; *see id.* at 468 n.2 (Thomas, J., dissenting). Accordingly, *Colorado II* does not "directly control[]" the as-applied challenge to the limits on party coordinated communications as defined in 11 C.F.R. § 109.37. *Rodriguez de Quijas*, 490 U.S. at 484; *see supra* at 26-27, 36-37, 40-41.

Thus, at a minimum, the Court should hold that § 30116(d)'s limits violate the First Amendment as applied to such communications. Indeed, the Supreme Court has previously admonished a lower court for concluding that *McConnell*'s rejection of a facial challenge against a BCRA provision foreclosed a later as-applied challenge against the same provision. *See Wisconsin Right to Life, Inc. v. FEC*, 546 U.S. 410, 411-12 (2006). Explaining that "[i]n upholding [that provision] against a facial challenge, we did not purport to resolve future as-applied challenges," the Court remanded for the lower court "to consider the merits of [the] as-applied challenge in the first instance." *Id.* Consistent with this instruction, the en banc D.C. Circuit has given plenary

consideration to as-applied challenges to campaign-finance restrictions under § 30110 even where the Supreme Court had previously upheld those limits against facial challenges. *See Libertarian Nat'l Comm.*, 924 F.3d at 539-46; *SpeechNow.org v. FEC*, 599 F.3d 686, 692-96 (D.C. Cir. 2010) (en banc).

Resolving the as-applied challenge thus requires this Court's fresh analysis. And that analysis is controlled by the Supreme Court's current doctrine in this area, not by the outdated form of "closely drawn" scrutiny employed in *Colorado II. See, e.g.*, *SpeechNow.org*, 599 F.3d at 694-95 (applying *Citizens United* framework to as-applied challenge to contribution limits). Thus, even if it applies the "closely drawn" test, the Court must analyze whether the coordinated party expenditure limits, as applied to party coordinated communications as defined in 11 C.F.R. § 109.37, prevent *quid pro quo* corruption or its appearance in a narrowly tailored way, *see, e.g.*, *Cruz*, 596 U.S. at 305; *McCutcheon*, 572 U.S. at 192, 197, 218. They fail this test. *See supra* at 40-41.

### B.    *Colorado II* Should Be Overruled

In all events, Plaintiffs preserve the argument that *Colorado II* should be overruled. *Stare decisis* is "not an inexorable command." *Janus v. AFSCME*, 138 S. Ct. 2448, 2478 (2018). The doctrine "is at its weakest" when "interpret[ing] the Constitution"—and "applies with perhaps least force of all to decisions that wrongly denied First Amendment rights." *Id.* (expressly overruling prior First Amendment precedent). Several factors underscore that *Colorado II* should be overruled.

*First*, *Colorado II* is an outlier that is not "consisten[t] with other related decisions." *Id.* As the dissenters explained, *Colorado II* was "an 'anomaly' in … First Amendment jurisprudence" even by 2001. *Id.* at 2483; *see Colorado II*, 533 U.S. at 474 (Thomas, J., dissenting). And even commentators generally sympathetic to limiting the role of money in politics have excoriated *Colorado II*'s analysis since then. For example, one described it as producing "jurisprudential incoherence" by indulging in "the fiction" that the Court was "adhering to the anticorruption rationale of *Buckley*" while it "reduced the evidentiary burden" and "relaxed the level of scrutiny." R. Hasen, Buckley *Is Dead, Long Live* Buckley*: The New Campaign Finance Incoherence of* McConnell v. Federal Election Commission, 153 U. PA. L. REV. 31, 32, 42-45 (2004).

*Second*, "[d]evelopments since [*Colorado II*], both factual and legal, have also 'eroded' [its] 'underpinnings' and left it" even more of "an outlier" in First Amendment jurisprudence. *Janus*, 138 S. Ct. at 2482. Those developments include the Supreme Court's clarification of the relevant governmental interests and strengthening of the "closely drawn" standard, Congress's 2014 authorization of unlimited coordinated party expenditures in some areas, and the erosion of party committees' political power through the enactment of BCRA and the rise of Super PACs. *See supra* Pt. II.A.

*Third*, *Colorado II* was "poorly reasoned"—an "important factor in determining whether a precedent should be overruled." *Janus*, 138 S. Ct. at 2479. For one thing, the coordinated party expenditure limits cannot satisfy even the "closely drawn" scrutiny

*Colorado II* purported to apply. *See supra* Pts. I, II.A. But *Colorado II* also erred in concluding that "closely drawn" rather than "strict" scrutiny applies in the first place. At the threshold, the *Buckley* framework "denigrates core First Amendment speech" and "should be overruled." *McCutcheon*, 572 U.S. at 228 (Thomas, J., concurring in the judgment). Instead, strict scrutiny should apply to *all* campaign-finance restrictions, including contribution limits. *See id.*

In any event, the coordinated party expenditure limits trigger strict scrutiny even under *Buckley*. Such expenditures are not "the functional equivalent of *contributions*." *Colorado II*, 533 U.S. at 447 (emphasis added). Contributions occur when a donor transfers money and "cede[s] control over the funds." *McCutcheon*, 572 U.S. at 210-11. But that is not how coordinated expenditures work: instead, the party committee retains ownership and ultimate control over the funds and how they are spent. Findings, R.49-1 ¶¶ 53-54, PageID##5505-06. *Colorado II* erred by eliding that material difference.

