No. 24-3051

---

In The
United States Court of Appeals
For the Sixth Circuit

---

NATIONAL REPUBLICAN SENATORIAL COMMITTEE, ET AL.,

*Plaintiffs-Appellants*,

v.

FEDERAL ELECTION COMMISSION, ET AL.,

*Defendants-Appellees.*

---

**On Certification from the United States District Court
for the Southern District of Ohio**
No. 1:22-cv-00639
The Honorable Douglas Russell Cole

---

**CORRECTED BRIEF OF AMICUS CURIAE SENATOR MITCH
MCCONNELL IN SUPPORT OF PLAINTIFFS-APPELLANTS**

---

Charles J. Cooper
Peter A. Patterson
John D. Ohlendorf
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
Email: ccooper@cooperkirk.com

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................... ii

INTEREST OF AMICUS CURIAE ........................................................ 1

INTRODUCTION ................................................................................. 2

ARGUMENT ........................................................................................ 5

I.     The Coordinated Spending Limit Does Not Further the Government's Anti-Corruption Interest, and *Colorado II* Was Wrongly Decided. ............... 6

II.    Intervening Developments in the Supreme Court's Campaign Finance Jurisprudence Further Confirm the Coordinated Spending Limit's Unconstitutionality. ........................................................................ 18

    A. The Supreme Court Has Invalidated Many of Congress's Unconstitutional Campaign Finance Restrictions Since 2001, Dramatically Changing the Landscape of Campaign Finance Law......... 18

    B. FECA's Coordinated Party Spending Limit Serves No Constitutionally Valid Purpose in the Framework of Campaign Finance Law that Has Emerged.................................................................. 25

CONCLUSION ..................................................................................... 28

i

## TABLE OF AUTHORITIES

**Cases**                                                            **Page**

*Arizona Free Enter. Club's Freedom Club PAC v. Bennett*,
   564 U.S. 721 (2011)................................................................11, 12

*Buckley v. Valeo*,
   424 U.S. 1 (1976)..........................................................1, 2, 6, 8,
                                                  9, 17, 18,
                                                     19, 26

*Citizens United v. FEC*,
   558 U.S. 310 (2010)..........................................................1, 5, 8, 23,
                                                    24, 26

*City of Los Angeles v. Alameda Books, Inc.*,
   535 U.S. 425 (2002)................................................................17

*Colorado Republican Federal Campaign Comm. v. FEC*,
   518 U.S. 604 (1996)................................................................15

*Davis v. FEC*,
   554 U.S. 724 (2008)................................................................11, 22, 23

*FEC v. Colorado Republican Fed. Campaign Comm.*,
   533 U.S. 431 (2001)..........................................................3, 6, 7, 8,
                                                  9, 13, 14,
                                                  15, 16, 17,
                                                  25, 26, 27

*FEC v. Cruz*,
   596 U.S. 289 (2022)................................................................1, 2, 12, 24, 25

*FEC v. National Conservative Pol. Action Comm.*,
   470 U.S. 480 (1985)................................................................6, 7, 8

*FEC v. Wisconsin Right to Life, Inc.*,
   551 U.S. 449 (2007)................................................................21, 22, 23, 26

*McConnell v. FEC*,
   540 U.S. 93 (2003)................................................................1, 20, 21

*McCutcheon v. FEC*,
    572 U.S. 185 (2014)..............................................................3, 4, 5, 6,
                                    9, 10, 11,
                                  12, 13, 24

*Nixon v. Shrink*,
    528 U.S. 377 (2000).....................................................................4, 17

*SpeechNow.org v. FEC*,
    599 F.3d 686 (D.C. Cir. 2010) .........................................................26

## **Statutes, Codes, and Regulations**

52 U.S.C.
    § 30116(a)(1)(B) .............................................................................12
    § 30116(a)(8) ............................................................................10, 16
    § 30116(j).........................................................................................12

11 C.F.R. § 109.37...................................................................................16

88 Fed. Reg. 7,088, 7,090 (Feb. 2, 2023) ...........................................12, 13

## **Other Authorities**

Richard Briffault, *Super PACs*, 96 MINN. L. REV. 1644 (2012) ........................26, 27

*Coordinated party expenditure limits adjusted* (2016), FEC,
    https://bit.ly/3wMAuY0 ..................................................................27

Samuel Issacharoff, *Outsourcing Politics: The Hostile Takeovers of Our
    Hollowed-Out Political Parties*, 54 HOUS. L. REV. 845 (2017)............7, 8, 27

Ian Vandewalker, *Since Citizens United, a Decade of Super PACs*, BRENNAN CTR.
    (Jan. 14, 2020), https://bit.ly/3uNtLN7 ........................................27

## INTEREST OF AMICUS CURIAE

*Amicus Curiae* Senator Mitch McConnell is the senior United States Senator from the Commonwealth of Kentucky. He has been the Leader of the Republican Conference in the United States Senate for over 17 years and is the former Chairman of the National Republican Senatorial Committee, a national political party committee comprising the Republican members of the United States Senate.