Even if coordinated party expenditures could be considered "functionally equivalent to contributions," strict scrutiny would still apply because "[t]he source of the 'contribution' at issue is a political party." *Colorado II*, 533 U.S. at 468 (Thomas, J., dissenting). *Buckley* excepted contribution limits from strict scrutiny on the theory that they impose "little direct restraint" on political speech because they do not "in any way infringe the contributor's freedom to discuss candidates and issues." 424 U.S. at 21. That is clearly not true, however, with respect to the coordinated party expenditure

limits at issue here, as the record amply documents. *See supra* Pt. I.A. So even if "[r]estricting contributions by individuals and political committees may, under *Buckley*, entail only a 'marginal restriction,' … the same cannot be said about limitations on political parties." *Colorado II*, 533 U.S. at 469 (Thomas, J., dissenting) (citation omitted).

Moreover, the involvement of political parties distinguishes coordinated party expenditures from private contributions. Many forms of coordinated party expenditures—such as party-developed television advertising in support of the party's candidate—"largely resemble, and should be entitled to the same protection as, independent expenditures," *id.* at 467, as they constitute "a clear manifestation of *the party's* most fundamental political views," *id.* at 468 (emphasis added). "By restricting such speech," the limits harm "parties' 'freedom to discuss candidates and issues'" in contravention of the First Amendment. *Id.* Thus, the limits are unconstitutional at least as applied to spending on core political advertising. *See supra* at 26-27, 36-37, 40-41.

More generally, "[p]olitical parties and their candidates are 'inextricably intertwined' in the conduct of an election." *Colorado II*, 533 U.S. at 469 (Thomas, J., dissenting). "Because of this unity of interest, it is natural for a party and its candidate to work together and consult with one another during the course of the election." *Id.* "[T]he ordinary means for a party to provide support is to make coordinated expenditures," so the coordinated party expenditure limits "ha[ve] restricted the party's most natural form of communication; ha[ve] precluded parties from effectively

amplifying the voice of their adherents; and ha[ve] had a stifling effect on the ability of the party to do what it exists to do." *Id.* at 469-71 (cleaned up). In other words, the limits infringe both "the [parties'] freedom to discuss candidates and issues," *Buckley*, 424 U.S. at 21, and their "freedom of association" to support their "standard bearer[s] who … represent[] the party[]" in elections, *Eu*, 489 U.S. at 224.

*Finally*, "[n]o serious reliance interests are at stake" in overruling *Colorado II*, which only "prevent[s]" political speech and association. *Citizens United*, 558 U.S. at 365. To the extent Congress "may have enacted" and amended the limits "believing that th[ey] were constitutional," that "is not a compelling interest for *stare decisis.*" *Id.*

## CONCLUSION

This Court should hold that FECA's limits on coordinated party spending under 52 U.S.C. § 30116(d) are facially unconstitutional and unconstitutional as applied to party coordinated communications as defined in 11 C.F.R. § 109.37. To the extent the Court concludes that existing precedent controls these questions, the Court should promptly so hold to permit Plaintiffs to seek Supreme Court review.

March 4, 2024

Jessica Furst Johnson
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street, N.W.
Suite 643A
Washington, DC 20037
Phone: (202) 737-8808
jessica@holtzmanvogel.com

*Counsel for Plaintiff-Appellants National Republican Senatorial Committee & National Republican Congressional Committee*

Respectfully submitted,

*/s/ Noel J. Francisco*
Noel J. Francisco
Donald F. McGahn II
John M. Gore
E. Stewart Crosland
Brinton Lucas
Charles E.T. Roberts
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Phone: (202) 879-3939
njfrancisco@jonesday.com

Sarah Welch
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio 44114
Phone: (216) 586-3939
swelch@jonesday.com

*Counsel for Plaintiff-Appellants*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,996 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Sixth Circuit Rule 32(b)(1), as counted using the word-count function on Microsoft Word 2016 software.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word 2016, in Garamond style, 14-point font.

Dated: March 4, 2024 *               /s/ Noel J. Francisco*
                                        Noel J. Francisco

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2024, I electronically filed the original of this brief with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all attorneys of record by operation of the Court's electronic filing system.

*/s/ Noel J. Francisco*
Noel J. Francisco

# DESIGNATION OF RELEVANT LOWER COURT DOCUMENTS

Pursuant to Sixth Circuit Rule 30(g), Plaintiff-Appellants designate the following filings from the district court's electronic records:

*National Republican Senatorial Committee v. FEC, No. 1:22-cv-639 (S.D. Ohio)*

| R. No. | Description | PageID# |
|---|---|---|
| R.1 | Complaint | 1-28 |
| R.10 | Motion to Dismiss or Transfer Venue | 81-99 |
| R.18 | Opinion and Order denying Motion to Dismiss or Transfer Venue | 151-169 |
| R.19-3 | Declaration of Senator Vance | 193-197 |
| R.20 | Motion to Certify Question to the En Banc Court of Appeals | 215-217 |
| R.21 | Memorandum of Law in Support of Motion to Certify Question to the En Banc Court of Appeals | 218-262 |
| R.26 | Opposition to Motion to Certify | 304-325 |
| R.41-3 | Expert Report of Raymond J. La Raja | 4121-4172 |
| R.41-6 | Senator Vance's First Objections And Responses To Defendant's First Set Of Discovery Requests | 4700-4731 |
| R.41-11 | FEC Conciliation Agreement | 4812-4816 |
| R.43 | Defendants' Proposed Findings of Fact | 5111-5244 |
| R.44 | Plaintiffs' Proposed Findings of Fact | 5245-5280 |
| R.49 | Order Certifying Question to the En Banc Court of Appeals | 5454-5495 |
| R.49-1 | Appendix to Order Certifying Question to the En Banc Court of Appeals (Findings) | 5496-5537 |