Senator McConnell is a respected senior statesman and is one of the Senate's strongest defenders of the First Amendment's guarantees. For many years, Senator McConnell has participated in litigation defending First Amendment freedoms. For example, he was the lead plaintiff challenging the Bipartisan Campaign Reform Act in *McConnell v. FEC*, 540 U.S. 93 (2003), and he participated as amicus both by brief and oral argument in *Citizens United v. FEC*, 558 U.S. 310 (2010), which overruled *McConnell* in part. He also participated as amicus in many of this Court's other campaign finance cases. *E.g.*, Br. of Amicus Curiae Sen. Mitch McConnell, *McCutcheon v. FEC*, 572 U.S. 185 (May 13, 2013); Br. of Amicus Curiae Sen. Mitch McConnell, *FEC v. Cruz*, 596 U.S. 289 (Dec. 22, 2021).[1]

---

[1] No party's counsel authored this brief in any part, and no person other than amicus or its counsel contributed money intended to fund preparing or submitting it. All parties have consented to this brief's filing.

1

# INTRODUCTION

"Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." *Buckley v. Valeo*, 424 U.S. 1, 14 (1976). The freedom of speech thus "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *FEC v. Cruz*, 596 U.S. 289, 302 (2022). And because any "restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached," the Supreme Court has held that such restrictions comport with the First Amendment only if they satisfy heightened constitutional scrutiny. *Buckley*, 424 U.S. at 19.

Money is essential to extend a political campaign beyond the soapbox. Yet Congress has nonetheless erected a complex, sweeping structure of restrictions on the flow of money into the political process. That sprawling regulatory edifice, which was originally fashioned in 1971 by the Federal Election Campaign Act of ("FECA") and was renovated in 2002 by the Bipartisan Campaign Reform Act ("BCRA"), has not aged well, as one after another of its most important features— its load-bearing pillars—have been toppled by the First Amendment. One of the

structure's important pillars, however, survived its first challenge under the First Amendment.

Section 315 of FECA, 52 U.S.C. Section 30116(d), tightly limits the amount of money that a national political party, such as the Republican or Democratic Party, can spend in coordination with the party's own candidates. Section 315's limits are adjusted for inflation and currently range between roughly $60,000 and $32 million depending on the office. This coordinated party spending limit was upheld by a closely divided Court in *FEC v. Colorado Republican Fed. Campaign Comm.* ("*Colorado II*"), 533 U.S. 431 (2001). The Court, respectfully, was wrong.

The only government interest the Supreme Court has recognized as adequate to justify a campaign funding restriction is the interest in preventing the reality or appearance of *quid pro quo* corruption—*i.e.,* transactional exchanges involving "dollars for political favors," *McCutcheon v. FEC*, 572 U.S. 185, 192 (2014) (plurality). But the influence that political parties seek to exercise over their own candidates' behavior is nothing like that. To the contrary, a party's influence over "its candidate's stance on issues and, if the candidate takes office or is reelected, his votes . . . is simply the essence of our Nation's party system of government." *Colorado II*, 533 U.S. at 477 (Thomas, J., dissenting) (cleaned up). Nor can Section 315's coordinated party expenditure limit be justified as curbing *quid pro quo* transactions between a candidate and the donor who is the ultimate source of the

3

funds spent by the party. For that donor's contribution to the party cannot lawfully be "earmarked" for the benefit of a particular candidate, and the donation *is itself* limited by federal contribution limits—limits that "indicate[ ] [Congress's] belief that contributions of that amount or less *do not create* a cognizable risk of corruption." *McCutcheon*, 572 U.S. at 210 (plurality) (emphasis added). In truth, the challenged coordinated-spending limit's real function and effect has *nothing to do* with fighting corruption. No, its inevitable real-world effect is to restrict the amount and diminish the effectiveness of *political speech—*"the primary object of First Amendment protection*." Nixon v. Shrink,* 528 U.S. 377, 410–411 (2000). And that effect is antithetical to the First Amendment.

These constitutional defects, evident when *Colorado II* was decided, have only become glaringly conspicuous in the decades since, as the Supreme Court has demolished several of the key pillars that Congress devised to support the overall structure of its regulatory edifice. The First Amendment's repeated collisions with FECA and BCRA have resulted in a dilapidated statutory framework that Congress did not anticipate and that no one would have designed: a framework where the national parties are tightly constrained in spending money on speech that is not corrupting in the slightest, while unaccountable outside "Super PACs" can freely spend *unlimited amounts* of money to influence federal elections and, thus, candidates. Even if one assumes that FECA's coordinated party spending limit could

have conceivably served a compelling government interest two decades ago, it does not do so today, standing in isolation among the statutory ruins of Congress's campaign finance rules. Appellants have thus made a strong case that *Colorado II* has lost its precedential force and should not be followed by this Court. *See* First Appellants' Br. at 41–49 (Mar. 5, 2024), Doc. 22. But at a minimum, this Court should hasten Section 315's inevitable, and fatal, rematch with the First Amendment in the Supreme Court by writing the first draft of its obituary.

## ARGUMENT

"Speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010). To be consistent with the First Amendment, the Supreme Court has held time and again that any regulation of campaign speech must "target what we have called '*quid pro quo*' corruption or its appearance"—"dollars for political favors." *McCutcheon*, 572 U.S. at 192 (plurality). Under the doctrinal framework first established in *Buckley*, laws that restrict *expenditures* on campaign speech are "subject to strict scrutiny" and thus must be "narrowly tailored" to prevent *quid pro quo* corruption or its appearance, *Citizens United*, 558 U.S. at 340 (2010), while laws that restrict campaign *contributions* must be "closely drawn" to serve that anti-corruption interest, *McCutcheon*, 572 U.S. at 197 (plurality). FECA's coordinated party expenditure limit is neither.

5

I.    **The Coordinated Spending Limit Does Not Further the Government's Anti-Corruption Interest, and *Colorado II* Was Wrongly Decided.**

A.    Any attempt to justify FECA's limits on coordinated party spending stumbles out of the starting blocks, for while the model of *quid pro quo* corruption makes sense when applied to contributions by *individual donors*—who could conceivably try to contribute "dollars" in exchange for the promise of "political favors," *McCutcheon*, 572 U.S. at 192 (plurality)—it makes *no sense at all* in the context of *political parties*.

The government may target *quid pro quo* corruption because it "undermine[s]" "the integrity of our system of representative democracy." *Buckley*, 424 U.S. at 26–27. Where contributions are "given as a *quid pro quo* for improper commitments from [a] candidate," *FEC v. National Conservative Pol. Action Comm.*, 470 U.S. 480, 498 (1985) ("*NCPAC*"), the democratic link between a candidate and those who vote for him is broken. "Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns." *Id.* at 497. Moreover, as *Buckley* affirms, "the appearance of corruption stemming from public awareness of the opportunities for abuse" arising from such "quid pro quo arrangements" can cause "confidence in the system of representative Government . . . to be eroded to a disastrous extent." 424 U.S. at 27 (cleaned up).

6

When the source of a contribution is the candidate's political party, these concerns simply do not obtain. Yes, political parties contribute money in an attempt to influence the candidate's behavior in office; indeed, they may perhaps even do so in an attempt to extract concrete "commitments." *NCPAC*, 470 U.S. at 498. But that is one of their basic *raisons d'être*. "The very aim of a political party is to influence its candidate's stance on issues and, if the candidate takes office or is reelected, his votes." *Colorado II*, 533 U.S. at 477 (Thomas, J., dissenting). Rather than constituting "a subversion of the political process," *id.*, this type of influence is one of the *basic features* of representative democracy in a party system of government.

Parties play a number of vital roles in our governmental system that make them "critical to the central public good of democratic self-governance." Samuel Issacharoff, *Outsourcing Politics: The Hostile Takeovers of Our Hollowed-Out Political Parties*, 54 Hous. L. Rev. 845, 854 (2017). For example, parties help to forge "a coherent set of policies or priorities" out of the "competing agendas[ ]" and interests of all of their disparate members, thus guarding against "inconsistency in potential political outcomes" so severe that it could "collapse the capacity of any legislative body charged with policy leadership." *Id.* at 855–56. Parties also generally pull officeholders on the political fringes closer "to the center of the political distribution of voters." *Id.* at 855. In short, "the party provides coherence to politics, disciplines candidates not to stray too far from the party message, offers

7

a mechanism for the ineffectual center to be protected from the extremes within each party, and maintains the ability to govern effectively." *Id.* at 858. And critically, to provide any of these public goods, a party must have tools to *influence the behavior* of its candidates and officeholders—including by supporting them with money raised by the party.

While parties thus most assuredly seek to wield influence over candidate behavior through their contributions and spending, there is nothing "improper," let alone corrupt, about the "commitments" they seek to obtain, *NCPAC*, 470 U.S. at 498, since they are in furtherance of "the central public good of democratic self-governance," Issacharoff, *supra*, at 854. Indeed, a party's efforts to gain influence over its candidates are, in the main, indistinguishable from the ordinary political motives and pressures that the Supreme Court has described as inevitable and even beneficial in a representative government: "It is well understood that a substantial and legitimate reason, if not the only reason, to cast a vote for, or to make a contribution to, one candidate over another is that the candidate will respond by producing those political outcomes the supporter favors." *Citizens United*, 558 U.S. at 359. (internal quotation marks omitted)

A party's effort at influencing a candidate's behavior thus does not undermine "the integrity of our system of representative democracy," *Buckley*, 424 U.S. at 26–27; it "is simply the essence of our Nation's party system of government.

8

One can speak of an individual citizen or a political action committee corrupting or coercing a candidate, but what could it mean for a party to 'corrupt' its candidate or to exercise 'coercive' influence over him?" *Colorado II*, 533 U.S. at 477 (Thomas, J., dissenting) (brackets and quotation marks omitted).

B.    Since the Government cannot show that coordinated party spending poses any risk of corruption by the *entity actually doing the spending*—the party—it has attempted to justify FECA's limit as targeting corruption from a different source: the original donor who *gave the party* the money it spends in coordination with the candidate. This original donor, the theory goes, might "give to a party with the understanding that the contribution to the party will produce increased party spending for the candidate's benefit," thereby circumventing the individual "contribution limits binding on them." *Colorado II*, 533 U.S. at 446–47. "The Government argues that if coordinated spending were unlimited, circumvention would increase: because coordinated spending is as effective as direct contributions in supporting a candidate, an increased opportunity for coordinated spending would aggravate the use of a party to funnel money to a candidate from individuals and nonparty groups, who would thus bypass the contribution limits that *Buckley* upheld." *Id.* at 447.

This argument makes a number of unwarranted inferential leaps. As an initial matter, "there is not the same risk of *quid pro quo* corruption or its appearance when

9

money flows through independent actors to a candidate, as when a donor contributes to a candidate directly," because the original individual donor "must by law cede control over the funds" when he gives them to the party. *McCutcheon*, 572 U.S. at 210 (plurality). Moreover, federal law already prevents a donor from "earmarking" funds for a particular candidate, in the way the Government's argument assumes. 52 U.S.C. § 30116(a)(8). But even setting these problems aside, the Government's "anti-circumvention" rationale faces an additional, and insurmountable, hurdle: federal base contribution limits already restrict the amount that any individual may contribute to a party as well as to a candidate, and so these base limits *already guard against* any threat of *quid pro quo* corruption that might stem from contributions to parties. The "anti-circumvention" justification for the coordinated party spending limit thus amounts to precisely the type of "prophylaxis-upon-prophylaxis approach" that the Supreme Court has repeatedly rejected. *McCutcheon*, 572 U.S. at 221 (plurality).

*McCutcheon* is closely on point. The plaintiffs there challenged FECA's "aggregate" contribution limits (as amended by BCRA). Those limits capped the amount any individual could "contribute in total to all candidates or committees"— even if each individual contribution within the aggregate total was within the applicable base contribution limit (then $2,600 for contributions to a candidate and $32,000 for contributions to a national party). *Id.* at 192. The Government defended

the aggregate limits as an additional layer of protection against the same risk of corruption targeted by the base limits, arguing that the aggregate cap was necessary to "prevent circumvention of the base limits." *Id.* at 210. The Supreme Court rejected this "prophylaxis-upon-prophylaxis approach." *Id.* at 221.

The "base limits remain the primary means of regulating campaign contributions," the Court explained, and "Congress's selection of a [$3,300] base limit indicates its belief that contributions of that amount or less *do not create a cognizable risk of corruption*." *Id.* at 209, 210 (emphasis added). And "[i]f there is no corruption concern" in donating the maximum allowable amount to each candidate until the aggregate limit is met, there can be no anti-corruption interest in preventing any *further* donations that *also* comply with the limit selected by Congress—donations that cannot be "regarded as corruptible" as a matter of law. *Id.* at 210; *see also Davis v. FEC*, 554 U.S. 724, 741 (2008) ("[G]iven Congress' judgment that liberalized limits for non-self-financing candidates do not unduly imperil anticorruption interests, it is hard to imagine how the denial of liberalized limits to self-financing candidates can be regarded as serving anticorruption goals sufficiently to justify the resulting constitutional burden."); *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 751–52 (2011) ("Arizona already has some of the most austere contribution limits in the United States. . . . In the face of such ascetic contribution limits, strict disclosure requirements, and the

11

general availability of public funding, it is hard to imagine what marginal corruption deterrence could be generated by the matching funds provision.").

The Court adopted similar reasoning in *Cruz*. There, Senator Ted Cruz challenged a provision of BCRA that capped at $250,000 the amount of loans from a candidate to his own campaign committee that could be repaid with funds raised by the committee after the election. *See* 52 U.S.C. § 30116(j). The Supreme Court struck down the limit, reasoning that it was "yet another in a long line of "prophylaxis-upon-prophylaxis approach[es]" to regulating campaign finance." *Cruz*, 596 U.S. at 306 (citation omitted).

> Individual contributions to candidates for federal office, including those made after the candidate has won the election, are already regulated in order to prevent corruption or its appearance. Such contributions are capped at $[3,300] per election, and nontrivial contributions must be publicly disclosed. . . . And the requirements are themselves prophylactic measures, given that few if any contributions to candidates will involve *quid pro quo* arrangements. Such a prophylaxis-upon-prophylaxis approach, we have explained, is a significant indicator that the regulation may not be necessary for the interest it seeks to protect.

*Id.* (citations and quotation marks omitted).

As in *McCutcheon* and *Cruz*, so too here. Any funds donated by individuals to finance a party's coordinated spending *already* must fall within the base limit for contributions to a national party, 52 U.S.C. § 30116(a)(1)(B)—currently set at the inflation-adjusted amount of $41,300, 88 Fed. Reg. 7,088, 7,090 (Feb. 2, 2023). Any effort to "circumvent" the limit for contributions to candidates by donating to the

12

candidate's party would thus run headlong into the limit for contributions to parties themselves. And contributions to a party *within* that limit, under *McCutcheon* and *Cruz*'s reading, cannot be regarded as corrupting as a matter of law. *McCutcheon*, 572 U.S. at 210, 221 (plurality).

Put differently, in setting the base limits on contributions to national parties, Congress *already took into account*—and *already provided prophylactic protection against*—the possibility that individual donors might seek to use those contributions in service of a *quid pro quo* arrangement with one of the party's candidates. And it is these individual contribution limits that "remain the primary means of regulating campaign contributions." *Id.* at 209. To be sure, the limit on contributions to parties is substantially higher than the limit on contributions to individuals, but that merely reflects the fact that "there is not the same risk of *quid pro quo* corruption or its appearance when money flows through independent actors to a candidate, as when a donor contributes to a candidate directly[,]" since with the addition of the intermediary, "the chain of attribution grows longer, and any credit must be shared among the various actors along the way." *Id.* at 210, 211.

If Congress believes that the base limit on contributions to parties is no longer adequate to prevent *quid pro quo corruption*—because of a ruling invalidating the challenged coordinated spending limit or for any other reason—"the proper response is to lower the cap." *Colorado II*, 533 U.S. at 482 (Thomas, J., dissenting). That

policy solution eschews directly regulating party expenditures—speech that lies at the heartland of the First Amendment's protective sweep. It avoids the Rube-Goldberg-like stack of "prophylaxis upon prophylaxis" measures entailed by the coordinated spending limit, *McCutcheon*, 572 U.S at 196. And it also has the benefit of being "directed at the source of the alleged corruption—the individual donor—and not the party," *Colorado II*, 533 U.S. at 482 (Thomas, J., dissenting) (cleaned up).

C.     In truth, while the *Colorado II* majority accepted the Government's rationale of the coordinated party spending limit as a prophylactic anti-corruption measure, its real function and effect has nothing to do with *quid pro quo* corruption. No, the real effect of the coordinated spending limit is simply to make party speech *less valuable and effective*.

*Colorado II* was quite clear about this. The only practical difference between party expenditures that are coordinated with a candidate's campaign and party expenditures that are made independently is that the latter are *less effective*: "[t]he absence of prearrangement and coordination of an expenditure with the candidate or his agent . . . undermines the value of the expenditure to the candidate." *Id.* at 464 (quoting *Buckley*, 424 U.S. at 47). A party spending without coordination runs the risk of spending funds at a time or place that is unhelpful or out of sync with the candidate's electoral strategy—running ads in a state or county, for example, that

14

the candidate has decided not to seriously contest. And uncoordinated spending can also be ineffective or, worse still, even unhelpful as a substantive matter, emphasizing themes that are out of step with the candidate's own campaign messaging, or discussing issues that the candidate has concluded are affirmatively harmful. As Appellants explained below, "a lack of coordination on independent expenditures" can thus "result in advertisements being run that are unhelpful to, if not entirely disfavored by, the supported candidate." D.Ct. Doc. 19-1 at ¶ 23 (Apr. 19, 2023). It is thus often "impractical and imprudent, to say the least, for a party to support its own candidates without some form of 'cooperation' or 'consultation.' " *Colorado Republican Federal Campaign Comm. v. FEC*, 518 U.S. 604, 630 (1996) ("*Colorado I*") (Kennedy, J., dissenting in part). Indeed, in the absence of coordination, it will be a matter of *pure happenstance* if a party's expenditures happen to produce, by the candidate's lights, the right message in the right place at the right time, and thus operate with anything approaching the same effectiveness as spending coordinated with the campaign. The design and effect of Section 315's coordinated party spending limit is thus to sow discord into the campaign speech of a political party and its own candidates for office, a result that enfeebles speech that "is the lifeblood of a self-governing people." *Colorado II,* 533 U.S. at 466 (Thomas, J., dissenting).

And for what? According to the *Colorado II* majority, the "special value" of coordinated expenditures "is also the source of their power to corrupt." *Id.* at 465. But in reality the two concepts are entirely unrelated. Only coordinated party expenditures that are part of a *quid pro quo* arrangement (a description that, on the available evidence, fits precious few coordinated expenditures, if any at all) are corrupting. And *uncoordinated* expenditures could just as readily be part of a *quid pro quo* arrangement as coordinated ones, since nothing in the copious regulatory rules fleshing out what constitutes "coordination," *see, e.g.*, 11 C.F.R. § 109.37, prevents a party from informing candidate X that donor Y has contributed $41,300 designated for uncoordinated spending on X's behalf, as the *quo* in exchange for a particular agreed-upon *quid*. It is instead FECA's separate rule against earmarking (not to mention bribery laws) that outlaws *that* sort of arrangement. *See* 52 U.S.C. § 30116(a)(8); *compare Colorado II*, 533 U.S. at 459 (discussing " 'tallying,' a system that helps to connect donors to candidates through the accommodation of a party"), *with id.* at 479 (Thomas, J., dissenting) ("[E]ven if the tally system were evidence of corruption-through-circumvention, it is only evidence of what is occurring under the current system, not of additional 'corruption' that would arise in the absence of the Party Expenditure Provision.").

Layering the coordinated party spending limit on top of the anti-earmarking rule is thus rather like *imposing a tax on a bribe*, on the theory that the crime of

16

bribery will occur less often because the tax "undermines the value" of each bribe. *Id.* at 464 (majority opinion). And the coordinated party spending limit, in addition to sharing the irrationality of such a bribery regime (which alone would be sufficient to doom the limit under any level of heightened scrutiny), suffers from an even more pernicious defect. For here the "tax" falls not on bribe payments but on "*the speech upon which democracy depends.*" *Shrink,* 528 U.S. at 405 (Kennedy, J. dissenting) (emphasis added). Again, the whole premise of the Government's anti-corruption theorem is that forcing more spending to be uncoordinated will reduce its attractiveness as a potential *quo* in a *quid pro quo* arrangement *by reducing its effectiveness as political speech*. And any argument built upon such a premise must fail, because that premise is *antithetical* to our First Amendment. *Cf. Buckley*, 424 U.S. at 48–49 ("the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment"); *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 445 (2002) .

## II.   Intervening Developments in the Supreme Court's Campaign Finance Jurisprudence Further Confirm the Coordinated Spending Limit's Unconstitutionality.

For all the reasons set forth above, *Colorado II* was wrong the day it was decided. In the intervening years, however, the Supreme Court's campaign-finance jurisprudence has significantly matured. Since 2001, the Court has knocked down

provision after provision, first of FECA and then of BCRA, as constitutionally invalid. And in the legal landscape that has emerged, it is now clearer than ever that FECA's limit on coordinated party spending has no constitutionally valid role to play.

**A. The Supreme Court Has Invalidated Many of Congress's Unconstitutional Campaign Finance Restrictions Since 2001, Dramatically Changing the Landscape of Campaign Finance Law.**

1.    The leading Supreme Court campaign finance decision on the books when *Colorado II* was handed down was the landmark 1976 decision in *Buckley*. While *Buckley* upheld much of FECA, it struck down many of its most significant provisions, effecting a sea-change in the overall structure of campaign finance law. Most momentously, *Buckley* established the basic framework that continues to govern the constitutional assessment of campaign finance restrictions. "[E]xpenditure limitations" on the *spending* of money to fund political speech must "satisfy the exacting scrutiny applicable to limitations on core First Amendment rights of political expression." 424 U.S. at 44–45. "[C]ontribution limitations," in contrast, "may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." *Id.* at 21, 25. Finally, "disclosure requirements," though nominally subject to "[t]he strict test established by *NAACP v. Alabama,*" are generally

considered "to be the least restrictive means" of furthering Congress's goals and, thus, constitutional, *id.* at 66, 68.

Applying this newly-minted framework, *Buckley* upheld some of FECA's restraints—including its base limits on contributions by individuals and political committees to candidates—as well as its numerous disclosure and recordkeeping requirements. *Id.* at 23–29, 35–36, 60–84. But the Court struck down many other features of the Act, including its spending limits—one of the chief, load-bearing pillars of the legislative structure. The *Buckley* Court held that FECA's $1,000 limit on expenditures "relative to a clearly identified candidate" could not be squared with "First Amendment Freedoms"—even if narrowed to encompass only "communications that in express terms advocate the election or defeat of a clearly identified candidate." *Id.* at 39, 44 (cleaned up). The Court employed similar reasoning to strike down the Act's "ceiling on personal expenditures by candidates on their own behalf." *Id.* at 52. And it also invalidated FECA's "limitations on overall campaign expenditures by candidates." *Id.* at 54.

2.    The Court's next major campaign-finance decision came two years after *Colorado II*, and was prompted by Congress's second major piece of legislation: BCRA. BCRA imposed several new restraints on speech—most significantly, detailed bans or restrictions on the use of so-called "soft money" (money raised outside the scope of FECA's federal contribution limits); a new

definition of "electioneering communications" that extended FECA's disclosure requirements to a category of independent expenditures far broader than the "express advocacy" boundary-line adopted by *Buckley*; and a ban on "express advocacy," as newly defined, by corporations. Plaintiffs (including *amicus* Leader McConnell) brought facial challenges to nearly every part of BCRA. And though a cobbled-together bare majority of Justices upheld most of the challenged provisions, cracks in the legislative structure's foundation were apparent—cracks that would ultimately lead to successive collapses of major pillars of the edifice.

Four Justices would have held many of BCRA's most significant provisions invalid. *See McConnell*, 540 U.S. at 286–341 (Kennedy, J., concurring in part and dissenting in part); *id.* at 264–86 (Thomas, J., concurring in part and dissenting in part). That includes Section 203's ban on "electioneering communications" by corporations and labor unions, *see id.* at 330 (Kennedy, J., concurring in part and dissenting in part); *id.* at 274–75 (Thomas, J., concurring in part and dissenting in part), but a majority allowed it to stand until the Court's decision in *Citizen United*. Taken together, the dissenters recognized BCRA for what it was: "an incumbency protection plan." *Id.* at 306 (Kennedy, J., concurring in part and dissenting in part).

Although a narrow majority in *McConnell* thus upheld much of BCRA, the Court struck down Section 213's requirement that a political party choose, "during the postnomination, preelection period," either to "spend more than $5,000 in

coordination with its nominee" or entirely to forego "the right to make independent expenditures for express advocacy" during that period. *Id.* at 213, 216–17 (majority opinion) (emphasis omitted). And it similarly invalidated Section 318's ban on contributions by individuals under the age of 18. *Id.* at 231–32.

Accordingly, most of BCRA's provisions narrowly survived the Act's first encounter with the First Amendment. But far from constituting the last word on BCRA's constitutionality, *McConnell* merely started the Supreme Court down a path that would ultimately dismantle much of BCRA—and knock out as constitutionally infirm much of the structural framework supporting federal campaign finance law as a whole.

3.    In *FEC v. Wisconsin Right to Life, Inc.* ("*WRTL*"), 551 U.S. 449 (2007), the Supreme Court returned to the constitutionality of Section 203's limit on corporate "electioneering communications." *McConnell* had upheld Section 203 on its face, but in *WRTL* a plurality of the Court clarified that this ban could constitutionally be applied only to the subset of "electioneering communications" that either falls within *Buckley*'s category of "express advocacy or its functional equivalent." *Id.* at 465. And "a court should find that an ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *Id.* at 469–70. Because the issue advertisements that WRTL wished to run were "plainly

21

not the functional equivalent of express advocacy," Section 203 could not constitutionally be applied to restrict them. *Id.* at 470. Three Justices would have gone further, overruled *McConnell*, and held that Section 203 was unconstitutional on its face. *Id.* at 499–500 (Scalia, J., concurring).

4.    The Supreme Court knocked down another of BCRA's pillars in *Davis*. That case concerned a "part of the so-called 'Millionaire's Amendment' " providing that "when a candidate spends more than $350,000 in personal funds . . . , that candidate's opponent may qualify to receive both larger individual contributions than would otherwise be allowed and unlimited coordinated party expenditures." 554 U.S. at 729, 736. The Court held that this "asymmetrical regulatory scheme," which "imposes an unprecedented penalty on any candidate who robustly exercises [his] First Amendment right," could be squared with the First Amendment only if it were "justified by a compelling state interest." *Id.* at 729, 739, 740 (cleaned up). But instead of a compelling interest, the Government had come forward with an illegitimate one: the aim of "level[ling] electoral opportunities for candidates of different personal wealth." *Id.* at 741. The Millionaire's Amendment's asymmetrical contribution scheme was thus "antithetical to the First Amendment," and another regulatory pillar fell. *Id.* at 744.

5.    Two Terms after *Davis*, the Supreme Court returned to the constitutionality of BCRA, and this time it took out one of the Act's most significant

structural supports: Section 203's ban on corporate "electioneering communications." The *McConnell* Court had upheld this ban on its face. And though *WRTL*, as discussed above, narrowed its application to expenditures on "express advocacy or its functional equivalent," 551 U.S. at 465, the Court left it standing as applied to that subset of speech. *Citizens United* finally struck down the ban in its entirety, overruling that portion of *McConnell*.

In *Citizens United*, a nonprofit corporation sought to broadcast a cable documentary regarding then-Senator Hillary Clinton within 30 days of the 2008 primary elections. 558 U.S. at 319–21. Unlike the issue ads in *WRTL*, the Court concluded that Citizen United's proposed broadcast plainly "qualifies as the functional equivalent of express advocacy," thus teeing up the constitutional validity of Section 203's ban as applied to that speech. *Id.* at 326. The Court repudiated *McConnell* and held that it was not valid.

"Political speech is indispensable to decisionmaking in a democracy, and this is no less true because the speech comes from a corporation." *Id.* at 349 (citation and quotation marks omitted). And no legitimate government interest could justify BCRA Section 203's restraint on that core political speech. The Government's proffered "antidistortion" interest did not do the trick, since that interest is not a *constitutionally legitimate one*, let alone compelling. *Id.* at 349–56. Nor could the ban be justified as preventing the reality or appearance of corruption. For while

independent expenditures by a corporation (or anyone else) might conceivably garner it "influence over or access to elected officials," those expenditures "do not give rise to corruption or the appearance of corruption," when that concept is properly understood as "limited to *quid pro quo* corruption." *Id.* at 357, 359.

6.      Following *Citizens United*, the Court took down yet another portion of the federal campaign finance structure in *McCutcheon*. As discussed above, *McCutcheon* invalidated the aggregate limits on "how much money a donor may contribute in total to all candidates or committees." 572 U.S. at 192 (plurality). The Court confirmed what was clear from its earlier decisions, from *Buckley* onward: the only compelling justification for regulating campaign speech is to prevent "what we have called '*quid pro quo*' corruption or its appearance." *Id.* And in light of the federal base contribution limits, "the aggregate limits do little, if anything, to address that concern" and "are therefore invalid under the First Amendment." *Id.* at 193.

7.      Finally, the Supreme Court's most recent encounter with BCRA in *Cruz* finished off the portion of the Millionaire's Amendment that *Davis* had left standing. *Cruz*, as also noted above, concerned the Millionaire's Amendment's restriction on a campaign committee "using more than $250,000 of funds raised after election day to repay a candidate's personal loans" to his campaign. 596 U.S. at 293. This limitation, the Court explained, suffered from the same basic constitutional infirmity as in *Davis*: it "burdens candidates who wish to make expenditures on

24

behalf of their own candidacy." *Id.* at 302. And because the loan-repayment limit did not further the "only one permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance," the Court struck it down. *Id.* at 305.

### B. FECA's Coordinated Party Spending Limit Serves No Constitutionally Valid Purpose in the Framework of Campaign Finance Law that Now Exists.

Over nearly a half century, then, the Supreme Court has again and again invalidated parts of Congress's campaign-finance framework—including several load-bearing timbers—in an effort to conform Congress's handiwork to the strictures of the First Amendment. The result is a crumbling legislative structure in which all but one or two pillars have collapsed and FECA's coordinated party spending limit serves no valid, let alone compelling, purpose.

While the national parties may have been "dominant players" in electoral politics when *Colorado II* was decided, 533 U.S. at 450, in the new reality wrought by Congress's legislation and the courts' decisions, permissible party coordinated spending has now been far outstripped by the "independent expenditures" of outside groups. *Id.* at 463.The Supreme Court's jurisprudence has correctly afforded this campaign spending the highest constitutional protection since *Buckley*, 424 U.S. at 14–20, and the Court's more recent decisions have emphatically reaffirmed this fundamental principle. *See WRTL*, 551 U.S. at 476–77. "Speech is an essential

mechanism of democracy, for it is the means to hold officials accountable to the people," the Court has insisted, and any "restriction on the amount of money a person or group can spend on political communication during a campaign . . . necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached," contrary to the First Amendment's most vital commands. *Citizens United*, 558 U.S. at 339 (citation omitted).

The Supreme Court's robust enforcement of the First Amendment's protection of independent campaign speech, particularly in the *Citizens United* decision, engendered the dramatic rise of the so-called "Super PAC"—political committees that engage solely in independent expenditures and, as a result, are constitutionally entitled to raise and spend unlimited amounts of money. Richard Briffault, *Super PACs*, 96 MINN. L. REV. 1644, 1647 (2012); *see SpeechNow.org v. FEC*, 599 F.3d 686, 694–95 (D.C. Cir. 2010). These Super PACs have eclipsed the parties themselves as the new "dominant players" in national electoral politics since *Colorado II* was decided, 533 U.S. at 450. The number of Super PACs grew *five-fold* between 2010 and 2012, Briffault, *supra*, at 1673–75, and in 2016, they spent

*over $1 billion* on the presidential election alone[2]—compared to the $23,821,100 in coordinated expenditures that the national parties were permitted to spend that year.[3]

As the role played in electoral politics by Super PACs and other outside groups has waxed, the role played by the parties has waned. This shift in power has partly come as a result of FECA's coordinated spending limit itself. That limit effectively stripped away "one of the competitive advantages that parties have in the race for campaign funding": the ability to "raise money to support its candidates on [a] basis distinct from any other contributor" and closely coordinate the spending of that money with the candidate's own strategic goals. Issacharoff, *supra*, at 864. And with that outlet of campaign spending severely restricted, "new outlets emerged for political donations outside the candidates and parties," most notably Super PACs *Id.* at 866.

The end result is that the limit challenged here restricts an activity—coordinated spending by political parties—that now occupies an utterly marginal place in what is left of FECA and BCRA after the Supreme Court decisions conforming those statutes to the First Amendment. While the parties' most effective means of influencing elections is tightly restricted by the coordinated spending limit,

---

[2] Ian Vandewalker, *Since Citizens United, a Decade of Super PACs*, BRENNAN CTR. (Jan. 14, 2020), https://bit.ly/3uNtLN7.

[3] *Coordinated party expenditure limits adjusted* (2016), FEC, https://bit.ly/3wMAuY0.

Super PACs are spending billions of dollars—completely unrestricted both in the amounts of contributions they can receive and the amounts of campaign speech they can fund—to influence election campaigns. Even if the coordinated party spending limit served some rational and valid purpose when FECA was enacted (and as shown *supra* in Part I, it did not), it certainly serves no such purpose today. Accordingly, it should be held unconstitutional.

## CONCLUSION

For the foregoing reasons, FECA's limit on coordinated party expenditures is invalid and should be struck down.

Dated: March 11, 2024                    Respectfully submitted,

/s/ Charles J. Cooper
Charles J. Cooper
Peter A. Patterson
John D. Ohlendorf
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C.  20036
Tel: (202) 220-9600
Fax: (202) 220-9601
Email: ccooper@cooperkirk.com

*Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation in Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6,499 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 23(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface, Times New Roman, in 14-point font using Microsoft Word.

Dated: March 11, 2024                                    /s/Charles J. Cooper
                                                         Charles J. Cooper

**CERTIFICATE OF SERVICE**

I hereby certify that on March 11, 2024, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: March 11, 2024                    /s/Charles J. Cooper
                                          Charles J. Cooper